## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN THE MATTER OF | : Hon. Cathy L. Waldor |
| THE EXTRADITION OF | : Mag. No. 23-9089 |
| STEVEN LEE | : COMPLAINT |
| | : **FILED UNDER SEAL** |

I, Carolyn Silane, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

1. I am an Assistant United States Attorney at the United States Attorney's Office for the District of New Jersey. In this matter, I represent the United States in fulfilling its treaty obligation to the Republic of Korea ("Korea").

2. There is an extradition treaty in force between the United States and Korea: Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea, U.S.-S. Korea, June 9, 1998, S. TREATY DOC. NO. 106-2 (1999) (the "Treaty").

3. Pursuant to the Treaty, the Government of Korea has submitted a formal request through diplomatic channels for the extradition of Steven Lee ("Lee").

4. According to the information provided by the Government of Korea, Lee is wanted for prosecution on three counts of occupational embezzlement and breach of trust in violation of Article 356 of the Act on the Aggravated Punishment etc. of Specific Economic Crimes ("the Act"). The offenses were committed within the jurisdiction of Korea.

5. On or about October 29, 2019, an arrest warrant was issued against Lee by Judge Yong-Shin Kim of the Seoul Central District Court, which remains outstanding. The extradition request presents the following facts, according to Korean authorities, as the basis for the arrest warrant and extradition request:

    a. Lone Star Funds ("LSF") is a private equity firm based in Dallas, Texas. During the relevant time, Lee was an LSF executive responsible for LSF's operations in Korea, including its subsidiaries Lone Star Advisors Korea ("LSAK") and Hudson Advisors Korea ("HAK"). In this role, Lee oversaw the investment

decisions of both LSAK and HAK. Between on or about December 8, 2000 and on or about October 15, 2004, Lee embezzled more than $3.4 million from LSAK and HAK through three separate transactions. For each transaction, Lee created phony invoices for fictional consulting services by entities that he secretly owned or controlled, approved payments by LSAK and HAK on those phony invoices, and routed the payments to himself.

        b.      The investigation into Lee's conduct began in or around August 2005, when LSF's General Counsel identified several questionable transactions Lee authorized on behalf of LSAK and HAK. When confronted by LSF's General Counsel and other senior LSF officials regarding these transactions, Lee admitted to misappropriating money for the benefit of himself and family members. LSF officials then authorized an independent investigation to determine the extent of Lee's misconduct. This investigation was jointly conducted by outside legal and financial firms between in or around early October 2005 and on or about December 30, 2005.

        c.      In or around October 2005, the Seoul Central District Prosecutors' Office also initiated an investigation into Lee and others at LSF in response to a written accusation from the Seoul Regional Tax Office. The results of LSF's independent investigation were also submitted to the prosecutors' office.

        d.      After examining the books and records of LSAK and HAK, LSF's outside investigation identified several suspect transactions and discovered documentary evidence of Lee's embezzlement, including fraudulent invoices and bank records proving Lee's unlawful receipt of funds. On or about November 29, 2005, the independent investigation's findings were presented to Lee and his attorney. Lee admitted that the transactions presented involved funds he misappropriated for his personal use or that of family members, and that he had approved these payments on fabricated invoices prepared either by him or at his direction.

        e.      The three transactions underlying the three criminal charges for which Lee's extradition is sought are described as follows:

### Transaction 1

        i.      On or about December 8, 2000, Lee directed the remittance of approximately $1,840,183.80 from LSAK to Shilla Advisors, Limited ("Shilla Advisors") as payment on a fabricated invoice that billed $2,359,210 for "consulting services for the acquisition of an office building in Seoul." According to the testimony of Heon-Choo Cheong ("Cheong"), CEO of HAK, in or around December 2000, Lee directed Cheong to pay the consulting fee to Shilla Advisors on behalf of LSAK. Cheong did so, believing the charge to be legitimate, though he thought that the amount to be paid to Shilla was "very huge."

        ii.      Shilla Advisors is a company Lee established in Hong Kong on or about June 2, 2000. Return of Allotments forms obtained from the Hong Kong

Companies Registry indicate that Lee and his wife are the only shareholders and serve as the Directors of the company.

iii. On or about December 29, 2000, Lee withdrew approximately $1.99 million from the Shilla Advisors account, transferring the money to his personal account at the Korea Exchange Bank.

iv. A consulting agreement between LSAK and Shilla Advisors listed Seong-Won Jeon ("Jeon"), Lee's stepfather, as the representative and signatory for Shilla Advisors. When questioned by authorities, Jeon revealed that he had never signed the agreement and had never heard of Shilla Advisors. He also stated that in or around November or December 2005, after the prosecutor's investigation had begun, Lee called him from abroad and "almost cried" as he apologized for using Jeon's name without permission.

