## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

In the Matter of the Extradition of    )      Mag. No. 23-9089

Steven Lee                              )


## MEMORANDUM OF EXTRADITION LAW
## AND REQUEST FOR DETENTION PENDING EXTRADITION
## PROCEEDINGS

The United States, in fulfilling its extradition treaty responsibilities and acting at the request of the Government of the Republic of Korea ("Korea"), requests that the fugitive, Steven Lee ("Lee" or "the fugitive"), be held without bond until the conclusion of the extradition process.  This memorandum summarizes the framework of extradition law in the United States and argues that Lee should be detained because he cannot overcome the strong presumption against bail in international extradition cases.  Specifically, Lee cannot meet his burden to show that he is not a risk of flight or that special circumstances warrant his release.

## BACKGROUND

### I.   PROCEDURAL HISTORY

Authorities in Korea seek Lee's extradition for three counts of occupational embezzlement and breach of trust in violation of Article 356 of the Act on the Aggravated Punishment etc. of Specific Economic Crimes ("the Act").   The United States, in accordance with its obligations under its extradition treaty with Korea[1]

---

[1] Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea, U.S.-S. Korea, June 9, 1998, S. TREATY DOC. NO. 106-2 (1999) (the "Treaty"), available at https://www.congress.gov/106/cdoc/tdoc2/CDOC-106tdoc2.pdf

and 18 U.S.C. §§ 3184 *et seq.*, filed a complaint in this District seeking a warrant for Lee's arrest.  The Honorable Cathy L. Waldor issued an arrest warrant, and Lee was arrested on or about March 2, 2023.  Lee is currently in the custody of the U.S. Marshals Service.

According to the materials Korea has provided, on or about October 29, 2019, an arrest warrant was issued against Lee by Judge Yong-Shin Kim of the Seoul Central District Court, which remains outstanding.  Lee is accused of embezzling over $3.4 million from his former employer, Lone Star Funds ("LSF") and its subsidiaries, Lone Star Advisors Korea ("LSAK") and Hudson Advisors Korea ("HAK"), between on or about December 8, 2000 and on or about October 15, 2004. He is alleged to have done so by, among other things: creating phony invoices for fictional consulting services purportedly provided by entities that he secretly owned or controlled; approving payments by LSF subsidiaries on those phony invoices; and routing the payments to himself.

## II.    FACTUAL BACKGROUND

The materials provided by the Government of Korea describe the following facts about Lee's alleged criminal acts:

The LSF Investigation

In or around August 2005, LSF's General Counsel identified several questionable transactions that Lee authorized on behalf of LSAK and HAK.  When confronted by LSF's General Counsel and other senior LSF officials regarding these transactions in or around September 2005, Lee admitted to misappropriating

money for his own benefit and that of his family members.  LSF officials then authorized an independent investigation to determine the extent of Lee's misconduct. After examining the books and records of LSAK and HAK, LSF's outside investigation identified several suspect transactions and discovered documentary evidence of Lee's embezzlement, including fraudulent invoices and bank records proving Lee's unlawful receipt of funds.  On or about November 29, 2005, the independent investigation's findings were presented to Lee and his attorney.  Lee again admitted that the transactions presented involved funds he misappropriated for his personal use or that of family members, and that he had approved these payments on fabricated invoices prepared either by him or at his direction.

The Korean Government Investigation

In October 2005, the Supreme Prosecutors' Office received a written accusation from the Seoul Regional Tax Office against four individuals at LSF, including Lee.  The written accusation against Lee stated that he had embezzled corporate funds from LSAK and HAK by making payments on phony invoices for services that were never rendered.  From in or around October 2005 to November 2005, the Seoul Central District Prosecutors' Office (the "Prosecutors' Office") reviewed the evidence and conducted additional investigation to prove the offenses committed by Lee.  During that investigation, the Prosecutors' Office determined that, on or about May 14, 2005, while the investigation by the Seoul Regional Tax Office was ongoing, Lee left Korea for the United States.  In doing so, he closed his

3

savings accounts, transferred all the money from those accounts overseas, and sold his house in Korea.