**Transaction 2**

v. On or about November 5, 2003, Lee directed the payment by HAK of approximately KRW 1,102,400,000 (at the time, equivalent to approximately $932,304.93) to the account of Jong-Kwun Lee pursuant to a fabricated invoice for "consulting services" in the amount of approximately KRW 1,413,000,000. Cheong told Korean authorities that Lee instructed him to make the payment and to treat it as confidential. Accordingly, Cheong paid Jong-Kwun Lee from HAK's account and locked the invoice in a safe, which he had only done with two other invoices in six years (one of which was the invoice for the third transaction described below).

vi. Lee's mother, Su-Mi Lee, told Korean authorities that Jong-Kwun Lee was a longtime family friend and pastor to whom Lee was close. Su-Mi Lee testified that in or around October 2003, Lee informed her that a sum of money would be deposited into her account by Jong-Kwun Lee. The investigation by the prosecutor's office revealed that the approximately KRW 1,102,400,000 paid by HAK to Jong-Kwun Lee on or about November 5, 2003, was transferred to Su-Mi Lee's account later that same day. According to Su-Mi Lee, she then sent this money to Lee via wire-transfers or check whenever Lee requested by phone that she do so.

**Transaction 3**

vii. On or about October 15, 2004, Lee directed the transfer of approximately $700,000 from LSAK to G&D Investments pursuant to a fabricated invoice for "consulting services on Mercury ABS Specialty Company, LLC." According to Cheong, Lee told him that Lee had been approved for a performance bonus of $700,000 from LSAK by the LSF vice chairman. Lee told Cheong that, because the amounts of executive bonuses at LSF are kept confidential from other employees, Cheong should dispense the bonus to Lee under the guise of a consulting fee paid to G&D, a company owned and controlled by Cheong, and then transfer the money from

3

G&D directly to Lee.  Cheong admitted that G&D had rendered no services to LSAK and that he later transferred this money to Lee's personal account as instructed.  Lee later transferred this money to an account he held abroad.

    f. Lee departed Korea on or about May 14, 2005, just three months before LSF's investigation into his conduct began, and five months before the prosecutor's office began investigating him.

    g. A series of arrest warrants for Lee have been issued by the Seoul Central District Court.  The first was granted on or about July 19, 2006, and expired on or about October 14, 2011.  The second was granted on or about November 21, 2011, and expired on or about November 20, 2015.  The most recent warrant, granted on or about October 29, 2019, is currently enforceable and will expire on or about March 29, 2026.

    h. The extradition request contains Lee's registered foreigner record, which includes his fingerprints, and his domestic residence report, which includes his photograph.  On or about January 17, 2020, Gwang-Yeon Kim, who worked with Lee at LSAK from in or around August 1998 to in or around 2004, identified the photograph of Lee in the domestic residence report as the Steven Lee she knew at LSAK.

  6. According to information provided by the U.S. Marshals Service, Lee is expected to be found in New Jersey, within the jurisdiction of this Court.

  7. Tom Heinemann, an attorney in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and providing a copy of the Treaty.  The declaration states that the offenses for which extradition is sought are covered by the Treaty and confirms that the documents supporting the request for extradition are properly certified by the principal U.S. diplomatic or consular officer in Korea, in accordance with 18 U.S.C. § 3190, enabling them to be received into evidence.

  8. The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from Korea, a copy of the Treaty, and the certified documents submitted in support of the request, (marked collectively as Exhibit 1) are filed with this complaint and incorporated by reference herein.

  9. Lee would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests: (1) that a warrant for the arrest of STEVEN LEE be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Korea, so that the fugitive may be arrested and brought before this Court so that evidence of criminality may be heard and considered; and (2) that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

<u>  by phone                   </u>
AUSA Carolyn Silane
U.S. Attorney's Office
District of New Jersey


AUSA Carolyn Silane attested to this Affidavit by
telephone pursuant to F.R.C.P. 4. 1(b)(2)(A) on this
\_\_ day of February, 2023

<u> s/Cathy L. Waldor 2/24/23          </u>
HONORABLE CATHY L. WALDOR
UNITED STATES MAGISTRATE JUDGE

5