The three transactions underlying the three criminal charges for which Lee's extradition is sought are described as follows:

*Transaction 1*

On or about December 8, 2000, Lee directed the remittance of approximately $1,840,183.80 from LSAK to Shilla Advisors, Limited ("Shilla Advisors") as payment on a fabricated invoice that billed $2,359,210 for "consulting services for the acquisition of an office building in Seoul."  According to the testimony of Heon-Choo Cheong ("Cheong"), CEO of HAK, in or around December 2000, Lee directed Cheong to pay the consulting fee to Shilla Advisors on behalf of LSAK. Cheong did so, believing the charge to be legitimate, though he thought that the amount to be paid to Shilla was "very huge."

Shilla Advisors is a company Lee established in Hong Kong on or about June 2, 2000.  Return of Allotments forms obtained from the Hong Kong Companies Registry indicate that Lee and his wife are the only shareholders and serve as the Directors of the company.

On or about December 29, 2000, Lee withdrew approximately $1.99 million from the Shilla Advisors account, transferring the money to his personal account at the Korea Exchange Bank.

A consulting agreement between LSAK and Shilla Advisors listed Seong-Won Jeon ("Jeon"), Lee's stepfather, as the representative and signatory for Shilla

4

Advisors.  When questioned by authorities, Jeon revealed that he had never signed the agreement and had never heard of Shilla Advisors.  He also stated that in or around November or December 2005, after the prosecutor's investigation had begun, Lee called him from abroad and "almost cried" as he apologized for using Jeon's name without permission.

*Transaction 2*

On or about November 5, 2003, Lee directed the payment by HAK of approximately KRW 1,102,400,000 (at the time, equivalent to approximately $932,304.93) to the account of Jong-Kwun Lee pursuant to a fabricated invoice for "consulting services" in the amount of approximately KRW 1,413,000,000.  Cheong told Korean authorities that Lee instructed him to make the payment and to treat it as confidential.  Accordingly, Cheong paid Jong-Kwun Lee from HAK's account and locked the invoice in a safe, which he had only done with two other invoices in six years (one of which was the invoice for the third transaction described below).

Lee's mother, Su-Mi Lee, told Korean authorities that Jong-Kwun Lee was a longtime family friend and pastor to whom Lee was close.  Su-Mi Lee testified that in or around October 2003, Lee informed her that a sum of money would be deposited into her account by Jong-Kwun Lee.  The investigation by the prosecutor's office revealed that the approximately KRW 1,102,400,000 paid by HAK to Jong-Kwun Lee on or about November 5, 2003, was transferred to Su-Mi Lee's account later that same day.  According to Su-Mi Lee, she then sent this money to Lee via wire-transfers or check whenever Lee requested by phone that she do so.

*Transaction 3*

On or about October 15, 2004, Lee directed the transfer of approximately $700,000 from LSAK to G&D Investments pursuant to a fabricated invoice for "consulting services on Mercury ABS Specialty Company, LLC."  According to Cheong, Lee told him that Lee had been approved for a performance bonus of $700,000 from LSAK by the LSF vice chairman.  Lee told Cheong that, because the amounts of executive bonuses at LSF are kept confidential from other employees, Cheong should dispense the bonus to Lee under the guise of a consulting fee paid to G&D, a company owned and controlled by Cheong, and then transfer the money from G&D directly to Lee.  Cheong admitted that G&D had rendered no services to LSAK and that he later transferred this money to Lee's personal account as instructed.  Lee later transferred this money to an account he held abroad.

Lee departed Korea on or about May 14, 2005, during an investigation by the Seoul Regional Tax Office and just three months before LSF's investigation into his conduct began, and five months before the prosecutor's office began investigating him.  It is believed he has not returned to Korea since.

## ARGUMENT

## I.   LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

The extradition process is *sui generis*, neither a criminal nor a civil proceeding. For reference, we have outlined the United States' extradition scheme below, and have detailed the Court's circumscribed role in the extradition process.

### A.      The Limited Role of the Court in Extradition Proceedings

Extradition is primarily an executive function with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see also Sidali v. I.N.S.*, 107 F.3d 191, 195 (3d Cir. 1997), *cert. denied*, 522 U.S. 1089 (1998); *Cheung v. United States*, 213 F.3d 82, 87-88 (2d Cir. 2000). The Secretary of State, and not the Court, makes the decision regarding whether the fugitive should ultimately be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Sidali*, 107 F.3d at 195. "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role will be to consider the evidence presented on behalf of Korea and determine whether the legal requirements for certification—as defined in the treaty, statutes, and case law—have been established. *Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *Cheung*, 213 F.3d at 88. If the court finds that the requirements for certification have been met, the Court must furnish the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the United

States Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *see Cheung*, 213 F.3d at 88.

### B.    The Requirements for Certification

At the extradition hearing, the Court's review will be limited to determining whether: (1)  the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. *See Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006).  The following sections briefly discuss each finding the Court must make in order to issue the certification to the Secretary of State.

### 1.    Authority of the Court Over the Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States," but, rather, acts in a "non-institutional capacity by virtue of a special authority."  *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (cleaned up).  Both magistrate judges and district judges may render a certification under Section 3184.  *See*, *e.g.*, *Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993).  Here, Rule 5.1 of the Local Criminal Rules for the

District of New Jersey expressly delegates to magistrate judges the authority to handle extradition matters in accordance with 18 U.S.C. § 3184.  L.C.R. 5.1(k).

### 2. Jurisdiction Over the Fugitive

The court has jurisdiction over a fugitive found within its jurisdictional boundaries.  18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### 3. Treaty In Full Force and Effect

The extradition statute, 18 U.S.C. § 3184, provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States.  *See Hoxha*, 465 F.3d at 562; *United States ex rel Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997).  The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the Department of State, attesting that there is a treaty in full force and effect between the United States and Korea. The Court should defer to the Department of State's determination in that regard. *Garcia*, 109 F.3d at 170 ("[O]n the question whether [the extradition] treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance.") (cleaned up); *cf. Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184-85, (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

4.   <u>Crimes Covered by the Treaty</u>

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Here, the Treaty provides that "[a]n offense shall be an extraditable offense if, at the time of the request, it is punishable under the laws in both Contracting States by deprivation of liberty for a period of more than one year, or by a more severe penalty."  Treaty, Art. 2(1). Consequently, in assessing whether the Treaty covers the crimes for which extradition is requested, the Court will examine the description of criminal conduct that Korea has provided in support of its extradition request and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states.  *See Wright v. Henkel*, 190 U.S. 40, 61 (1903); *Hu Yau-Leung v. Soscia*, 649 F.2d 917, 918 & n.4 (2d Cir. 1981); *In re Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989).  A requesting country need not establish that its crimes are identical to ours.  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions."  *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *see United States v. Riviere*, 924 F.2d 1289, 1302–3 (3d Cir. 1991)); *see also* Treaty, Art. 2(3).

In fulfilling its function under Section 3184, the judicial officer should construe liberally the applicable extradition treaty in order to effectuate its purpose,

10

namely the surrender of fugitives to the requesting country.  *Factor v. Laubenheimer*, 290 U.S. 276, 298 (1933). Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902), the court should "approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) ("The point of an extradition treaty after all is to facilitate extradition . . . .").

    5. <u>Probable Cause that the Fugitive has Committed the Offenses</u>

    To certify the evidence to the Secretary of State, the court must next conclude that probable cause exists to believe that the person before it committed each of the offenses for which Korea seeks extradition.  Probable cause is established if there is evidence that "would support a reasonable belief that the defendant was guilty of the crime charged." *Sidali*, 107 F.3d at 199 (cleaned up); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.") (cleaned up); *Hoxha*, 465 F.3d at 561 ("The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings.").  The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted

11

evidence on which the decision to certify extradition is based." *Quinn*, 783 F.2d at 791 (cleaned up).

### C. The Extradition Hearing Follows Unique Procedures

As discussed above, extradition hearings are neither criminal nor civil proceedings. *See, e.g.*, *Austin*, 5 F.3d at 603 ("We have repeatedly noted, for example, that an extradition hearing is not a criminal prosecution: the order of extraditability expresses no judgment on [the fugitive]'s guilt or innocence."). "By design, 'the procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation.'" *Skaftouros v. United States*, 667 F.3d 144, 155 (2d Cir. 2011) (quoting *First Nat'l City Bank v. Aristeguieta*, 287 F.2d 219, 226 (2d Cir. 1960)). Those advantages are as follows.

#### 1. Extradition Hearings Rely on Written Submissions and Do Not Require Live Witnesses

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *see also, e.g.*, *Skaftouros*, 667 F.3d at 155 n.16; *In re Extradition of Bolanos*, 594 F. Supp. 2d 515, 519 (D.N.J. 2009).

Further, hearsay evidence is admissible at an extradition hearing.  *See Collins*, 259 U.S. at 317 (stating that "unsworn statements of absent witnesses may be acted upon by the committing magistrate"); *Hoxha*, 465 F.3d at 561; *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y.), *aff'd*, 478 F.2d 1397 (2d Cir. 1973) ("A determination of probable cause in an extradition proceeding may rest entirely upon hearsay.").  Accordingly, a certification of extraditability may be, and typically is, based entirely on the authenticated documentary evidence and information the requesting government provides.  *See, e.g.*, *Harshbarger v. Regan*, 599 F.3d 290, 294 (3d Cir. 2010) (finding that Canadian law enforcement officers' affidavits  were competent proof and "provided ample evidence of probable cause"); *Skaftouros*, 667 F.3d at 155 n.16; *In re Extradition of Breyer*, 32 F. Supp. 3d 574, 582 (E.D. Pa. 2014) ("[T]his evidence can be based entirely on authenticated documentary evidence and/or written statements by foreign prosecutors or judges summarizing the evidence expected to be used.") (citing *Rice v. Ames*, 180 U.S. 371, 375–76, (1901)).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *Shapiro v. Ferrandina*, 478 F.2d 894, 902 (2d Cir. 1973).

       2.   <u>Limitations on Fugitives' Defenses in Extradition Proceedings</u>

Because an extradition hearing is not a criminal trial, a fugitive's defenses in extradition proceedings are heavily circumscribed.  For example, a fugitive has: (i) no Sixth Amendment right to a speedy extradition, *see, e.g.*, *Yapp v. Reno,* 26 F.3d

1562, 1565 (11th Cir. 1994); (ii) no Fifth Amendment protection against successive extradition proceedings, *see, e.g.*, *In re Extradition of McMullen*, 989 F.2d 603, 612-13 (2d Cir. 1993); (iii) no ability to invoke the exclusionary rule, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); (iv) no right to confront accusers, *see, e.g.*, *Bingham,* 241 U.S. at 517; (v) no right to invoke defenses that "savor of technicality," *see id.*; (vi) no right to introduce affirmative defenses, *see, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 461 (1913); and (vii) no right to discovery, *see, e.g.*, *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976); *In re Extradition of Singh,* 123 F.R.D. 108, 115 (D.N.J. 1987).

Relatedly, a fugitive's right to present evidence is severely constrained. "In the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country." *Messina*, 728 F.2d at 80; *see Charlton*, 229 U.S. at 457-58; *Hoxha*, 465 at 561. Accordingly, "evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing." *Shapiro*, 478 F.2d at 901. "[S]tatements [that] would in no way explain . . . or . . . obliterate the government's evidence, but would only pose a conflict of credibility . . . should properly await trial in [the country seeking extradition]." *Id.* at 905 (cleaned up).

3. <u>Rule of Non-Inquiry: All Matters Other Than Certification Are Reserved for the Secretary of State</u>

All matters a fugitive may raise as defenses to extradition, other than those related to the requirements for certification, are for the Secretary of State to consider, not the Court. *See* 18 U.S.C. §§ 3184, 3186. This comports with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State," within the executive's powers to conduct foreign affairs. *See In re Kaine*, 55 U.S. 103, 110 (1852); *see also Ahmad v. Wigen*, 910 F.2d 1063, 1066-67 (2d Cir. 1990).

## II.   LEE SHOULD BE DETAINED

### A.   Applicable Law

1. <u>A Strong Presumption Against Bail Governs in International Extradition Proceedings</u>

The federal statute governing extradition procedures in the United States, 18 U.S.C. §§ 3184 *et seq.*, does not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply here because an extradition proceeding is not a criminal case. *See Collins*, 259 U.S. at 316.[2]

Rather, unlike in domestic criminal cases, "[t]here is a presumption against bail in extradition cases." *Hababou v. Albright*, 82 F. Supp. 2d 347, 351 (D.N.J. 2000) (citing *Wright*, 190 U.S. 40). "[B]ail should be granted only in the most

---

[2] The Bail Reform Act applies only to "offenses" against the United States that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Lee is not accused of an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed against the requesting state, Korea.

pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).; *see also In re Extradition of Mejuto*, No. 14-M-515, 2014 WL 2710948, at *5 (E.D. Pa. June 13, 2014) ("There is no entitlement to or presumption in favor of bail in extradition cases; rather the general rule is that bail should be denied except based upon a showing of special circumstances.") (citing *Wright*, 190 U.S. at 61–62).

This presumption against bail is rooted in *Wright v. Henkel*, where the Supreme Court explained that when a foreign government makes a proper request under a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

When, as here, the Government of Korea meets the conditions of the treaty, the United States is obliged to deliver the fugitive.  It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their

reciprocal obligations to the United States.  Such reciprocity would be defeated if a fugitive flees after being released on bond.  *See id.* at 62; *see also Leitner*, 784 F.2d at 160-61 (noting that the Government has an overriding foreign relations interest in complying with treaty obligations and producing extradited persons).

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the court that is seeking the accused's presence for trial, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave Korea without either remedy or compensation.

    2.  <u>Fugitives Must be Detained Unless They Establish "Special Circumstances" and Also Demonstrate that They are Neither A Flight Risk Nor A Danger to the Community</u>

In light of the strong presumption against bail established in *Wright*, a fugitive may not be released on bail unless he demonstrates that (1) he is neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant his release. *See, e.g.*, *Leitner*, 784 F.2d at 160; *Hababou,* 82 F. Supp. 2d at 351 ("Special circumstances are limited to those situations in which the justification for release is pressing as well as plain."); *In re Extradition of Rovelli*, 977 F. Supp. 566, 568 (D. Conn. 1997).[3]  "This 'special circumstances' standard is much stricter than

---

[3] "[T]here is disagreement among the federal district courts regarding the burden of persuasion that a potential extraditee must satisfy . . . . [Some] courts require the person subject to international extradition to overcome the presumption against bail by presenting clear and convincing evidence that bail is warranted. . . . [and t]here is a negligible minority of courts that have adopted a preponderance of the evidence standard." *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 481 (S.D. Tex. 2010).  The Third Circuit has not yet weighed in, but this Court need not decide the issue here because bail is unwarranted under either standard.

the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *Leitner*, 784 F.2d at 160; *Rovelli*, 977 F. Supp. at 567-68. Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995). In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also, e.g.*, *Hababou*, 82 F. Supp. 2d at 352.

"[C]ourts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extraditees." *Garcia*, 761 F. Supp. 2d at 472. Courts have

considered and rejected a lengthy list of would-be special circumstances, among

them:

- The COVID-19 pandemic, *see, e.g.*, *In re Extradition of Rollo*, No. 20-mc-80746-, 2020 WL 13379288, at *2 (S.D. Fla. May 28, 2020) (COVID-19 not "special circumstance" when no evidence that jail "is unable to provide adequate medical treatment should [fugitive] contract COVID-19"); *see also Risner v. Fowler*, No. 3:19-cv-03078, 2020 WL 2110579, at *7 (N.D. Tex. May 1, 2020); *Valentino v. United States Marshal*, No. 4:20-cv-304, 2020 WL 1950765, at *2 (S.D. Tex. Apr. 15, 2020);

- The complexity of the pending litigation, *see, e.g.*, *Kin-Hong*, 83 F.3d at 525; *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271-72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *Beresford-Redman*, 753 F. Supp. 2d at 1089-90; *Duran v. United States*, 36 F. Supp. 2d 622, 628 (S.D.N.Y. 1999); *Rovelli*, 977 F. Supp. at 568;

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 173-74 (S.D.N.Y. 2009); *Bolanos v. Avila*, No. 09-cv-1208, 2009 WL 3151328, at *4 (D.N.J. 2009); *In re Extradition of Hamilton-Byrne*, 831 F. Supp. 287, 290-91 (S.D.N.Y. 1992);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *In re Extradition of Knotek*, No. 13-9204, 2016 WL 4726537, at *3, 7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- • The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- • The availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- • Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1297-98 (S.D. Fla. 2017); *Antonowicz*, 244 F. Supp. 3d at 1070; *In re Klein*, 46 F.2d 85, 85 (S.D.N.Y. 1930); and

- • Availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 244 F. Supp. 3d at 1070; *Garcia*, 615 F. Supp. 2d at 172; *In re Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *2 (C.D. Cal. July 1, 2004).

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

## B. Analysis

The Court should detain Lee without bond because Lee presents a significant flight risk. *First*, Lee left Korea after committing his crimes but before he could be arrested and face prosecution, and it is believed that he has not been back since. *See, e.g.*, *United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the

context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges.  The intent is the same—the avoidance of prosecution.") (citing *Jhirad*, 536 F.2d at 483).  The Court therefore has reason to surmise that he will continue trying to evade justice.

*Second*, Lee's history reflects that he has the resources and skills to flee.  The materials from Korea reflect that Lee, a former executive of a private equity firm, conducted a sophisticated scheme to embezzle millions of dollars through shell entities over a period of years.

*Third*, now that Lee is aware that Korea seeks his extradition, he has strong incentive to flee further, either to a third country or to an underground location within the United States.  As noted above, the upcoming extradition proceedings are limited in scope and afford Lee few rights, and the Government's burden to establish extraditability is relatively light.  *See, e.g.*, *Garcia*, 761 F. Supp. 2d at 483 (finding that fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there are significant risks that he will be formally extradited").  Moreover, the seriousness of the potential penalty he faces in Korea (ten years imprisonment for each of the three counts for which extradition is sought) incentivizes his flight.  *See, e.g.*, *In re Extradition of Shaw*, No. 14-mc-81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6,

21

2015) (noting that "the [fugitive] is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee").

The flight risk that Lee poses is, alone, fatal to his request for bail.  However, even if the Court were satisfied that the fugitive were not a flight risk and posed no danger to the community here or abroad, the Government is unaware of any "special circumstances" that would justify bail in this case.  Allowance of bail in any amount would not guarantee the fugitive's presence in court and would invite the possibility of the United States failing in its international obligations and causing embarrassment in the conduct of its foreign affairs.[4]

---

[4] Should, however, the Court be inclined to grant bail in this case, counsel for the Government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Korea, counsel requests that the Court notify the parties a reasonable time in advance of any contemplated release order so that the United States can consider the matter of whether, under the circumstances, to seek a stay pending possible appeal on the bail issue.

III.   **CONCLUSION**

For the foregoing reasons, the United States requests that the fugitive be detained pending resolution of the extradition proceedings.


Dated: March 5, 2023                                    Respectfully submitted,


                                                        PHILIP R. SELLINGER
                                                        United States Attorney


                                                        By:    s/ *Carolyn Silane*

                                                        Carolyn Silane
                                                        Assistant United States Attorney