## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

In the Matter of the Extradition of Steven
Lee

Mag No. 23-9089

Hon. Cathy L. Waldor

---

## BRIEF OF RESPONDENT STEVEN LEE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR EXTRADITION

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

*Attorneys for Respondent,*
*Steven Lee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

Preliminary Statement ................................................................................................ 1

Statement of Facts ...................................................................................................... 3

    I.    United States Citizenship and Residence ......................................................... 3

    II.    Temporary Work Abroad in Korea for Employer Lone Star .......................... 3

    III.    Korean Cultural and Political Backlash Against Lone Star and Other Foreign Investors ......................................................................................................... 5

    IV.    Mr. Lee's Return Home to the United States and Departure from Lone Star ....... 6

    V.    Mr. Lee's Open Life in the United States .................................................... 8

    VI.    Korea's Arbitration with Lone Star and Interest in Mr. Lee as a Potential Witness in those Civil Proceedings .......................................................................... 10

        a.    The Asian Financial Crisis and Lone Star's Purchase of KEB ................ 10

        b.    Korean Government Investigation of Lone Star ...................................... 14

        c.    The Korean Government Opts Not to Pursue Mr. Lee's Arrest or Extradition for Roughly A Decade Following Its Investigation. .............. 17

        d.    Lone Star Initiates Investor-State Arbitration Against Korea, Claiming Billions in Damages ................................................................................. 20

        e.    Facing Potential Liability In Lone Star Arbitration, the Korean Government Opts To Pursue Mr. Lee's Arrest. ....................................... 22

        f.    Following the Arbitration Award in Favor of Lone Star, Mr. Lee is Arrested Here and Released on Bail. ....................................................... 26

Argument ................................................................................................................. 28

    I.    Korea Seeks Mr. Lee's Extradition for Purposes Not Permitted by the Treaty.... 30

        a.    Korea's Extradition Request Contravenes Article 1 of the Treaty Permitting Extradition Only For "Prosecution, Trial, Or Imposition Or Execution of Punishment." ...................................................................... 30

        b.    Extradition of Mr. Lee Would Also Violate Article 15 and The Rule of Speciality.................................................................................................. 36

    II.    Extradition is Unavailable Because The Statutes of Limitations of Both the United States and Korea Have Expired. ............................................................................ 40

        a.    Application of the Statute of Limitations is Appropriately Before the Court. ....................................................................................................... 42

        b.    Mr. Lee's Extradition is Time-Barred Under United States Law. ............ 46

            i.    Applying the five-year statute of limitations, the offenses alleged became time barred on December 8, 2005, November 8, and

i

October 15, 2009, respectively—the last of which occurred nearly fifteen years ago. ......................................................................... 46

ii.    Because Mr. Lee did not flee from justice, the limitations period has not been tolled under U.S. law. ............................................. 48

c.    Mr. Lee's Extradition is Time-Barred Under Korean Law ...................... 52

III.    The "Humanitarian Exception" and The Convention Against Torture Prohibit Mr. Lee's Extradition ................................................................................ 58

CONCLUSION ................................................................................................................ 64

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguasvivas v. Pompeo*,
    984 F.3d 1047 (1st Cir. 2021) ...................................................................31, 36, 37

*Matter of Burt*,
    737 F.2d 1477 (7th Cir. 1984) ................................................................................59

*Cheung v. United States*,
    213 F.3d 82 (2d Cir. 2000)......................................................................................28

*Credit Suisse Sec. (USA) LLC v. Simmonds*,
    566 U.S. 221 (2012)................................................................................................47

*Curry v. Mississippi Dep't of Corr.*,
    No. 13-76, 2013 WL 2469630 (S.D. Miss. June 7, 2013), *aff'd sub nom.*
    *Curry, Jr. v. Mississippi Dep't of Corr.*, 586 F. App'x 165 (5th Cir. 2014) ...................46, 53

*Dongkuk Int'l, Inc. v. U.S. Dep't of Just.*,
    204 F. Supp. 3d 18 (D.D.C. 2016) ..........................................................................31

*E. Airlines, Inc. v. Floyd*,
    499 U.S. 530 (1991)................................................................................................42

*In re Extradition Bolanos*,
    594 F. Supp. 2d 515 (D.N.J. 2009) .........................................................................28

*Matter of Extradition of Ahn*,
    602 F. Supp. 3d 1304 (C.D. Cal. 2022) ..................................................................39

*In re Extradition of Azra Basic*,
    No. 11-MJ-5002, 2012 WL 3067466 (E.D. Ky. July 27, 2012) .............................51

*In re Extradition of Handanovic*,
    829 F. Supp. 2d 979 (D. Or. 2011) ...................................................................48, 51

*in re Extradition of Harshbarger*,
    600 F. Supp. 2d 636 (M.D. Pa. 2009) ........................................................41, 45, 46

*In re Extradition of Rana*,
    No. 20-7309, 2023 WL 3506410 (C.D. Cal. May 16, 2023) ..................................39

*In re Extradition of Sidali*,
    899 F. Supp. 1342 (D.N.J. 1995) ................................................................41, 45, 46

iii

*in re Extradition of Yoo,*
  2021 WL 2784836 (S.D.N.Y. July 2, 2021) ....................................................46, 47

*Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli,*
  575 F.3d 693 (7th Cir. 2009) ................................................................................10

*Gallina v. Fraser,*
  278 F.2d 77 (2d Cir. 1960)....................................................................................58

*Harris v. Kellogg, Brown & Root Servs., Inc.,*
  796 F. Supp. 2d 642 (W.D. Pa. 2011)...................................................................43

*Heraeus Med. GmbH v. Esschem, Inc.,*
  927 F.3d 727 (3d Cir. 2019)..................................................................................43

*Hernandez v. Johnson & Johnson Consumer Inc.,*
  No. 19-15679, 2023 WL 2634496 (D.N.J. Mar. 24, 2023) ...................................42

*Hoxha v. Levi,*
  465 F.3d 554 (3d Cir. 2006)..................................................................................58

*Iwanowa v. Ford Motor Co.,*
  67 F. Supp. 2d 424 (D.N.J. 1999) .........................................................................43

*James P. B. v. Edwards,*
  No. CV 21-4810 (JMV), 2021 WL 2981044 (D.N.J. July 15, 2021) .....................62

*Jean v. Mattos,*
  No. 13-5346, 2014 WL 885058 (D.N.J. Mar. 5, 2014) .........................................28

*Jiménez v. Aristeguieta,*
  311 F.2d 547 (5th Cir.1962) .................................................................................37

*Mironescu v. Costner,*
  480 F.3d 664 (4th Cir. 2007) ................................................................................39

*Nagy v. United States,*
  No. 4:18 CV 416, 2018 WL 3999683 (N.D. Ohio June 19, 2018).........................43

*Noeller v. Wojdylo,*
  922 F.3d 797 (7th Cir. 2019) ................................................................................45

*In re Extradition of Betrand,*
  No. 85-0158J-01, 1986 WL 8845 (D.N.J. June 13, 1986)..........................41, 45, 46

*Patterson v. Wagner,*
  785 F.3d 1277 (9th Cir. 2015) ..............................................................................42

*Perenco Ecuador Ltd. v. Republic of Ecuador,*
No. 1:19-CV-2943, 2023 WL 2536368 (D.D.C. Mar. 16, 2023) ............................................34

*Prushinowski v. Samples,*
734 F.2d 1016 (4th Cir.1984) ...................................................................................................58

*Santos v. Thomas,*
830 F.3d 987 (9th Cir. 2016) ....................................................................................................45

*SEC v. Pence,*
323 F.R.D. 179 (S.D.N.Y. 2017) ..............................................................................................47

*TIG Ins. Co. v. EIFlow Ins. Ltd.,*
No. 14-CV-459, 2015 WL 5714686 (D.N.H. Sept. 29, 2015)...................................................53

*Trinidad y Garcia v. Thomas,*
683 F.3d 952 (9th Cir. 2012) ....................................................................................................58

*United States v. Alvarez-Machain,*
504 U.S. 655 (1992).................................................................................................................31

*United States v. Ballesteros–Cordova,*
586 F.2d 1321 (9th Cir.1978) ...................................................................................................48

*United States v. Bilic,*
625 F. Supp. 3d 1214 (D. Utah 2022) ......................................................................................45

*United States v. Bogue,*
No. 98-572-M, 1998 WL 961369 (E.D. Pa. Dec. 11, 1998).........................................41, 45, 46

*United States v. Duff,*
931 F. Supp. 1306 (E.D. Va. 1996) ....................................................................................48, 50

*United States v. Gentile,*
235 F. Supp. 3d 649 (D.N.J. 2017) .....................................................................................47, 48

*United States v. Kin-Hong,*
110 F.3d 103 (1st Cir. 1997).............................................................................................45, 58, 59

*United States v. Kin-Hong,*
No. 96-1386 ..............................................................................................................................59

*United States v. Landfried,*
No. 19-cr-8, 2021 WL 5417515 (W.D. Pa. Nov. 19, 2021) ................................................48, 50

*United States v. Levine,*
658 F.2d 113 (3d Cir. 1981)......................................................................................................47

*United States v. Livingston,*
    404 F. App'x 685 (3d Cir. 2010) ...................................................................48, 52

*United States v. Mendoza,*
    4 F. App'x 94 (2d Cir. 2001) .............................................................................47

*United States v. Porumb,*
    420 F. Supp. 3d 517 (W.D. La. 2019)...............................................................39

*United States v. Rauscher,*
    119 U.S. 407 (1886)...........................................................................................37

*United States v. Riviere,*
    924 F.2d 1289 (3d Cir. 1991)............................................................................37

*United States v. Thomas,*
    322 F. A'ppx 177, 181 (3d Cir. 2000) ............................................37, 38, 39, 40

*United States v. White,*
    488 F.2d 660 (8th Cir. 1973) ............................................................................49

*Villines v. Harris,*
    487 F. Supp. 1278 (D.N.J. 1980) .....................................................................42

*Yoo v. United States,*
    43 F.4th 64 (2d Cir. 2022) ................................................................................42

**Statutes**

18 U.S.C § 20................................................................................................................47

18 U.S.C. § 1343....................................................................................................46, 47

18 U.S.C. § 3184....................................................................................................28, 39

18 U.S.C. § 3282..............................................................................................29, 41, 46

18 U.S.C. § 3290..........................................................................................................48

18 U.S.C. § 3293(2).....................................................................................................47

**Treatises**

RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 306 .....................................31

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 477. .....................................37

**Regulations**

U.S. Dep't of State Regulations, 7 Foreign Affairs Manual 1612.................................................36

## PRELIMINARY STATEMENT

The Republic of Korea here seeks the extradition of Steven Lee, an American citizen, who has been living a peaceful and law-abiding life with his family here in New Jersey since 2005; before that, he lived in the United States since birth, other than a brief period during which he worked in Korea for his then-employer.

The extradition request before the Court is based upon actions that occurred between 19 and 24 years ago and which have already been the subject of civil litigation between Mr. Lee and his former employer, the purported victim of the embezzlement alleged in the extradition complaint. That victim, Lone Star Global Acquisition, LLC ("Lone Star"), has written to the Court making clear that it and Mr. Lee previously reached a mutual settlement and satisfactorily resolved all claims against each other, including related to the alleged embezzlement. It seeks no further redress, let alone the prosecution of Mr. Lee.

As set forth in detail below, Korea's request should be denied for three reasons. *First*, the historical record makes clear that the purpose of the extradition is not, in fact, to prosecute Mr. Lee for offenses against Korea at all, let alone for the ones set forth in the extradition request, but so that Korea—under great and longstanding public pressure to do so—can attempt to seek new evidence in an ongoing civil dispute with Lone Star, one that has resulted in a much-criticized international arbitration award in favor of Lone Star. But extradition treaties cannot be used for such purposes. By its terms, the treaty between the United States and Korea, which includes a strong statement of the Doctrine of Specialty (allowing extradition only for the purposes set forth in the extradition request) does not permit the use that Korea seeks to make of the treaty here.

*Second*, that same treaty contains a lapse of time provision, pursuant to which one cannot be extradited for actions that would be barred by statutes of limitation in either Korea or the United States. As Judge Clarke held in finding the exceptional circumstances pursuant to which Mr. Lee

1

has been released on bail here, that provision is applicable in this case, given that the offenses occurred so long ago that they would certainly be statute-barred in either country. Nor was either statute tolled by virtue of Mr. Lee's departure from Korea, which occurred even before any investigation of him had been launched; that departure was in process well before he left Korea for good. Indeed, Mr. Lee began preparations to return his family in the United States in 2003 and was primarily living in the United States with only brief trips to his company's Korean office by the end of 2004. Thus, he could not, under the law of either nation, be deemed a fugitive from justice, particularly because since that time he has lived so openly in the United States, including making himself available to Korean authorities when they wished to speak to him.

*Third,* and finally, Mr. Lee's return to Korea, especially given the notoriety of the dispute between Korea and Lone Star, his former employer, would present the very high risk of his torture and abuse, as is endemic to the Korean detention system. Having recently suffered a heart attack, Mr. Lee's condition is tenuous, and the Korean detention system's consistent failure to provide adequate medical care exacerbates the likelihood of very dire, tragic consequences should he be extradited, in contravention of international law.

In sum, and on many levels, Mr. Lee's requested extradition would be unlawful, and should be denied, and Mr. Lee should be released from the strict conditions of his bail and allowed to resume the constructive and law-abiding life, dedicated to family and faith, that he has lived for the more than two decades since the acts alleged in this case. Korea's request for extradition, so obviously a subterfuge to assist it to gain leverage in its long battle with foreign investors in general and Lone Star in particular, should be denied.

## STATEMENT OF FACTS

### I.   United States Citizenship and Residence

Steven Lee is a 54 year-old United States citizen, husband, and father.[1]  He was born and raised in the United States, and he has raised his own family here.  Born in Los Angeles in 1969, Mr. Lee grew up in Southern California, attending public elementary and private high school.  He graduated from UCLA with a bachelor's degree in economics in 1991 and from Harvard Business School with an M.B.A. in 1995.  Thereafter, he took a position working for Lone Star, a private equity fund in Dallas, and started a family in Texas.  After several years, his company asked him to open an Asian office in the Republic of Korea ("Korea" or "South Korea").  Following  a period of temporary (and intermittent) work abroad over six years in the late 1990s and early 2000s, Mr. Lee returned to the U.S. and raised his two sons in Short Hills, New Jersey; he continues to reside in Mountainside, New Jersey with this wife, Mia.  His sons Jonathan (26) and Andrew (22), both of whom work for Goldman Sachs, were educated in New Jersey and now live nearby in New York City.  In short, Mr. Lee has lived with his family in New Jersey for nearly the last twenty years.  He has no criminal record and remains an active member of his local community, including his church community where he has served on boards and as a youth minister.

### II.   Temporary Work Abroad in Korea for Employer Lone Star

Nearly 25 years ago, Mr. Lee's employer, Lone Star, began to look for investment opportunities in Asia.[2]  In 1997, the Korean financial sector had experienced a serious financial crisis (the "Asian Financial Crisis").  *See* Certification of Anne M. Collart ("Collart Cert."), Ex. 2

---

[1]Mr. Lee's citizenship is relevant because the obligations pursuant to the United States-Korean Extradition Treaty are more lenient with respect to nationals.  *See*  Art. 3(1) ("Neither Contracting State shall be bound to extradite its own nationals[.]").

[2]At the time, Mr. Lee had visited Korea twice in his entire life (once for a week when he was 22, and once when he was 27).  *See* ECF No. 1-1 at 59.

(Expert Opinion and Report of Ambassador Martin Uden (hereinafter "Amb. Uden Report")), ¶¶ 30-31.  The value of the Korean Won fell precipitously relative to the U.S. dollar, and substantial Korean companies and financial institutions suffered extreme distress, were forced into bankruptcy, or were acquired by other companies; "the Korean government had to seek assistance from the [International Monetary Fund (IMF)] in the face of stock market collapse, negative economic growth, rising unemployment and interest rates," and as a condition of that aid, the IMF required that the Korean financial sector permit greater foreign participation.  Amb. Uden Report ¶¶ 31-32.

Given Korea's need for foreign capital and the resulting opportunities for U.S. investors, in February 1999, Texas-based Lone Star established Lone Star Advisors Korea ("LSAK") and Hudson Advisors Korea ("HAK") to identify, manage and service its investments in Korea.  Lone Star assigned Mr. Lee to become its Country Manager in charge of the new office in Seoul.  When he began his new position in Korea, Mr. Lee's family initially remained in the United States, so Mr. Lee traveled back and forth between the two countries in early 1999.  *See* ECF No. 1-1 at 59-60.  By the end of February, Mr. Lee's wife and young son, Jonathan, moved from Dallas, Texas to join him in Seoul, Korea.

Under Mr. Lee's leadership, Lone Star made a number of successful investments in Korean real estate and companies.  For example, Mr. Lee identified as an investment opportunity the Star Tower, which was then an unfinished office building in downtown Seoul.  Lone Star purchased the Star Tower in 2001 and, three years later, sold the property at a profit of over $200 million.  Most notably, Mr. Lee was instrumental in Lone Star's acquisition of a controlling interest in Korea Exchange Bank ("KEB"), then Korea's fifth largest bank (discussed in more detail *infra*), also proved a very profitable investment for Lone Star.

### III.   Korean Cultural and Political Backlash Against Lone Star and Other Foreign Investors

The business successes of Lone Star and other foreign investors, however, were not without cultural and political backlash in Korea.  The Korean Government and Korean businesses needed foreign capital, but often resented and retaliated against those who supplied it.  The provision of foreign capital was inextricably linked to the Asian Financial Crisis and the widespread bankruptcies and fire sales of distressed assets that were the result of it, angered and embarrassed many Koreans, and was a source of humiliation and political difficulty for the Korean Government.  In short, "Koreans saw the crisis as a humiliation, caused by factors outside Korea's control and not one brought about by any significant fault on Korea's part."  Amb. Uden Report ¶ 33.  The subsequent "foreign investment in the Korean financial sector was seen as highly unwelcome."[3] *Id.* at ¶ 34.

Korean politicians, press, and public opinion viewed Lone Star, in particular, with resentment and distain.  Thus, Lone Star became a symbol of all foreign investors and was virulently criticized for its excessive profits, which were viewed as draining national wealth.  *See*, *e.g.*, B.J. Lee, *'Speculative' funds are under fire for big profits*, NEWSWEEK INTERNATIONAL (Nov. 28, 2005); Martin Fackler, *South Korea Blames its Growing Pains on 'Vulture' Funds*, THE INTERNATIONAL HERALD TRIBUNE (July 4, 2006).[4]  For example, the spokesperson for one Korean labor group claimed that Lone Star was guilty of "siphoning astronomical amounts of national wealth out of our country.  What did they do in return?  They laid off workers.  Talk about

---

[3]In particular, Koreans had developed a perception that "Korean financial companies had received substantial government support and then been sold at massive profits by foreign buyers with clever accounting to avoid Korean tax."  Amb. Uden Report. ¶ 36.

[4]Copies of these articles are provided for the Court's convenience.  *See* Collart Cert. Exs. 32, 33 (articles from the International Herald Tribune and Newsweek International).

injustice!"  Choe Sang-Han, *In Seoul, fears return of foreign investors*, THE NEW YORK TIMES (May 12, 2005), https://www.nytimes.com/2005/05/12/business/worldbusiness/in-seoul-fears-return-of-foreign-investors.html.  Thus, although foreign investors earned the large profits they did in part because they were willing to take substantial risks as Korean markets suffered a crisis, "[the] view, of foreign investors preying on the local economy, is one that held by many people in South Korea today." *Id.*

## IV.    Mr. Lee's Return Home to the United States and Departure from Lone Star

Meanwhile, Mr. Lee and his family moved forward with their plans to return to the United States.  In 2000, Mr. Lee returned here when his wife became pregnant with their second child.  In February 2000, knowing that the family would ultimately return to the United States where the children would be raised and attend school, Mr. Lee purchased a family home in Dallas, Texas.  *See* Collart Cert. Ex. 6 (Feb. 23, 2000 Deed for purchase of 12013 Edgestone Road, Dallas home).  Their second child, Andrew Lee, was born in December 2000, and the family remained in Texas until 2002, briefly returning to Korea again to join Mr. Lee where he continued to work.  *See* Collart Cert. Ex. 7 (June 5, 2002 Deed for sale of 12013 Edgestone Road, Dallas home).  In 2003, Mr. Lee's older son Jonathan was approaching school age, and Mr. Lee began preparations to more permanently relocate back to the United States with his family, ultimately purchasing a home in Short Hills, New Jersey that year.  *See* Collart Cert., Ex. 8 (emails regarding insurance quotes and storage information); Ex. 9 (Jan. 22, 2003 deed for purchase of 15 East Lane, Short Hills).  When proposed construction on that home was not approved by the local authorities, Mr. Lee sold the property, and purchased another, in the same town.  *See* Collart Cert. Ex. 11 (2003 emails regarding architectural plans); Ex. 10 (Apr. 19, 2004 deed of sale for 15 East Lane, Short Hills).  Specifically, on July 29, 2004, Mr. Lee purchased the home at which he and his family would reside for the next eight years and began transitioning his family—including himself—back to the United States.

*See* Collart Cert., Ex. 13 (July 29, 2004 deed for purchase of 18 Madison Terrace, Short Hills). That transition included, for example, obtaining a New Jersey driver's license with his new residence at 18 Madison Terrace in Short Hills, *see* Collart Cert., Ex. 14 (copy of Mr. Lee's 2004 driver's license), seeking recommendations for a variety of doctors and medical professionals in the New Jersey area, *see* Collart Cert., Ex. 15 (August 4, 2004 email exchange with Mary McNamara), and, in Fall 2004, enrolling Mr. Lee's son Jonathan in the first grade at Millburn Public School for the 2004-2005 school year, while his son Andrew began preschool at The Kent Place School Nursey Program nearby. *See* Collart Cert., Ex. 16 (Jonathan Lee report cards); Ex. 17 (Andrew Lee nursery certificate).

From then on, having moved his family back to the United States and having enrolled his sons in school, Mr. Lee, though still a Lone Star employee, was living in the United States. He traveled back to Korea for short business trips in order to conduct his job responsibilities there. His successor at Lone Star in Korea, Paul Yoo, officially registered as CEO of LSAK on July 25, 2003, *see* Collart Cert. Ex. 24 (Korean Business Registration Certificate), and by 2005, Mr. Lee was in Korea only so much as was necessary to transition his responsibilities to Mr. Yoo. That year, he visited for 4 days in January, 7 days in February, two weeks in March, 3 days in April, and 5 days in May. *See* ECF No. 1-1 at 66. By May 14, 2005, he was permanently in the United States, and he has never returned to Korea since.

Prior to Mr. Lee's departure from Lone Star, the company suspected that he had engaged in the misconduct alleged in the Complaint. *See* Collart Cert. Ex. 1 (Declaration of Rebecca Smith, Lone Star General Counsel), ¶ 4. The company raised its suspicions with Mr. Lee, who immediately agreed to—and did—cooperate with Lone Star's internal investigation. *Id.* ¶ 5. Lone Star and Mr. Lee subsequently asserted various claims against each other in multiple litigations

and ultimately reached a comprehensive settlement agreement in 2010, some 13 years ago, whereby both parties released the other from all potential liabilities associated with Mr. Lee's employment. *Id.* ¶ 6.  Lone Star is aware of this proceeding and has submitted a declaration from its General Counsel stating that "Lone Star considers all matters related to Mr. Lee's employment and alleged embezzlement to have been long since resolved," and "[a]ccordingly, Lone Star is not currently seeking, nor will it seek in the future, to pursue any claims or press charges against Mr. Lee in Korea, the United States, or any other jurisdiction." *Id.* ¶¶ 7-8.  *See also* Collart Cert. Ex. 25 (Letter from Lone Star General Counsel from bail hearing).

## V.     Mr. Lee's Open Life in the United States

Since returning home to the United States, Mr. Lee has lived openly without any efforts to hide his whereabouts. *See* ECF No. 12, Opinion and Order ("Op."), at 4 ("As regards the risk of flight, it is uncontested that Mr. Lee has lived openly in the United States since his return from Korea in 2005, despite the fact that the threat of criminal charges from Korea has persisted for approximately seventeen years.").   As is discussed further below, this included openly communicating with the Korean authorities who were investigating Lone Star.  Indeed, in 2006, Mr. Lee communicated frequently with Korean prosecutors in an effort to assist in their investigations, and he has always been available and able to be contacted through the same counsel as he has had throughout, had the Korean authorities wished to do so.  *See* Collart Cert. Ex. 20 (email communications between Mr. Lee's attorneys and Korean prosecutors).

Throughout the last eighteen years during which Mr. Lee has resided in the United States, he has lived completely openly and in only two places:  18 Madison Terrace in Short Hills (2004 to 2012) and 1414 Whipporwill Way in Mountainside (2012 to present).  *See* Collart Cert. Exs. 13, 5 (August 7, 2012 deed for purchase of 1414 Whippoorwill Way, Mountainside, NJ).  Those addresses were not, in any way, secret:  so open was his residence that on one occasion in 2022, a

Korean reporter came to Mr. Lee's home to seek an interview, having located Mr. Lee through public property records. *See, e.g.*, https://youtube.com/shorts/TKlI3794VUo?si=DUsWkrkn6XGof0Ma.

In addition to residing in the same state for nearly twenty years, Mr. Lee—a man of devout Christian faith—has been an active member of the Praise Presbyterian Church in Somerset, New Jersey. Mr. Lee attends public services and participates in various group activities at his church, such as serving as a youth group leader, college adviser, and adult fellowship group leader for the church community. Indeed, up until his arrest, Mr. Lee led a weekly sermon every Sunday to help welcome and integrate new members into the church community. *See* Collart Cert. Exs. 28, 29 (Letters from Pastors No, Huh, and Yang). He has also volunteered to lead the church's building maintenance committee, which included significant efforts related to repair and fundraising after the church's roof caved in last year. *Id.* And again, he has done all of this entirely openly.

Mr. Lee has never hidden his identity or whereabouts and never used an alias. He holds official government identifications, including both a New Jersey driver's license and a United States passport (currently being held by the Office of Pretrial Services), both indicating his real name and address. *See* Collart Cert. Ex. 12. Mr. Lee purchased his home in his own name (as opposed to, for example, via a limited liability company or other entity that would mask the identity of the property's owner) and is registered to vote. Almost immediately upon returning home to the United States, Mr. Lee also enrolled openly as a student in New York's vibrant academic community. For example, he enrolled in art history courses at Columbia University for the fall and spring 2005-2006 semesters, again using his real name. *See* Collart Cert. Ex. 18 (student ID card). Indeed, Mr. Lee's enrollment in Columbia University is of particular significance—and the furthest thing from flight—because, each year, Korean Government prosecutors also enroll at

9

Columbia University, typically as LLM students at Columbia Law School. For example, the current Korean Minister of Justice enrolled and obtained an LLM from Columbia in 2005, the same year Mr. Lee studied at the University. *See* Collart Cert. Ex. 3 (Expert Opinion and Report of Professor Sanghyun Lee (hereinafter "Prof. Lee Report")), ¶ 23(f).

## VI. Korea's Arbitration with Lone Star and Interest in Mr. Lee as a Potential Witness in those Civil Proceedings

### a. The Asian Financial Crisis and Lone Star's Purchase of KEB

While Mr. Lee returned to the US to raise his children and live a normal and upstanding life, a war was waged between his former employer, Lone Star, and the Korean Government. As previously noted, Mr. Lee was instrumental in Lone Star's acquisition of the Korean bank KEB, which came about following the Asian financial crisis of 1997. *See* Collart Cert. Ex. 19 (hereinafter "ICSID Award"[5]), ¶¶ 110, 113, 118. That crisis had particularly devastating consequences in Korea, resulting in widespread economic distress, bankruptcies of several large Korean industrial conglomerates, and loss of investor confidence in Korean markets. *See* David T. Coe and Se-Jik Kim, *Korean Crisis and Recovery*, INTERNATIONAL MONETARY FUND (Sept. 12, 2002), https://www.imf.org/external/pubs/nft /seminar/2002/korean/. As a result, foreign banks refused to provide credit lines to Korean financial institutions and many foreign investors pulled out of Korea. *Id.* The Korean Won lost more than 50% of its value from July to December 1997. Alice Ba, *Asian Financial Crisis*, BRITANNICA (Jul 27, 2023),

---

[5]Citations to "ICSID Award" are to the arbitration award issued by an international arbitral tribunal constituted under the auspices of the International Centre for Settlement of Investment Disputes in the matter *LSF-KEB Holdings SCA and others v. Republic of Korea*, ICSID Case No. ARB/12/37, Award (Aug. 30, 2022). An electronic copy of the decision is also available at https://italaw.com/cases/2022. Citations to the decisions are provided solely in order to establish background information and factual context. *See Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli*, 575 F.3d 693, 696 (7th Cir. 2009) ("An American court can take judicial notice of a foreign judgment.").

https://www.britannica.com/money/topic/Asian-financial-crisis.   Korea, on the brink of bankruptcy in November 1997, and seeing its foreign exchange reserves being depleted, had no choice but to seek international aid, including a bailout package from the IMF, part of The World Bank Group based in Washington, D.C.   David T. Coe and Se-Jik Kim, *Korean Crisis and Recovery*, INTERNATIONAL MONETARY FUND (Sept. 12, 2002), https://www.imf.org/external/pubs/nft/seminar/2002/korean/.   By December 1997, the IMF and Korea agreed upon a $58.4 billion bailout package, pursuant to which Korea agreed to modernize its financial markets, including by opening up its banking and securities sectors to foreign investment. *Id.*

During the years following the crisis, the Korean Government was responsible for identifying and dissolving failed financial institutions.  Jong-Wha Lee, *Twenty Years After The Financial Crisis In The Republic Of Korea*, ADBINSTITUTE (Nov. 2017), https://www.adb.org/sites/default/files/publication/378801/adbi-wp790.pdf.  Thus, in 1998, Korea established the Financial Supervisory Commission ("FSC") in an effort to establish regulations by which to distinguish viable financial institutions from those that were not and to develop plans for the resolution of insolvent financial institutions according to international standards and procedures. *Id.*  At that time, KEB, then substantially state-owned, was Korea's third largest commercial bank.  ICSID Award at ¶¶ 4, 524.  After the Asian Financial Crisis, KEB was on the verge of insolvency.  ICSID Award at ¶ 150.  Because the Korean government was unwilling or unable to provide enough additional capital to keep KEB afloat, the bank was forced to seek foreign investment. *Id.*

KEB's search for foreign investment coincided with Lone Star's search for investment opportunities in Asia.  Lone Star had already experienced success in the region with its acquisition

of a struggling regional bank in Japan (Tokyo Sowa Bank, since renamed Tokyo Star Bank). *Asia*, PRIVATE EQUITY INTERNATIONAL (Jan. 1 2003), privateequityinternational.com/asia-14/. Following the success in Japan, Lone Star directed Mr. Lee to look for promising financial sector investments in Korea. Mr. Lee determined that KEB had overvalued its loan assets, and viewed the resulting balance sheet deficiency as a ticking time bomb for KEB management and investors. ICSID Award at ¶¶ 121-123. The timing of KEB opening up to foreign investment was, thus, an opportune moment for Lone Star to invest and thereby to help address this crisis.

Lone Star approached then-shareholder, Commerzbank, about acquiring some or all of its stock in KEB, offering approximately $1.2 billion for a 50.5% stake in KEB. *Lone Star wins Korean bank deal*, CNN (Aug. 27, 2003), http://www.cnn.com/2003/BUSINESS/08/27/korea.lonestar/. Ultimately, Lone Star purchased and acquired a 51% controlling interest in KEB (peaking at 64.6% by 2006) from Export-Import Bank of Korea and Commerzbank. *Id*. The purchase closed in October 2003, after the Korean government approved Lone Star as qualified to own a controlling interest in a Korean bank. ICSID Award at ¶¶ 150-152; Brett Cole, *Lone Star sale of Korea Exchange Bank stymied-sources*, REUTERS (Aug. 10, 2010), https://www.reuters.com/article/keb-lonestar/update-2-lone-star-sale-of-korea-exchange-bank-stymied-sources-idUSSGE67902T20100810. Though Lone Star was viewed negatively by many Koreans as a buy-low-sell-high "eat and run" investor, in reality Lone Star agreed as a condition of the purchase of KEB to a two-year "lock up" provision, which required Lone Star to hold its investment in KEB for at least two years. ICSID Award at ¶¶ 6-7, 181.

Thus, Lone Star became a major, high profile foreign investor in Korea following the Asian Financial Crisis. But many Koreans resented Lone Star's presence because, they believed, it was

a hostile foreign investor looking to prey upon the Korean financial sector at a time of extreme duress.  Indeed, soon after Lone Star established itself in Korea, virulent anti-foreigner sentiment emerged in Korean politics and government, as Korean politicians and press vilified foreign investors as "vulture" capital firms draining the nation's wealth.  Martin Fackler, *South Korea Blames its Growing Pains on 'Vulture' Funds*, THE INTERNATIONAL HERALD TRIBUNE (July 4, 2006), https://www.nytimes.com/2006/07/04/business/worldbusiness/04iht-star.2116696.html. Although the anti-foreigner backlash was not directed solely at Lone Star, there was significant focus on Lone Star largely because of its extraordinary investment success and perceived aggressive approach, making it a target of the ensuing nationalist reaction.[6]  *See*, *e.g.*, Se Young Lee, *In $8 billion Samsung bid, some Koreans break ranks to side with foreign activist*, REUTERS (June 14, 2015), http://finance.yahoo.com/news/8-billion-samsung-bid-koreans-211153152.html?1=1 ("The stereotype of the money-hungry foreign opportunist is a staple of local media coverage.  U.S.-based private equity firm Lone Star remains the archetypical villain, often portrayed as a greedy investor that took advantage of the country in the aftermath of the 1997-98 Asian financial crisis, profiting massively from its investment in Korea Exchange Bank."); Choe Sang-Hun, *In Seoul, Fears Return of Foreign Investors*, NEW YORK TIMES (May 12, 2005), https://www.nytimes.com/2005/05/12/business/worldbusiness/in-seoul-fears-return-of-foreign-

---

[6]As noted, in the early 2000s, Lone Star was active in buying non-performing loans internationally and successfully acquired Tokyo Sowa Bank from the Japanese government, KEB from Korea, and TLG Immobilien from Germany.  Locally, however, Lone Star was referred to "as part of the hagetaka, or bank hawks[,]" in Japan, "meoktwi[,] [or] eat-and-run capital[,]" in Korea, and "the Executioner from Texas" in Germany.  Jason Singer, *U.S.'s Lone Star Equity Fund Will Buy Tokyo Sowa Bank*, The Wall Street Journal (Jan. 26, 2001), https://www.wsj.com/articles/SB980451607305302828; Nathan Vardi, *The Billionaire Banker In The Shadows*, Forbes (Mar. 1, 2016), https://www.forbes.com/sites/nathanvardi/2016/03/01/the-billionaire-banker-in-the-shadows/?sh=153a72c44a84.

investors.html; Amb. Uden Report ¶ 41.  Thus, having been allowed to enter Korea and having

saved KEB when there was no other willing buyer, Lone Star was nevertheless viewed by the

Korean public "as a source of [their] heartbreak" that "caused [them] envy[.]"  Oh Young-jin,

*Ending Lone Star Trauma*, THE KOREA TIMES (Sept. 19, 2023),

https://m.koreatimes.co.kr/pages/article.amp.asp?newsIdx=102610.  Criminal investigations and

prosecutions of Lone Star followed.

### b.    Korean Government Investigation of Lone Star

As public criticism of Lone Star mounted, the Korean Government initiated an

investigation of the company.  The investigation focused on allegations that Lone Star had

purchased the bank below market value, and/or that it was permitted to make the purchase only

because the bank's value and financial soundness were deliberately understated.  Korea also

alleged that Lone Star's counsel bribed Korean official Yang-Ho Byeon to manipulate KEB's

market value to facilitate the sale.  ICSID Award at ¶ 130.[7]  Eventually, Byeon was indicted but

---

[7]Korean law regulates bank ownership where a foreign acquiring company exceeds particular ownership thresholds.  ICSID Award at ¶¶ 156-158.  If an acquisition would result in a foreign company owning above a certain threshold of shares, it must obtain the FSC's prior approval.  *Id*. At the time of the Lone Star–KEB deal, the ownership threshold was 10% of shares.  *Id*.  Thus, regulations required that (1) the foreign applicant be a bank or financial institution in their home country, or (2) the applicant structure its acquisitions using the FSC's joint venture method by collaborating with a financial institution.  *Id*.  The Lone Star–KEB purchase circumvented both of these methods by obtaining the "financial distress exception," which applied because of KEB's capital adequacy ratio projections.  ICSID Award  at ¶¶ 156-164.  The higher the capital adequacy ratio of a bank, the more equity it has at its disposal, and the higher its likelihood of being protected against unexpected loss.  Stated simply, a strong ratio is the hallmark of a healthy bank.  *Id*.  A few months before Lone Star purchased KEB, KEB's ratio stood above the statutory 8% threshold and was projected to remain above that threshold until the end of the year.  *Id*.  Later, regulators revised projections and estimated the ratio to fall under 6% by the end of 2003.  Because of this 6% ratio, regulators applied the financial distress exception and permitted Lone Star to proceed with the acquisition.  *Id*.  After the sale was completed, the Korean government began to allege that Lone Star had bribed officials to secure the more favorable ratio and bypass regulatory requirements. ICSID Award at ¶¶ 160-164.

then acquitted at trial; the then-KEB president was found guilty of bribery and corruption in the same prosecution.  *Id.*

The Korean government also investigated Lone Star for alleged stock price manipulation, stemming from KEB's rescue of its credit card subsidiary, Korea Exchange Bank Credit Services ("KEB Card").  ICSID Award at ¶¶ 176-180.  When Lone Star took control of KEB, it was in the midst of a liquidity shortage.  ICSID Award at ¶ 165, 168-169.  Mr. Lee and other Lone Star executives voted to buy out the other KEB Card owners, including Olympus Capital, another minority shareholder.  ICSID Award at ¶¶ 169-172.  According to the Korean government, in the course of that buyout, Lone Star falsely threatened that it would withhold liquidity support from KEB Card and was prepared to allow it to default on its obligations, in order to be able to purchase Olympus Capital's shares at a depressed price.  ICSID Award at ¶¶ 173, 176.

Among these many investigations, spurred by anti-foreign investor sentiment, at some point in or around May 2005, the Seoul Regional Tax Office initiated an investigation into Lone Star's dealings.  ECF No. 1-1 at 40-41.  And beginning in 2006, at the request of the National Assembly (Korea's legislature) the Korean Bureau of Audit and Investigation ("BAI") initiated audits of the KEB sale.  ICSID Award at ¶¶ 127, 198.  The BAI alleged that the acquisition was achieved illegally, and recommended that the FSC take action against Lone Star.  ICSID Award at ¶¶ 198-201.  In February of 2008, Lone Star's Belgian affiliate, which owned the shares in KEB ("LSF-KEB"), as well as Paul Yoo and KEB, were convicted for the alleged KEB Card market manipulation scheme.  ICSID Award  at ¶¶ 124-125.  Yoo was sentenced to 5 years in prison, and the companies were fined.  Choe Sang-Hun, *Lone Star Executive Sentenced*, NEW YORK TIMES (Feb. 2, 2008), https://www.nytimes.com/2008/02/02/business/ worldbusiness/02lone.html.  However, a Korean appellate court overturned the convictions in June 2008.  *Lone Star Wins A*

15

*Round In Korean Court*, FORBES (June 24, 2008), https://www.forbes.com/2008/06/24/keb-lonestar-appeal-markets-equity-cx_vk_0624markets0 5.html?sh=259fa67e7e78.   After their acquittals were reversed on appeal in March 2011, LSF-KEB and Yoo were retried, and once again convicted in October 2011. *South Korea Court Overturns Lone Star Acquittals*, Reuters (Mar. 11, 2011),       https://www.reuters.com/article/lonestar-keb/south-korea-court-overturns-lone-star-acquittals-idUSTOE72A01S20110311.   Yoo was then sentenced to three years in prison and LSF-KEB was fined KRW 25B. *Court Upholds 3-Year Prison Term For Ex-Head Of Lone Star Korea*, THE          KOREA          HERALD          (Feb.        9        2012), https://m.koreatimes.co.kr/pages/article.amp.asp?newsIdx=104504.   By that time, Lone Star had been trying for years—in 2007-2008 and again in 2010-2011—to sell its stake in KEB and exit Korea, but Korean regulators at the FSC blocked the sales, for fear of political backlash if they were seen as allowing Lone Star to earn high profits (*i.e.*, "eat and run") on its investment.   After the convictions, Korean regulators ordered Lone Star to sell its controlling stake in KEB, as the convictions rendered Lone Star legally ineligible to own more than 10% of a Korean financial institution. *Lone Star Ordered To Sell Down KEB Stake Within 6 Months*, REUTERS (Nov. 18, 2011), https://www.reuters.com/article/lonestar-korea-idCNL4E7M702Q20111118.

Though nearly a decade has passed since these events unfolded, hostility towards Lone Star remains powerful in Korean politics and culture.   Indeed, in 2019, a film based on the Lone Star-KEB acquisition reignited controversy over the deal, and activists and a lawmakers from the progressive Justice Party raised the dispute between Lone Star and South Korea and called for the punishment of those responsible. *Civic activists raise concerns about Lone Star as film dramatizes dispute*, The Investor Nov. 21, 2019), https://m.theinvestor.co.kr/view.php?ud=20191121000836.

Unquestionably, the events surrounding the Lone Star-KEB deal remain a powerful thorn in Korea's side. *See generally* Amb. Uden Report ¶¶ 41, 43-44.

### c.   The Korean Government Opts Not to Pursue Mr. Lee's Arrest or Extradition for Roughly A Decade Following Its Investigation.

While these many fights were unfolding between Lone Star and the Korean authorities, in October 2005—and well after Mr. Lee had relocated back to the United States—Korea's Supreme Prosecutor's Office ("SPO") received a written accusation from the Tax Office against four individuals, including Mr. Lee, and sixteen other corporations for alleged violations of the Punishment of Tax Evaders Act. ECF No. 1-1 at 39. The SPO assigned the case to the Financial Investigation Department of the Seoul Central District Prosecutors' Office ("FID"), which thereafter initiated an investigation. ECF No. 1-1 at 39.

FID conducted its investigation from October to November 2005, again, well after Mr. Lee had returned home to the United States and formally resigned from his position at Lone Star. ECF No. 1-1 at 40. Months later, in March 2006, the SPO reassigned the case to the Investigation Division II under the Central Investigation Department of the SPO to investigate the matter jointly with the Finance and Economy Committee of the National Assembly. ECF. No. 1-1 at 41. On March 29, 2006, prosecutors executed a search warrant at LSAK's and HAK's offices, where Mr. Lee was no longer working and no longer had an office. *Id.* Indeed, Mr. Lee was not present at or around the time the warrants were executed. *Id.*

The Korean government did not inform Mr. Lee of its investigation. Instead, Mr. Lee first learned of Korea's investigation in April 2006, when Lone Star's General Counsel contacted Mr. Lee's counsel to advise that the SPO and tax authorities had requested that Lone Star take steps to secure Mr. Lee's cooperation in their ongoing investigation into (1) Lone Star's purchase of KEB; (2) whether Lone Star was permanently established in Korea; and (3) other areas that were arising

17

in the course of its investigation.  *See* Collart Cert. Ex. 30 (email communication).  The very next day, on April 20, 2006, Mr. Lee's counsel stated Mr. Lee's willingness to be interviewed by Korean authorities by telephone and thereafter in person to cooperate with the investigations into his former employer.  Counsel articulated this offer in the context of typical cooperation terms, including that "Mr. Lee would be willing to be interviewed by telephone under the condition that nothing he says can be used against him, a standard condition for such an interview were it to be conducted here in the United States; he is also willing to be interviewed in person if such interview is conducted here in the United States, with an appropriate grant of immunity, or in Korea, with a grant of immunity accompanied by a guarantee of safe passage, including a promise that he will not be detained there."  *Id.*

On July 13, 2005, Mr. Lee's counsel conducted a telephone conference with Korean prosecutors regarding the SPO's investigation.  At that time, Korean Prosecutor Yung Sang Lee represented to Mr. Lee's counsel that the office would give Mr. Lee complete immunity, but only if he revealed to them information regarding alleged bribery in connection with the KEB deal.  *See* Collart Cert. Ex. 30.  Specifically, Prosecutor Lee sought information regarding "lobbying schemes involving financial favors."  Although Mr. Lee was not aware of any such schemes and therefore could not provide such information in exchange for complete immunity, *see* Collart Cert. Ex. 21 (email communication), he nonetheless voluntarily participated in multiple telephone interviews with the SPO in July 2006 and voluntarily informed the office of his location in the United States.  *See* Collart Cert. Exs. 20, 30.  During these conversations, the SPO remained focused on alleged wrongdoing by Lone Star in connection with its Korean investments.  Mr. Lee voluntarily shared what he knew, but Korean prosecutors were dissatisfied with Mr. Lee's truthful insistence that he was unaware of any instances of bribery.

Unbeknownst to Mr. Lee, on July 19, 2006, the Seoul Central District Court issued a warrant for his arrest, which alleged a "Violation of Act on the Aggravated Punishment, etc. of Specific Crimes (tax evasion, etc.)."  ECF No. 1 at 4, ¶ g; ECF No. 1-1 at 97.[8]  Although Mr. Lee and his counsel were in regular communication with SPO prosecutors at this time, they failed to inform Mr. Lee or his counsel that they had obtained a warrant for his arrest.  Meanwhile, from September to November 2006, the SPO gave Mr. Lee a total of 45 written questions in three separate batches, which he answered.  On several occasions, the prosecutors expressed dissatisfaction with Mr. Lee's answers, primarily because he consistently (though truthfully) maintained that he was unaware of anyone from Lone Star ever bribing any Korean officials or anyone else.  *See* Collart Cert. Ex. 20.  In an effort to more fully air the issue, Mr. Lee's counsel continued to offer an in-person meeting, under certain conditions, but the SPO never availed itself of the opportunity.

Korean authorities did not pursue Mr. Lee's arrest under the July 19, 2006 arrest warrant and instead allowed it to expire, which it did five years later, on October 14, 2011.  ECF No. 1-1 at 42.  Thereafter, the SPO obtained another arrest warrant for Mr. Lee, dated November 21, 2011, alleging a violation of the Act on the Aggravated Punishment, etc. of the Specific Crimes (tax evasion, etc.).  Again, however, Korean authorities did not pursue Mr. Lee's arrest under the November 21, 2011 arrest warrant and instead allowed it to expire four years later, on November

---

[8]On August 2, 2006, Korea allegedly submitted an extradition request for Mr. Lee.  *See* ECF No. 1-1 at 5 (letter dated July 31, 2020 from Minister of Justice Lee, Dong-un to Attorney General William Barr noting that Korea was formally withdrawing its extradition request dated August 2, 2006 and "re-submit[ing] a request after making changes to the extraditable crimes.").  However, the Korean government did not include a record of the 2006 extradition request in support of its request presently pending before the Court, and it was apparently not acted upon by either Korea, or the United States.

20, 2015.  Thus, although Korean authorities had obtained arrest warrants spanning nearly a decade from July 2006 to November 2015, they took no known action to arrest or extradite Mr. Lee during this period.  *Id.*

### d.   Lone Star Initiates Investor-State Arbitration Against Korea, Claiming Billions in Damages

In May 2012, Lone Star notified Korea that it would file a request for investor-state arbitration with The World Bank's International Centre for Settlement of Investment Disputes (ICSID).  Lone Star's claims in arbitration accused the Korean government of violating Lone Star's rights as a foreign investor and sought damages from the Korean government for, among other things, the government's role in delaying Lone Star's attempts to sell its stake in KEB, and for imposing improper and discriminatory taxes on Lone Star because of its status as a foreign investor.  *See* Collart Cert. Ex. 19.  Specifically, in May 2006, Lone Star had agreed to sell all of its shares in KEB to Kookmin Bank ("Kookmin") for $7.2 billion, subject to regulatory approval by the FSC".  *See id.*  However, the Korean authorities cited the pending investigations regarding Lone Star as a basis for denying the approval, and the inability to obtain regulatory approval caused the deal to fall apart in late 2006.  *See id.*  In April 2008, Lone Star again attempted to sell its shares of KEB—this time to the Hong Kong Shanghai Banking Corp ("HSBC").  *See id.*  Again, however, the sale failed, as Korean officials cited to the pending KEB Card investigation in denying its approval.  ICSID Award  at ¶¶ 8-10, 110-113.

Finally, in 2010-2011, Lone Star sought to mitigate its damages by selling KEB to Hana Bank for $4.3 billion.  *See* Collart Cert. Ex. 19.  However, according to Lone Star, the FSC caused a lengthy delay by, among other things, failing to complete its review within the requisite time limit and making their approval of the KEB sale conditional on a sale price reduction to appease Korean politicians and public opinion.  ICSID Award at ¶¶ 491 n.634, 570.  Eventually, the KEB-

Hana Bank sale was executed in January 2012 for $3.5 billion. *See* Collart Cert. Ex. 19. Lone Star contended that the FSC blocked the HSBC sale, then pressured Hana Bank to reduce Lone Star's profits on the Hana sale, all the while also attacking Lone Star's profits with illegal taxation. ICSID Award at ¶ 195. Thus, Lone Star initiated the arbitration proceeding, claiming losses of some $4.7 billion in total. ICSID Award at ¶12.

On November 21, 2012, Lone Star formally initiated its arbitration proceedings against Korea. ICSID Award at ¶ 29. Although the proceedings were supposed to be confidential at the request of the Korean government, it was leaked and publicly reported in the Korean press that Lone Star's claimed damages were calculated at $4.68 billion. *See* Nam Hyun-woo, *Moon gov't refuses to disclose Lone Star data*, THE KOREA TIMES (July 6, 2017), https://www.koreatimes.co.kr/www/biz/2023/10/602_232559.html. The arbitration was reported to be "the biggest … legal dispute the [Korean] government has ever had with a foreign company." *See* Jung Min-ho, *Did Lone Star shoot itself in foot?*, THE KOREA TIMES (June 26, 2015), https://www.koreatimes.co.kr/www/nation/2023/09/113_181676.html; *see also* Kim Jae-won, *Lone Star seeks international arbitration*, THE KOREA TIMES (Nov. 22, 2012), https://www.koreatimes.co.kr/www/biz/2023/10/602_125322.html (noting that the FCS "immediately . . . vowed to fight the complaint" and that it had "prepared for the arbitration trial by launching a task force in May when Lone Star notified us of its intentions."); *Lone Star files ISD arbitration claim against Seoul government*, Yonhap News Agency (Nov. 22, 2012), https://en.yna.co.kr/view/AEN20121122009700315 (noting that Lone Star's complaint "mark[ed] the first time that the Seoul government will go through arbitration trials under the ISD mechanism to resolve the tax issues" and that the government had "set up task force teams" to defend Lone Star's claims).

The first substantive hearings were held in the ICSID matter in May 2015, and the second set of hearings occurred in June-July 2015.  *See* Collart Cert. Ex. 19.  In November, 2015, it was announced that the next set of hearings would take place at the Hague in January 2016.  *See 3rd Lone Star hearing to take place in The Hague in Jan.*, The Korea Herald (Nov. 5, 2015), https://khnews.heraldcorp.com/common/newsprint.php?ud=20151105001212.

> **e.     Facing Potential Liability In Lone Star Arbitration, the Korean Government Opts To Pursue Mr. Lee's Arrest.**

On August 5, 2017, Mr. Lee was arrested without warning.  He had travelled to Italy, where he was arrested at the Milan Malpensa Airport, apparently based upon an Interpol "Red Notice" requested by Korea.[9]  *See* Collart Cert. Ex. 27 (Italian Order).  Specifically, Mr. Lee was arrested based upon the purported existence of valid arrest warrants for market manipulation in connection with Lone Star's purchases of KEB and KEB Card, described above.  *See id.* ("the subject was the Korean representative of LONE STAR FUND (An American company). On 27 August 2003. [sic] when LOAN STAR FUND purchased EXCHANGE Bank of Korea and in October 2003 when the KOREA EXCHANGE CRED[T [sic] CARD Co. merged with KOREA BANK. [sic] The defendant with artifice caused a decrease in the prices of the securities of the stock exchange.").

After approximately ten days, the Italian court released Mr. Lee on the ground that any prosecution for Lone Star events that allegedly occurred nearly fifteen years earlier would be time-barred under Italian law, and therefore was not a proper basis for extradition.  *See id.*  The Court explained that "there is no evidence of any actions that have interrupted the lapsing of the statute of limitations (see the copious e-mail correspondence obtained from Mr. Lee's American legal counsel, which attests that numerous contacts between Mr. Lee, his legal counsel and the Korean

---

[9]Mr. Lee had traveled internationally prior to this trip and had always returned home to New Jersey without issue; presumably, there were no "Red Notices" at that time.

Prosecutors took place in 2006 …).” *Id.*  It thus ordered Mr. Lee's immediate release, holding that "the Korean Judicial Authority is moving forward on the hypothesis that market abuse was committed between 27 August 2003 and 27 November of the same year, and that such criminal offense [cannot form the basis for extradition where the extradition treaty] states:  'Extradition shall not be granted when the person claimed has, according to the law of either the requesting or the requested Party, become immune by reason of lapse of time from prosecution or punishment.'"[10]  *Id.*

On October 29, 2019—two years after the Italian court denied Mr. Lee's extradition as untimely, four years after the last arrest warrant had expired, and over a decade after the SPO began its investigation—Korea obtained a third warrant for Mr. Lee's arrest, alleging a violation of the Act on the Aggravated Punishment, etc. of Specific Economic Crimes (Embezzlement). ECF No. 1-1 at 110-116.

After closing hearings took place in June 2016, the arbitration had been mostly dormant while the parties awaited the tribunal's Award.  The proceedings were even suspended at one point upon the resignation (and later death) of the presiding arbitrator, but in June 2020, the tribunal was reconstituted and proceedings resumed pursuant to ICSID Arbitration Rule 12, with new hearings scheduled for later that year.   ICSID Award at ¶ 50.   The next month, Korea requested the extradition of Steven Lee.  ECF No. 1-1 at 35.  Specifically, on July 31, 2020, the Korean Minister of Justice formally requested Mr. Lee's extradition in a letter directed to Attorney General Barr. ECF No. 1-1 at 5, 35.

---

[10]As discussed below, the US-Korean extradition treaty similarly provides that extradition may be denied when the prosecution "would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State."  Art. 6.

Thereafter, the ICSID tribunal held new closing hearings in the arbitration on October 14-15, 2020.  *See* Collart Cert. Ex. 19.  On August 30, 2022, the ICSID arbitrators issued an arbitration award in favor of Lone Star, ordering Korea to pay Lone Star $216.5 million, plus interest; *see also* Shinhye Kang & Kyungji Cho, *Lone Star Awarded $216.5 Million in Dispute With South Korea*, Bloomberg (August 30, 2002, 9:27PM), https://www.bloomberg.com/news/articles/2022-08-31/lone-star-awarded-216-5-million-in-dispute-with-south-korea.   The majority concluded that: (1) the FSC "declined to approve Hana in the autumn of 2011 because of public and political opposition to Lone Star not only as an 'Eat and Run' investor, but worse still, a 'Cheat and Run' investor"; (2) the "FSC abused its regulatory discretion by preferring its own self-interest to performance of its statutory mandate; it succumbed to a conflict of interest"'; (3) the FSC violated the treaty obligation of Fair and Equitable Treatment because its "intervention in the share price was not in furtherance of a legitimate regulatory purpose," but rather "was for an objective (its own self-interest) and not its professed objective (a prudential concern for the integrity of Korean banking institutions), and "the FSC intervened to impose a price reduction which the FSC itself acknowledged would be an improper action for the FSC to undertake"; and the (4) the FSC "did not act in relation to Lone Star's investment in KEB in good faith."  *See LSF-KEB Holdings SCA and others v. Republic of Korea*, ICSID Case No. ARB/12/37, 11 (2022), https://www.italaw.com/sites/default/files/case-documents/italaw170701.pdf.   In no uncertain terms, the majority noted the "controlling rationale of the FSC's behaviour was the growing political pressure." *Id*. at 283.

The result of this arbitration has occasioned a great deal of criticism in Korea of the manner in which the Korean Government defended against Lone Star's claim and has reignited the longstanding hostility against Lone Star.  *See* Amb. Uden Report ¶¶ 40-44.  Press reports criticized

the Government for not sufficiently challenging Lone Star and continued to disparage the foreign investment firm:  "Korea must no longer remain an easy target of Wall Street gadflies and their short-term opportunism."  Amb. Uden Report ¶ 41.  They encouraged the Korean government to "mobilize all means and resources available to win the case against Lone Star, which has long been notorious here for its ruthless and predatory pursuit of windfalls."  *Id.*

Six weeks after the ICSID tribunal rendered its decision, on October 14, 2022, Korea filed a Request for Rectification of the Award in the arbitration.  Specifically, Korea asked the Tribunal to change various arithmetical, clerical, and other errors in the ICSID award, including reducing the liability from $216.5 million to about $216.01 million to reflect an error in calculating the interest awarded.  ICSID Rect. at ¶¶ 1-2, 20-23.  Ultimately, on May 8, 2023, Korea's request was largely denied:  the Tribunal recognized and considered only the interest error in the rectification.  ICSID Rect. at ¶ 36.  Within hours of the issuance of the Award, the Korean Justice Ministry asserted that Korea "cannot accept the order and will 'actively push to file an objection.'"  Jin Min-Ji, *Lone Star arbitration ruling to be challenged by Korea*, KOREA JOONGANG DAILY (Aug. 31, 2022), https://koreajoongangdaily.joins.com/2022/08/31/business/finance/korea-lone-star-keb/20220831174523239.html; Anna J. Park, *Korea to challenge Int'l tribunal decision on Lone Star suit*, THE KOREA TIMES (Aug. 31, 2022), https://www.koreatimes.co.kr/www/biz/2023/10/602_335362.html ("Although the award at the court acknowledged only a partial amount of what Lone Star claimed, the Korean government finds it hard to fully accept the ruling[.]").  Thus, after the ICSID Rectification, the Korean Ministry of Justice stated that it would file separate lawsuits for annulment (*i.e.* for the cancellation

of the entire ICSID Award order. [11]  *Int'l tribunal reduces damages Korea owes to Lone Star by $452,898: ministry*, THE KOREA TIMES (May 9, 2023), https://www.koreatimes.co.kr/www/biz/2023/10/602_350612.html.   And, in August 2023, the Ministry of Justice announced that it had indeed requested annulment of the ICSID Award, arguing, *inter alia*, that "the ruling was made without proving specific details about the illegal acts conducted by the Korean financial authorities."   Lee Ho-Jeong & Jin Min-Ji, *Gov't seeks cancellation of tribunal's Lone Star Funds ruling*, Korea JoongAng Daily (Sept. 1, 2023), https://koreajoongangdaily.

### f.   Following the Arbitration Award in Favor of Lone Star, Mr. Lee is Arrested Here and Released on Bail.

Several months later, on February 24, 2023, this Court issued a warrant for Mr. Lee's arrest pursuant to the Government's Complaint, ECF No. 1, filed in response to Korea's extradition request, ECF No. 1-1 at 2-3.  The Complaint alleges that, according to the information provided by the Korea government, Korea seeks Mr. Lee's extradition in connection with three counts of alleged occupational embezzlement and breach of trust in violation of Article 356 of the Criminal Act.  Compl. ¶ 4.  The three counts are predicated on three alleged transactions that occurred on December 8, 2000;  November 5, 2003; and October 14, 2004, respectively.  Compl. ¶ 5(e).

Mr. Lee was arrested on March 2, 2023; his arrest, which followed several months after the arbitration tribunal's ruling in favor of Lone Star, garnered substantial media attention in Korea.  Significantly, the press in Korea repeatedly drew the connection between the arrest and

---

[11]In fact, as of May 2023, the Ministry of Justice spent 54.9 billion Korean Won ($41.7 million) in Investor-State Dispute Resolution Procedure ("ISDS") lawsuits since 2013.  88.2% of the expenditures were spent on the Lone Star case.  Lee Bora, Ministry of Justice spent 48.4 billion won over 10 years on Lone Star lawsuit alone,  KYUNGHYANG SHINMUN (May 23, 2023), https://www.khan.co.kr/national/court-law/article/202305221739001.

the Lone Star ICSID arbitration discussed above: for example, one newspaper article quotes a Korean Ministry of Justice official as saying, "Steven Lee's arrest on the 2nd has generated momentum to consider the cancellation of the International Centre for Investment Dispute Resolution (ICSID) adjudication." Amb. Uden Report ¶ 46. It continues: "Currently, the Ministry of Justice expects that the resumption of related investigations into former CEO Lee will also reinforce positive content in the application to cancel the Lone Star ruling."[12] *Id.*

Following submissions by counsel for Mr. Lee and the Government and oral argument, on March 8, 2023, the Honorable James B. Clark, III, United States Magistrate Judge, released Mr. Lee on bail subject to certain conditions, after having found that Mr. Lee does not present a danger of flight and that special circumstances warrant his release—including, importantly, the "likelihood of success defending against extradition." ECF Nos. 9, 10 at 4-8. Regarding the likelihood of Mr. Lee's success on the merits, the Court noted that "this case is somewhat unique in that another sovereign state, Italy, has already refused extradition pursuant to its treaty with Korea because the subject prosecution would be time-barred under Italian law." ECF No. 12 at 7. As the Court recognized, the Italian order "raise[s] far more than a metaphysical doubt as to the inevitability of Mr. Lee's extradition to Korea in this matter." *Id.*

Mr. Lee has been on home incarceration since his arrest and release on bail in March 2023. During the last seven months he has fully complied with all conditions of release and GPS

---

[12]Pursuant to Article 51 of the Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States, the current arbitration award can be challenged on the basis of new information. Specifically, a party "may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence." ICSID Award Convention, Art. 51, ¶ 1, ICSID/15 (April 2006).

monitoring and continued to attend church services.  In the days before this brief was filed, he suffered a serious heart attack and was hospitalized.  Doctors identified critical coronary disease and he underwent emergency quadruple coronary artery bypass surgery, for which he will now need extensive cardiac rehabilitation in his home for the next eight to twelve weeks.  *See* Collart Cert. Ex. 26 (letter from Mid-Atlantic Surgical Associates).  Medical records with regard to his heart attack and current condition can be provided for the Court's *in camera* inspection should the Court wish to review additional information.

## ARGUMENT

International extradition proceedings are governed by the applicable extradition treaty and by the federal extradition statute, 18 U.S.C. § 3184, which lays out the extradition process.  *See In re Extradition Bolanos*, 594 F. Supp. 2d 515, 517 (D.N.J. 2009); *Jean v. Mattos*, No. 13-5346, 2014 WL 885058, at *1 (D.N.J. Mar. 5, 2014).  "A judge of the United States 'or any magistrate authorized . . . by a court of the United States' . . . may issue warrants for the arrest of a person charged with committing a covered crime in a foreign jurisdiction, and may then determine whether extradition is appropriate under the terms of the relevant treaties."  *Mattos*, 2014 WL 885058 at *1 (first alteration in original) (quoting *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000)).  In determining whether to issue a certificate of extradition, the Court must determine, *inter alia*, "whether the treaty authorized the extradition for the crime alleged to have been committed."  *Bolanos*, 594 F. Supp. 2d at 517; *Mattos* 2014 WL 885058 at *1.  Here, the Extradition Treaty Between the United States and the Republic of Korea (the "Treaty") does not authorize Mr. Lee's extradition, for multiple reasons.

**First**, Article 1 of the Treaty permits extradition only for a "person who is wanted in the Requesting State for prosecution, trial, or imposition or execution of punishment for an extraditable offense."  Art. 1.  Moreover, Article 15 of the Treaty requires that a person extradited

28

under the Treaty "may not be detained, tried, or punished in the Requesting State except for … the offense for which extradition has been granted." Art. 15.  However, as explained *infra*, the record shows that Korea does not seek to extradite Mr. Lee to detain or prosecute him for the an extraditable offense.  Instead, substantial evidence demonstrates that Korea seeks Mr. Lee's extradition in order to use him in the context of an ongoing battle over a massive ICSID arbitration award against Korea, in favor of Mr. Lee's former employer, Lone Star.  Because the present extradition request is merely a subterfuge to compel Mr. Lee's cooperation in this decades-long legal battle between Korea and Lone Star, the basis for extradition is not covered and indeed prohibited by the Treaty, and Korea's request must be denied.

**Second**, and relatedly, the lapse of time during which Korea has failed to pursue this extradition request dictates that Mr. Lee's extradition be barred pursuant to the applicable Statutes of Limitations under both the laws of the United States and Korea.  As explained below, Article 6 expressly provides for application of a time-bar defense:  "Extradition may be denied under this Treaty when the prosecution or the execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State."  Here, the applicable state of limitations is five years under the laws of the United States and seven years under Korean law. *See* 18 U.S.C. § 3282; Prof. Lee Report ¶¶ 10-11.  The alleged crimes occurred on December 8, 2000; November 5, 2003; and October 14, 2004, respectively—over twenty years ago in some instances and well beyond either State's limitations period.  Furthermore, because Mr. Lee has not "fled from justice," circumstances do not warrant the suspension of that limitations period. Therefore, Mr. Lee's extradition should be denied because the offenses alleged are time barred.

**Finally and in addition**, application of the humanitarian exception and the Convention Against Torture prevent Mr. Lee's extradition, as Korea may wish to coerce his cooperation in the context of a high-stakes arbitration challenge and substantial evidence demonstrates that, if detained in Korea, he is likely to be subjected to treatment that, in the aggregate, amounts to torture. Indeed, in a recent extradition matter that involved very similar circumstances, the Westminster Magistrate's Court of England and Wales denied Korea's extradition request, in part, because the respondent in that case would likely be tortured.  *Republic of South Korea v. Derek Ong*, Decision made on 4 October 2022, Westminster Magistrate's Court of England and Wales [hereinafter "*Ong*"] ¶ 659 (denying Korea's extradition request where "the Request does entail a real risk of police ill-treatment, a grossly disproportionate sentence and, in gravest particular, prison conditions that would disproportionately infringe the Requested Person's right against torture and/or inhumane and degrading treatment.").  Certainly, his recent cardiac issues and the failures of Korean prisons to provide appropriate medical care, as detailed in the report of George Tugushi, *see* Collart Cert. Ex. 4, weigh in favor of application of the humanitarian exception.

I.     **Korea Seeks Mr. Lee's Extradition for Purposes Not Permitted by the Treaty**

a.     **Korea's Extradition Request Contravenes Article 1 of the Treaty Permitting Extradition Only For "Prosecution, Trial, Or Imposition Or Execution of Punishment."**

Article 1 of the Treaty, which establishes the Contracting States' "obligation to extradite," provides that each State agrees, subject to certain exceptions, "to extradite to each other, pursuant to the provisions of this Treaty, any person who is wanted in the Requesting State for prosecution, trial, or imposition or execution of punishment for an extraditable offense."[13]  Art. 1.  The plain

_____

[13]Here, Korea could not seek Mr. Lee's extradition for "imposition or execution of punishment" because Mr. Lee has not been indicted, let alone found guilty, of any crimes.  *See* Art. 8(4) (identifying the documents required for "[a] request for extradition relating to a person who has

language of the text is the starting point for understanding this provision.  *See United States v. Alvarez-Machain*, 504 U.S. 655, 663, (1992) ("In construing a treaty . . . we first look to its terms to determine its meaning."); RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 306 (Am. Law Inst. 2018) ("A treaty is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in light of its object and purpose."). Accordingly, the phrase "for prosecution" "does not call for the extradition of a person wanted for questioning[, such as] regarding a possible but not yet charged prosecution."[14]  *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1059 (1st Cir. 2021).[15]  Here, substantial evidence demonstrates that, in contravention of Article 1's plain text, Korea is seeking Mr. Lee's extradition not "for prosecution" of the identified embezzlement offenses, as is required, but to use Mr. Lee—for example, by

---

been found guilty of the office for which extradition is sought," which includes "a copy of the judgment of conviction or . . . a statement by a judicial authority that the person has been found guilty.").

[14] Indeed, the United States and Korea signed a distinct and separate treaty for the  mutual assistance in criminal matters, conventionally referred to as an MLAT, in November 1993. *Dongkuk Int'l, Inc. v. U.S. Dep't of Just*., 204 F. Supp. 3d 18, 21 (D.D.C. 2016).  The purpose of that treaty is to "provide for the sharing of information and evidence related to criminal investigations and prosecutions."  *Id.* (internal quotation marks omitted (quoting U.S. Sen., 104th Cong., 2d Sess., Executive Report No. 104–22, at 1 (1996)); *see also* Treaty with the Republic of Korea on Mut. Legal Assistance in Crim. Matters, S. Treaty Doc. No. 104-1 (Nov. 23, 1993) ("The Contracting Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, in connection with the prevention, investigation, and prosecution of offenses, and in proceedings related to criminal matters.").

[15] The *Aguasvivas* court held that a warrant could not serve as a "charging document," which was required to extradite under the US-Dominican Republic treaty, relying, in part, on the fact that the extradition treaty intended to provide only for extradition of persons "sought  . . . for prosecution," and noting that ordering extradition in the absence of a charging document may lead to extradition for unpermitted hypothetical prosecutions.  *Id.*  Mr. Lee does not here suggest that the US-Korea treaty requires a charging document such as an indictment (under Article 8 it plainly does not). Instead, *Aguasvivas* supports the proposition that the plain meaning of "for prosecution" does not entail "for questioning" or some investigative purpose.

coercing his cooperation—in the context of Korea's decades-long legal battle with Lone Star and its ongoing challenge to the ICSID arbitration award in favor of Lone Star.

This is not a speculative or fanciful concern. Korean officials have openly acknowledged that Mr. Lee's extradition is not sought for prosecutorial purposes, but rather to support its attempt to overturn the ICSID arbitration award ordering Korea to pay $216.5 million to Lone Star. *See, e.g.*, Amb. Uden Report at ¶ 46; Yoon Jung-sun, *Justice Department Gains Momentum to 'Seek Revocation' of Lone Star Restitution Award in Arrest of Stephen Lee*, Munhwa Ilbo (March 6, 2023), https://www.munhwa.com/news/view.html?no=2023030601039921068001 ("On 6 July, a Justice Department official commented on the arrest of former CEO Lee on 2 July, saying, 'The arrest of Stephen [*sic*] Lee has given impetus to the consideration of the application to revoke the International Center for the Settlement of Investment Disputes (ICSID) award[.]'"); Kim So-hee, *Recruitment of Steven Lee, Will Lone Star Compensation Decision 'Cancellation Request' Affect?*, The Seoul Shinmun (March 12, 2023), https://www.seoul.co.kr/news/newsView.php?id=20230312500091 ("The Ministry of Justice seems to be expecting that if a re-investigation is carried out, it can have a certain impact on ISDS"). Since Mr. Lee's arrest, it has been widely reported that the purpose of his extradition is to re-investigate Lone Star for bribery in connection with the KEB sale. *See, e.g.*, *'Lone Star Crisis' key Stephen Lee arrested in the US for the first time in 17 years*, SBS News (March 6, 2023), https://news.sbs.co.kr/news/endPage.do?news_id=N1007102783&plink=LINK&cooper=YOUT UBE ("When Stephen [*sic*] Lee, who has been suspended from indictment, is extradited to Korea and the investigation resumes, attention is focused on whether the reality of the lobbying suspicion surrounding Lone Star's acquisition and sale of Korea Exchange Bank will be clarified."); Kim

Cheol-gwan, *Upon news of the arrest of the former Lone Star Korea representative, civic groups urged "to re-investigate the Lone Star incident"*, KOREA NEWS (March 9, 2023), http://www.24news.kr/news/articleView.html?idxno=208209 (reporting that civic groups[16] "expect that if Stephen [*sic*] Lee is extradited, a new breakthrough will be made in the process of canceling the Investor-State Dispute Settlement (ISD), which is being waged by the Korean government and Lone Star.").

Thus, If Korea is able to obtain the extradition of Mr. Lee, it can and most certainly will interrogate him about the KEB sale—which is not in any way the subject of the present extradition request, which focuses on allegations, long since resolved civilly following Mr. Lee's cooperation, and now without a criminal complainant of embezzlement by Mr. Lee from Lone Star—and coerce his cooperation with Korea's ongoing efforts to appeal or otherwise set aside the ICSID arbitration award, which embarrassed Korea by ruling in Lone Star's favor.  Amb. Uden Report at ¶ 46 (noting that Korean press reports suggest that "Mr. Lee would be able to provide information that the government would use to seek to re-open the issue of the price paid for KEB in 2003, undermining the calculation of Lone Star's foregone profit."), ¶52 ("The Ministry of Justice has been quoted as believing that the Tribunal's finding could be overturned and that the arrest and extradition of Mr

---

[16]Pressure from such civic groups has played an increasingly significant role in Korean politics; indeed, scholars have documented how civic groups impacted general elections and shaped Korean policy.  *See, e.g.*, Andrew Eungi Kim, *Civic activism and Korean democracy:  the impact of blacklisting campaigns in the 2000 and 2004 general elections*, 19 THE PACIFIC REVIEW 519, 519 (Dec. 2006) ("For the general elections in 2000 and 2004, civic groups in South Korea joined forces to stage the so-called 'blacklisting campaign' or 'defeat campaign' against allegedly corrupt, incompetent or anti-reform politicians.  The campaigns not only played a significant role in thwarting many politicians from getting nominated or elected but also heralded a new era in Korean politics: civic groups have now emerged as a major political force, capable not only of challenging party policies and pending legislation but also taking on an agenda-setting prominence in a wide array of policy areas.").

Steven Lee would add positive reinforcement to those efforts, allowing the government to avoid paying any taxpayer's money."). Specifically, pursuant to Article 51 of the Convention On The Settlement Of Investment Disputes Between States And Nationals Of Other States, Korea "may request revision of the award by an application in writing addressed to the Secretary-General on the ground of discovery of some fact of such a nature as decisively to affect the award, provided that when the award was rendered that fact was unknown to the Tribunal and to the applicant and that the applicant's ignorance of that fact was not due to negligence." Art. 51, ¶ 1, ICSID/15 (April 2006). Korea has also said that it will seek to bring a collateral challenge to the Lone Star arbitration award in Korea courts, or to oppose any effort by Lone Star to enforce the award. *See* Kim Arin, *South Korea to appeal international tribunal's order to pay Lone Star*, THE KOREA HERALD (Aug. 31, 2022), https://www.koreaherald.com/view.php?ud= 20220831000598 ("[T]he government will be taking steps to suspend and annul the decision so that not a single dime of South Korean taxpayer money is spent on damages."). It is in this context that Korea would seek to use Mr. Lee, for example, by forcing him to provide testimony or "new facts" as part of Korea's efforts to challenge or re-open this highly-despised award. *See Perenco Ecuador Ltd. v. Republic of Ecuador*, No. 1:19-CV-2943, 2023 WL 2536368, at *5 (D.D.C. Mar. 16, 2023) ("Parties can even ask for a revision of the award if new facts are discovered after the arbitration concludes." (citing ICSID Convention, art. 51)). Indeed, it is plain from statements by the Korean government and prosecuting authorities that they intend to question Mr. Lee specifically in order to obtain (or represent that they have obtained) evidence of bribery that would undermine the authorization of the KEB purchase and therefore eviscerate any valid claim that Lone Star was damaged by Korea's obstruction of its subsequent sale.

Mr. Lee's (and counsel's) interactions with Korean prosecutors in 2006 further support that it is not mere conjecture that the Korean government's intent is to seek information from Mr. Lee regarding allegations of bribery in connection with the KEB sale.  As explained, *supra* at 20-21, Korean Prosecutor Yung Sang Lee represented to Mr. Lee's counsel in 2006 that Korea would provide Mr. Lee complete immunity if he revealed "lobbying schemes involving financial favors" in connection with the KEB deal.  *See* Collart Cert. at Ex. 30.  Further, when Korean prosecutors telephonically interviewed Mr. Lee, the focus of their questions was not on the allegations of embezzlement here at issue but on whether Lone Star engaged in wrongdoings in connection with its Korean investments.  *See* Collart Cert. at Ex. 20.  The prosecutors also expressed their dissatisfaction with Mr. Lee for maintaining—truthfully—that he was unaware of instances of Lone Star bribing Korean officials.  *See id.*  Thus, the record demonstrates Korea's clear intent to use Mr. Lee as a witness against Lone Star for its actions with regard to the KEB transaction.

Moreover, as noted and again, the events surrounding the alleged embezzlement have long been civilly and amicably resolved between Mr. Lee and Lone Star.  *See* Collart Cert. Ex. 1 ¶ 5. As a result, after Mr. Lee and Lone Star asserted various claims against each other in civil litigation, the parties reached a comprehensive settlement agreement and released each other from all potential liabilities.  *Id.* ¶ 6.  Thus, "Lone Star considers all matters related to Mr. Lee's employment and alleged embezzlement to have been long since resolved" and "is not currently seeking, nor will it seek in the future, to pursue any claims or press charges against Mr. Lee in Korea, the United States, or any other jurisdiction."  *Id.* ¶¶ 7-8.  The fact that there is no actual victim on whose behalf Korea may seek to extradite Mr. Lee further sheds light on Korea's intent in bringing this extradition complaint, demonstrating, along with all of the other evidence described here, that its real purpose is not to prosecute Mr. Lee for the embezzlement alleged, but

to re-open its investigation into the Lone Star-KEB acquisition and to attempt to use Mr. Lee as a witness in Korea's effort to overturn the unfavorable ICSID award.

Extradition of Mr. Lee for such purposes would violate Article I of the Treaty, which permits extradition only for "prosecution" of a particular crime or imposition of punishment. Art. 1. It certainly does not permit extradition for purposes of coercing cooperation or testimony for use in the appeal or challenge of an arbitration award. Because, for all the reasons explained above, Korea seeks Mr. Lee's extradition in connection with its re-investigation of Lone Star and its anticipated appeal of the ICSID award, Korea does not seek extradition for a permissible prosecutorial purpose. *See Aguasvivas*, 984 F.3d at 1059 (noting that the plain meaning of "for prosecution" "does not call for the extradition of a person wanted for questioning regarding a possible but not yet charged prosecution."). Korea's extradition request therefore must be denied because it exceeds the scope of the Treaty as set forth in Article 1.

### b. Extradition of Mr. Lee Would Also Violate Article 15 and The Rule of Speciality.

The "Rule of Speciality"[17] provides that the requesting state—here, Korea—"may … prosecute or punish the [extradited] fugitive only for the crime or crimes for which extradition was granted …." U.S. Dep't of State Regulations, 7 Foreign Affairs Manual 1612 (defining the "Rule of Speciality" for purposes of U.S. extradition treaties). Article 15 of the Treaty, which incorporates the "Rule of Speciality," provides:

> 1. A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:
>
> (a)   the offense for which extradition has been granted or a differently denominated offense based on the same facts on which

---

[17]This doctrine is also sometimes referred to as the "Rule of Specialty"; the spelling utilized herein is that used in the treaty.

> extradition was granted, provided each offense is extraditable, or is
> a lesser included offense;
>
> (b)  an offense committed after the extradition of the person; or
>
> (c)  an offense for which the executive authority of the Requested
> State consents to the person's detention, trial or punishment for an
> offense;

Art. 15(1)(a)-(c).

Thus, "[t]he principle of specialty requires that an extradited defendant be tried for the crimes on which extradition has been granted, and none other." *United States v. Thomas*, 322 F. A'ppx 177, 181 (3d Cir. 2000). Indeed, the doctrine "is designed to prevent prosecution for an offense for which the person would not have been extradited or to prevent punishment in excess of what the requested state had reason to believe was contemplated." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 477 cmt. b (1987). Specifically, the doctrine is generally observed and extradition denied "where charges against the person sought were broader than those for which extradition was granted." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 477 Reporters Notes No. 1 (citing *Jiménez v. Aristeguieta*, 311 F.2d 547, 558-60 (5th Cir.1962)). That is, the treaty provisions incorporating the specialty doctrine both allow defendants to challenge their prosecution following extradition, *United States v. Riviere*, 924 F.2d 1289, 1297 (3d Cir. 1991) ("The Supreme Court acknowledged the right of a person extradited pursuant to a treaty to invoke the rule of specialty to avoid prosecution in *United States v. Rauscher*, 119 U.S. 407 (1886)"), and serve as a basis for denying extradition in the first instance, *see Aguasvivas*, 984 F.3d at 192 (concluding that, even if the Requesting State had provided the appropriate documentation to support its extradition request, the Court would still vacate certification of a charge included in the extradition request that was not included on the arrest warrant pursuant to the rule of specialty).

Here, it is substantially likely, if not certain, that Mr. Lee's rights under the Rule of Speciality and Article 15 of the Treaty will be violated if his extradition is allowed. As discussed above, substantial evidence demonstrates that Korea does not, in fact, seek Mr. Lee's extradition for prosecution of his long-ago civilly-resolved embezzlement from his employer. Nor does Korea seek Mr. Lee's extradition to prosecute and punish him for any other crime covered by the Treaty, though even that would be improper if those were not the subject of the extradition complaint. Instead, Korea is transparently extraditing him as part of its efforts to re-open its investigation into the Lone Star-KEB transaction and to overturn the ICSID award granted in favor of Lone Star in its long-running dispute with Korea. But because allegations of bribery are mentioned nowhere in Korea's materials supporting extradition, and certainly not in the arrest warrant, any prosecution (or interrogation) of Mr. Lee in connection with the KEB transaction will be prohibited by Article 15's incorporation of the Rule of Speciality. *See Thomas*, 322 F. App'x at 181 ("The principle of specialty requires that an extradited defendant be tried for the crimes on which extradition has been granted, and none other.").

Nor is this concern the least bit speculative: In another recent extradition case involving the United States and Korea—where the individual involved was a green card holder and not, like Mr. Lee, a United States citizen— Korea did much the same thing it seeks to do here. Specifically, it disguised the true reason for its extradition request and provided a pretextual reason to the United States for extradition, in violation of the Rule of Speciality and Article 15 of the Treaty. *See* Amb. Uden Report ¶ 48. There, the individual in question, Keith Yoo, was allegedly involved with a tragic ship sinking in 2014, which resulted in the deaths of over 300 people. *Id.* Although Korea intended to prosecute and punish him for his alleged role in that tragic event, Korea hid this fact from the United States and instead charged Mr. Yoo with embezzlement and sought his extradition

only for that offense.  *Id.* at ¶ 49.  Mr. Yoo's challenges to his extradition were rejected by the U.S. Courts and he was extradited to Korea.  Following his extradition, however, Korea did not, in fact, prosecute Mr. Yoo for embezzlement.  Instead, the Korean Ministry of Justice issued a press release identifying him as "the last remaining fugitive in the sinking of the Sewol ferry incident And then charged him with offenses related to that incident"  *Id.* at ¶ 50.

Korea is taking the same improper approach here.  Just as it did in Mr. Yoo's case, so too has Korea here misrepresented its true reason for seeking to extradite Mr. Lee.  That is, the record is clear: Korea says it seeks Mr. Lee's extradition for a crime allegedly committed nearly 20 years ago, when it fact it seeks to use Mr. Lee as a pawn in Korea's ongoing efforts to challenge an arbitration award and prevail in its long-running battle with Lone Star.  This violates the Rule of Speciality and Article 15 of the Treaty and therefore should not be allowed by this Court under Articles 1 and 15 of the Treaty, given the Court's "obligation to determine whether the extradition would violate the individual's constitutional rights or established federal law."  *United States v. Porumb*, 420 F. Supp. 3d 517, 521 (W.D. La. 2019) (citing *Mironescu v. Costner*, 480 F.3d 664, 672–73 (4th Cir. 2007)).

In sum, there really can be no question based upon the historical record, however hard the Government may try to shield that record from the Court behind the formalities of the extradition process:  Korea seeks Mr. Lee's extradition for the impermissible purposes of re-investigating alleged bribery in connection with the Lone Star-KEB sale and for challenging the ICSID award— purposes different from the alleged embezzlement prosecution identified in Korea's extradition

request.  Mr. Lee's extradition would thus violate Article 15's Rule of Speciality.  *Thomas*, 322 F. A'ppx 177, 181.  The Court must deny extradition on this basis alone.[18]

## II.     Extradition is Unavailable Because The Statutes of Limitations of Both the United States and Korea Have Expired.

The statutory periods for the crime of embezzlement in the United States and Korea are 5 and 7 years, respectively.  Here, the alleged embezzlement in question occurred nearly 20 years ago.  Accordingly, extradition is unavailable under Article 6 of the Treaty, which provides for the denial of any extradition in which the crimes are time-barred under the law of the requested state, here, the United States.  Thus, even leaving aside the question of whether extradition is being sought for ulterior purposes relating to the Lone Star arbitration award, rather than an extraditable offense, and beyond the question raised by the doctrine of speciality, Mr. Lee's extradition is also time-barred by the lapse of time provision of the treaty.

Specifically, the Extradition Treaty with the Republic of Korea contains a lapse of time provision pursuant to which "[e]xtradition may be denied . . . when the prosecution or the execution of punishment of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State had the same offense been committed in the Requested State."  Art. 6.  The Treaty further provides that the "period during which a person for

---

[18]In the alternative, and at the very least, the Court should hold an evidentiary hearing, as it certainly has the discretion to do, 18 U.S.C. § 3184   (providing for hearing in extradition proceedings); *In re Extradition of Rana*, No. 20-7309, 2023 WL 3506410, at *9 (C.D. Cal. May 16, 2023) (noting that 18 U.S.C. § 3184 "confers jurisdiction on 'any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States' to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation.") *Matter of Extradition of Ahn*, 602 F. Supp. 3d 1304, 1310 (C.D. Cal. 2022) ("Whether to admit evidence offered by the fugitive is within the "sound discretion" of the Court."), to ascertain whether, as the evidence ineluctably indicates, Korea's actions are not for the purpose of the offense set forth in the extradition request.

whom extradition is sought fled from justice does not count towards the running of the statute of limitations." *Id.* And, it states, "[a]cts or circumstances that would suspend the expiration of the statute of limitations of either State shall be given effect by the Requested Stated, and in this regard the Requesting State shall provide a written statement of the relevant provisions of its statute of limitations, which shall be conclusive." *Id.*

As explained more fully below, the application of the Treaty's time-bar provision is appropriately before the Court.  Contrary to the Government's assertion, the ability to deny extradition due to lapse of time does not lie within the exclusive discretion of the Secretary of State.  Indeed, such a reading of the treaty would render superfluous the provisions that explicitly describe when an action is discretionary, *see*, Art. 3(1), or where the relevant determination lies solely with the Executive, *see* Art. 2(4), Art. 4(3)-(4), Art. 13, Art. 15(1)(c).  Indeed, application of statutes of limitations lies within the traditional purview of the judiciary; thus, numerous courts in the Third Circuit, including this one, have analyzed relevant time-bar provisions in considering extradition requests from numerous other nations.  *See In re Extradition of Sidali*, 899 F. Supp. 1342, 1348 (D.N.J. 1995); *In re Extradition of Betrand*, No. 85-0158J-01, 1986 WL 8845, at *3 (D.N.J. June 13, 1986); *in re Extradition of Harshbarger*, 600 F. Supp. 2d 636, 647 (M.D. Pa. 2009); *United States v. Bogue*, No. 98-572-M, 1998 WL 961369, at *2 (E.D. Pa. Dec. 11, 1998).

Mr. Lee respectfully submits that certain aspects of this inquiry are, in this case, clear as a matter of law and, are in some respects, undisputed.  *First*, the applicable statute of limitations under United States law for the alleged embezzlement offenses is five years.  *See* 18 U.S.C. § 3282.  Mr. Lee has been charged with three counts of occupational embezzlement and breach of trust in violation of Article 356 of the Criminal Act.  ECF No. 1, Complaint ("Compl.") ¶ 4.  The three counts are predicated on three alleged transactions that occurred on (1) December 8, 2000;

41

(2) November 5, 2003; and (3) October 14, 2004. Compl. ¶ 5(e).  Therefore, the statute of limitations expired for each offense on (1) December 8, 2005; (2) December 5, 2008; and October 15, 2009, respectively.  *Second*, that five-year statute of limitations was not tolled under U.S. law because Mr. Lee did not, in fact "fle[e] from prosecution."  Indeed, as Judge Clark found, Mr. Lee has lived openly in the United States for nearly twenty years.  Op. at 4.  Thus, his extradition for the embezzlement alleged in the Complaint is time-barred under U.S. law.  *Third*, as a matter of Korean law, the application of the statute of limitations period—seven years—has also expired; it also was not suspended because objective circumstances demonstrate that Mr. Lee did not leave Korea with the intent to avoid criminal prosecution.  Thus, under the law of the Requesting State, Mr. Lee's extradition is time-barred as well.  Each of these arguments is fleshed out in further detail below.

> a.     **Application of the Statute of Limitations is Appropriately Before the Court.**

The Government submits that because the lapse of time provision contains "permissive language" ("Extradition may be denied . . . when the prosecution . . . of the offense for which extradition is requested would have been barred because of the statute of limitations of the Requested State . . ."), Article 6 provides a "discretionary exception[]" to extradition that is "reserved exclusively to the Secretary of State."  ECF No. 22 at 21-22.  The Government relies upon *Yoo v. United States*, 43 F.4th 64 (2d Cir. 2022), and *Patterson v. Wagner*, 785 F.3d 1277 (9th Cir. 2015), where the Second and Ninth Circuit, respectively, held that Article 6's lapse of time provision is discretionary and therefore committed solely to the State Department's jurisdiction.  But that precedent from other circuits is not binding on this Court,[19] and no court in

---

[19]*See Hernandez v. Johnson & Johnson Consumer Inc.*, No. 19-15679, 2023 WL 2634496, at *3 (D.N.J. Mar. 24, 2023) ("Decisions of the Court of Appeals for a given circuit are binding on the district courts within the circuit, but are not binding on courts in other circuits, whether at the

the Third Circuit has addressed Article 6 of the US-Korea Treaty.  This Court should, consistent with traditional principles of treaty interpretation and judicial power, hold that application of the statute of limitations is within its purview, consistent with traditional judicial power.

The Court's analysis in interpreting Article 6 must "begin with the text of the treaty and the context in which the written words are used."  *See E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 534, (1991) (cleaned up).  Here, Article 6's use of "may" in the phrase "Extradition may be denied …" does not make clear that it is only the Executive and not the Court that may decline to allow extradition on this basis.  And other courts have reached a conclusion at odds with the authority cited by the Government.  For example, in interpreting a very similar lapse of time provision in the US-Romania extradition treaty ("Extradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State"), the United States District Court for the Northern District of Ohio (even after the Ninth Circuit's decision) concluded that the provision "bars" extradition if the offense is untimely under the Requesting State's applicable statute of limitations.  *Nagy v. United States*, No. 4:18 CV 416, 2018 WL 3999683, at *6 (N.D. Ohio June 19, 2018), *report and recommendation adopted*, No. 4:18CV416, 2018 WL 3996296 (N.D. Ohio Aug. 21, 2018).

Moreover, the interpretation of Article 6 advanced by the Government, which would exclusively reserve statute of limitations concerns for the Secretary of State, ignores the broader context of the provision and improperly renders superfluous the Treaty provisions that explicitly state when an action is committed to executive discretion.  *See Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 458 (D.N.J. 1999) ("It is a cardinal principle of construction that courts shall

---

appellate or district level.") (quoting *Villines v. Harris*, 487 F. Supp. 1278, 1279 n.1 (D.N.J. 1980)).

interpret contracts, including treaties, so as to give meaning to each provision rather than rendering some provisions, or portions thereof, superfluous."); *Harris v. Kellogg, Brown & Root Servs., Inc.*, 796 F. Supp. 2d 642, 653 (W.D. Pa. 2011) (same); *see also Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 737 (3d Cir. 2019) ("where a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent") (internal quotation mark and citations omitted); 2A Sutherland Statutory Construction § 46:6 (7th ed.) ("The omission of the same term or phrase from a similar section is significant to show different legislative intent for the two sections."). That is, in other provisions, the Treaty explicitly states when a determination lies solely with the executive branch. *See, e.g.*, Art. 2(4) ("If the offense was committed outside the territory of the Requesting State, extradition shall be granted in accordance with this Treaty if the laws of the Requested State provide for punishment of an offense committed outside of its territory in similar circumstances or if the offense has been committed by a national of the Requesting State. If the laws in the Requested State do not so provide*, the executive authority of the Requesting State may, in its discretion*, grant extradition, provided that the requirements of this Treaty are met.") (emphasis added); Art. 4(3) ("Surrender shall not be granted *if the executive authority of the Requested state determines*: (a) that the request for surrender . . . was in fact made for the primary purpose of prosecuting or punishing the person sought on account of his race, religion, nationality or political opinion. . . .") (emphasis added); Art. 4(4) ("*The executive authority of the Requested State may* refuse extradition for offenses under military law which are not offenses under ordinary criminal law.") (emphasis added); Art. 13 ("If the Requested State receives requests from the other Contracting State and from any other State or States for the extradition of the same person . . ., *the executive authority of the Requested State shall determine* to which State it will surrender the person.") (emphasis added); Art. 15(1)(c) ("A

44

person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for: . . . (c) an offense for which *the executive authority of the Requested State consents* to the person's detention, trial, or punishment for an offense.") (emphasis added).  Thus, had the drafters of the treaty, or those in Congress who approved it, intended that courts be precluded from considering statutes of limitations under the lapse of time provisions in Article 6, they surely knew how to do so:  the language exists in other treaty provisions to reserve the consideration to "the executive authority."

Additionally, the "bifurcated process" of extradition—wherein a judicial officer determines extraditability in the first instance—"reflects that fact that extradition proceedings contain certain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997); *see also Noeller v. Wojdylo*, 922 F.3d 797, 802 (7th Cir. 2019) ("Authority over the extradition process is shared between the executive and judicial branches.").  But application of statutes of limitations, of course, is an analysis familiar to courts and well suited for judicial resolution; indeed, numerous courts within the Third Circuit have exercised their judicial power to analyze time-bar provisions in considering extradition requests from other nations. *See Sidali*, 899 F. Supp. at 1348; *Betrand*, 1986 WL 8845 at *3; *Harshbarger*, 600 F. Supp. 2d at 647; *Bogue*, 1998 WL 961369 at *2.  Moreover, "[w]hile a court's role in an extradition proceeding is a limited role, that 'is not to say that a judge in an extradition proceeding is expected to wield a rubber stamp.'"  *United States v. Bilic*, 625 F. Supp. 3d 1214, 1222 (D. Utah 2022) (quoting *Santos v. Thomas*, 830 F.3d 987, 1006 (9th Cir. 2016)).  Thus, "Courts also act within their authority by considering the evidence as it relates [not only to probable cause, but

also] to the other elements, such as whether there is a valid treaty in effect and whether the political offense exception applies." *Id.* The same must apply to a determination of whether the applicable statute of limitations prevents extradition under the terms of the extradition treaty. *See Sidali*, 899 F. Supp. at 1348; *Betrand*, 1986 WL 8845, at *3; *Harshbarger*, 600 F. Supp. 2d at 647; *Bogue*, 1998 WL 961369 at *2. In sum, because Article 6's lapse of time provision is not expressly subject to the Secretary of State's discretion and because application of the statute of limitations is a traditional judicial function even in extradition proceedings, *see Sidali*, 899 F. Supp. at 1348; *Betrand*, 1986 WL 8845 at *3; *Harshbarger*, 600 F. Supp. 2d at 647; *Bogue*, 1998 WL 961369 at *2; *see also Curry v. Mississippi Dep't of Corr.*, No. 13-76, 2013 WL 2469630, at *3 (S.D. Miss. June 7, 2013), *aff'd sub nom. Curry, Jr. v. Mississippi Dep't of Corr.*, 586 F. App'x 165 (5th Cir. 2014) ("[R]uling on the statute of limitations [is] clearly within the normal judicial function[.]"), this Court should consider the application of the statute of limitation in evaluating Korea's extradition request with respect to Mr. Lee and not shrink from deciding the issue by deferring to the Secretary of State.

> **b.      Mr. Lee's Extradition is Time-Barred Under United States Law.**
>
> **i.      Applying the five-year statute of limitations, the offenses alleged became time barred on December 8, 2005, November 8, and October 15, 2009, respectively—the last of which occurred nearly fifteen years ago.**

If the alleged acts in the extradition complaint occurred in the United States, they would likely be charged as wire fraud under 18 U.S.C. § 1343. *See in re Extradition of Yoo*, 2021 WL 2784836, at *5 (S.D.N.Y. July 2, 2021) (comparing counts of embezzlement charged under Article 355 of the Criminal Act and Article 3 of the Aggravated Punishment Act to wire fraud under 18 U.S.C. § 1343); ECF No. 1-1 at 54-55 (alleging that Mr. Lee violated Article 355 of the Korean Criminal Act (Embezzlement, Breach of Trust)). Therefore, the catch-all five-year limitations

period for non-capital offenses under 18 U.S.C. § 3282 would apply to the embezzlement counts charged against Mr. Lee.  *See* 18 U.S.C. § 3282 ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").  Here, as noted, because the alleged acts of embezzlement were completed on December 8, 2000, November 5, 2003, and October 15, 2004, had these alleged acts been committed in the United States, the five-year limitations period would have lapsed on December 8, 2005, November 5, 2008, and October 15, 2009, respectively.  *See Yoo*, 2021 WL 2784836 at *5; 18 U.S.C. § 1343.[20]

That is, the alleged crimes set forth in the extradition complaint occurred nearly twenty years ago—well beyond the five-year statute of limitations period under United States law.  *See supra* at 32.  Thus, the purposes of statutes of limitations are obviously implicated by this matter.  If extradited, Mr. Lee will face significant hardships in preparing a defense based upon stale evidence and otherwise lost evidence as well as failures of memory and loss of witnesses.  *See*, *e.g.*, *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012) (noting that the "purpose of statutes of limitations" is "to protect defendants against stale or unduly delayed claims." (citations omitted)); *United States v. Levine*, 658 F.2d 113, 123 (3d Cir. 1981) ("[A] central purpose of statutes of limitations to prevent the government from instituting prosecutions

---

[20]Through the statute of limitations for wire fraud may extend to ten years if the offense "affects a financial institution, 18 U.S.C. § 3293(2); *see also SEC v. Pence*, 323 F.R.D. 179, 191 (S.D.N.Y. 2017), that provision does not apply to crimes that affect a private equity investment firm, *see United States v. Mendoza*, 4 F. App'x 94, (2d Cir. 2001) (holding that a private equity firm does not constitution a "financial institution" within the meaning of 18 U.S.C § 20 (Financial Institution Defined) for purposes of sentencing enhancements.  But even if a ten-year statute applied, it would have expired long ago, given that the acts at issue occurred, at the latest, in 2004.

after excessively long delays which may prejudice defendants by increasing the difficulty of marshalling evidence is linked to protecting the truth and accuracy of the factfinding process at trial."); *United States v. Gentile*, 235 F. Supp. 3d 649, 654 (D.N.J. 2017) (criminal statute of limitations are "designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.") (citations omitted). Indeed, limitations periods "are intended to foreclose the potential for inaccuracy and unfairness that stale evidence and dull memories may occasion in an unduly delayed trial." *Id.* That risk is certainly present here.

### ii. Because Mr. Lee did not flee from justice, the limitations period has not been tolled under U.S. law.

Article 6 further provides that "[t]he period during which a person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations." Art. 6. This provision incorporates 18 U.S.C. § 3290, which states that "[n]o statute of limitations shall extend to any person fleeing from justice." S. Exec. Rep. No. 106-13, 106th Cong., 1st Sess (1999) [hereinafter "Senate Report"] at 14 ("The second sentence of [Article 6] adopts the U.S. Standard, stating that the period during which the person for whom extradition is sought fled from justice does not count towards the running of the statute of limitations."). "To invoke the tolling statute, the Government must show, by a preponderance of the evidence, that 'the accused concealed himself with the intent to avoid arrest or prosecution.'" *United States v. Livingston*, 404 F. App'x 685, 690 (3d Cir. 2010). And, in the extradition context and beyond, the notion of "flight" requires that an individual have knowledge of the charges against him. *See*, *e.g.*, *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 992 (D. Or. 2011) ("To toll the statute of limitations . . . the government must show that 'the defendant knew that [she] was wanted by the police and [she]

48

failed to submit to arrest.'" (second and third alteration in original) (quoting *United States v. Ballesteros–Cordova,* 586 F.2d 1321, 1323 (9th Cir.1978)); *see also United States v. Duff*, 931 F. Supp. 1306, 1311-12 (E.D. Va. 1996) (flight requires that the individual "knew charges against him were pending and actively concealed himself with intent to avoid arrest or prosecution."); *United States v. Landfried*, No. 19-cr-8, 2021 WL 5417515, at *3 (W.D. Pa. Nov. 19, 2021) (concluding that knowledge that defendant "was charged with a crime, being summoned to court, or subject to an arrest warrant" was required to establish flight); *United States v. White*, 488 F.2d 660, 662 (8th Cir. 1973) (holding that evidence of a defendant's flight from law enforcement was erroneously admitted when an attempted arrest occurred "over five months" after the underlying crime and there was "no indication" the defendant knew he was being sought for the crime charged when law enforcement tried to stop him).

These requirements for showing flight are not present here.  First, as set forth at length above, *see infra* at 6-8, Mr. Lee's final departure from Korea in 2005 (and certainly the steps he was taking to return to his home in the United States) occurred before—indeed, long before—any investigation had been initiated in late 2005, let alone before he knew anything about it.  ECF No. 1 at ¶ 5(f) & (g).  Indeed, the record is clear that Mr. Lee's decision to return to the United States long predated his departure from Korea.  Far from an effort to flee prosecution or investigation, Mr. Lee's return to the United States was the culmination of a series of personal decisions by him and his wife, all focused on where their children would go to school and grow up, which would be in their home in the United States.  Thus, the family returned to the United States in 2000 after Mr. Lee's wife became pregnant with their second child.  *See* Collart Cert. Ex. 6.  The family returned to Korea again in 2002 for Mr. Lee's work, but that trip was short-lived.  In 2003, Mr. Lee and his family began the process of permanently relocating back to the United States so that his children

could attend school here.  That year, Mr. Lee purchased a home in Short Hills, New Jersey, which was sold after the proposed construction was not approved by the town, but the family quickly found a new house and on July 29, 2004, Mr. Lee purchased the home at which he and his family would reside for the next eight years.  *See* Collart Cert. Exs. 7,13.  The older son Jonathan started first grade in New Jersey in Fall 2004, and the younger, Andrew, began nursery school, all while Mr. Lee was finishing up his work for Lone Star in Korea and transitioning to the United States. *See* Collart Cert. Exs. 16-17; ECF No. 1-1 at 66.  Significantly, his successor took over as CEO of LSAK in mid-2003; Mr. Lee ultimately resigned from Lone Star in June 2005, before the Korean investigation commenced and at least one year before any arrest warrant had issued.  Thus, beyond the fact that no charges were pending, Mr. Lee could not even have known of any potential charges pending against him at the time he returned to the United States, defeating any theory of flight. *See Duff*, 931 F. Supp. at  1311-1; *Landfried*,  2021 WL 5417515 at *3.

Additionally, as Judge Clark found in granting Mr. Lee bail in this matter, "it is uncontested that Mr. Lee has lived openly in the United States since his return from Korea in 2005."  ECF No. 12 at 4.  Indeed, since returning home, Mr. Lee has made no attempt to conceal his identity or otherwise to avoid prosecution.  Perhaps most compellingly, beginning in the Spring of 2006, when the Korea's Supreme Prosecutor's Office contacted Mr. Lee in connection with their investigation, Mr. Lee, through counsel, promptly offered to meet with the Korean prosecutors— either in the United States or, under certain conditions, in Korea—which offer was rejected. Nevertheless, Mr. Lee twice permitted prosecutors to interview him telephonically, and later responded to a series of written questions.  From 2006 through 2017, Mr. Lee was never again contacted by the SPO or the Korean government, nor was his counsel, who has remained the same

throughout the last 18 years.[21]  Meanwhile,  since Mr. Lee reestablished his life in the United States in the early 2000s, he has lived open and honestly, without any attempt to hide his identify and in exactly two locations, within a few miles of each other, in Northern New Jersey.  Mr. Lee has never used an alias or false identification, and both his driver's license and passport identify his real name and address.  Mr. Lee holds property in his own name and is a registered voter.  And, almost immediately upon returning home, Mr. Lee enrolled in art history courses at Columbia University for the fall and spring 2005-2006 semesters, using his real name.  *See* Collart Cert. Exs. 13, 18.  Moreover, Mr. Lee has been—and remains to this day—an active member in his church community, which consists of Korean Americans.  He has attended weekly worship services, served as a youth group leader, and a college advisor to high school students in the church community attending high schools that do not offer college counseling.  *See* Collart Cert. Ex. 28. He has headed the church's building maintenance committee, including working tirelessly to fix the church roof when it caved in a year ago, and has been a leader in the adult fellowship group. As part of that work, he leads a discussion with a group of adults to go over the sermon message, but also to help befriend and integrate new members into the community.  *Id.* at 2.

Mr. Lee's cooperation in the SPO's investigation and his continued open life in the United States resoundingly defeats any allegation of flight under U.S. law.  *See Handanovic*, 829 F. Supp. at 993 (limitations period not tolled where immediately after leaving Bosnia and Herzegovina,

---

[21]The first that Mr. Lee learned of any interest in his prosecution by Korea was when he was arrested on August 5, 2017 at the Milan Malpensa Airport in Italy based upon an Interpol "Red Notice" requested by Korea.  Significantly, ten days later, an Italian court found no proper bases for extradition, as any prosecution would be time-barred under Italian law.  *See* Collart Cert. Ex. 27.  Indeed, the court explained that "there is no evidence of any actions that have interrupted the lapsing of the statute of limitations (see the copious e-mail correspondence obtained from Mr. Lee's American legal counsel, which attests that numerous contacts between Mr. Lee, his legal counsel and the Korean Prosecutors took place in 2006 …)."  *Id.*

respondent sought refugee status, disclosing her true identity and army affiliation; obtained an identification card from Bosnian government; and it was not established she was aware, or even should have known, that she was wanted by authorities); *In re Extradition of Azra Basic*, No. 11-MJ-5002, 2012 WL 3067466, at \*17 (E.D. Ky. July 27, 2012) (defendant did not flee, and therefore limitations period was not tolled, where respondent entered the United States in her own name and then continued to act openly as she had "always used the same, accurate identifiers" on her driver's license and social security card, and did not attempt to conceal where she lived). Cf. *Livingston*, 404 F. App'x at 690-91 (finding defendant "conceal[ed] himself from the authorities with the intent to avoid prosecution' where he used provided an alias to United States government agents, filed tax returns under a false name, and refused to turn himself in after being told on twelve occasions that he was wanted by law enforcement). Thus, the statute of limitations has not been tolled, and his extradition is time-barred under U.S. law.

### c.      Mr. Lee's Extradition is Time-Barred Under Korean Law.

Finally, Article 6 also provides that "[a]cts or Acts or circumstances that would suspend the expiration of the statute of limitations of either State shall be given effect by the Requested State, and in this regard the Requesting State shall provide a written statement of the relevant provisions of its statute of limitations, which shall be conclusive." Art. 6. Thus, the Court must also consider Korean law, to the extent it would toll the statute of limitations. Consistent with the treaty, the Korean government has provided a statement of the relevant statute of limitations provisions. ECF No. 1-1 at 50-52. Those provisions are Articles 252 and 253 of the Korean Criminal Procedure Act. Article 252 provides that the "limitation period shall commence to run after the criminal act is completed," and Article 253 of that Act provides that the "limitation period shall be suspended during the period, for which an offender stays abroad for the purpose of escaping criminal punishment." ECF No. 1-1 at 51.

Mr. Lee does not take issue with the Korean Government's statement of what the law in Korea is; that is consistent with the Article 6. But the application of that law to the facts of this case—*i.e.* the conclusion that Mr. Lee's actions indicate that he "fled" under Korean law, ECF No. 1-1 at 52, or was "stay[ing] abroad for the purpose of escaping criminal punishment"—is not a fact that is even provided by the extradition request, let alone insulated from review by this Court, which is certainly possessed of the judicial authority to make this fact-finding determination. *See Curry*, 2013 WL 2469630 at *3 ("[R]uling on the statute of limitations [is] clearly within the normal judicial function[.]"); *see also TIG Ins. Co. v. EIFlow Ins. Ltd.*, No. 14-CV-459, 2015 WL 5714686, at *5 (D.N.H. Sept. 29, 2015) ("While nothing could be easier than applying the forum's statute of limitations, no subject of foreign law could probably be ascertained with greater ease than a limitation period.") (internal quotation marks and citations omitted).

Indeed, the statement of the law provided by Korea in its extradition request is no more than a citation to the applicable statutory provisions. However, Korean law turns on the underlying facts—that is, on whether Mr. Lee has "stay[ed] abroad for the purpose of escaping criminal punishment." ECF No. 1-1 at 51; Prof. Lee Expert Report ¶. In this regard, the suspension provision under Article 253 of the Korean Criminal Procedure Act is construed narrowly because it creates a legal impediment to the operation of the statute of limitations, as expert information regarding Korean law provided by Mr. Lee, and the caselaw supporting his opinion, shows. Prof. Lee Expert Report ¶ 14 (citing Pusan High Court Decision 2013No38; Pusan District Court Decision 2012gohap248; Byung-Han Lee, What Constitutes "With the Intent of Fleeing from Justice" within Meaning of Subsection 253(3) of rule of Criminal Procedure, p.31 (2008); Constitutional Court of Korea, Sep.27, 1993, 92 gunma 284 decision ("[O]ur Criminal Procedure Law has a statute of limitations system, and this system gives up the state's right to punish after a

certain period of time, mainly for substantial reasons that the social impact of crimes has weakened over lapse of sufficient time and necessity of punishment on a crime(s) has disappeared.  As a result, a state faces extinction of its power to punish and its right to prosecute criminals, thereby guaranteeing the stability of the legal status of criminal suspects by law.")).

Specifically, to establish flight under Korean law, the prosecution bears the burden of establishing that a defendant left Korea with the "purpose of avoiding criminal punishment," which cannot be shown where "objective circumstances exist which clearly reveal the [defendant's] subjective intent being inconsistent with 'the purpose of escaping criminal punishment."  Prof. Lee Expert Report ¶¶ 16-18 (quoting Supreme Court Decision 2008do4101).  And, it cannot be shown that a defendant remained abroad to escape punishment "where it is difficult or impossible for the defendant to know of the case at issue or the possibility of being punished for it." *Id.* ¶ 16.

That is, to determine whether a defendant has "stay[ed] abroad for the purpose of escaping criminal punishment," Korean courts consider "various circumstances," including:  "the limitations period for the indictment of the pertinent crime"; "circumstances making the offender unable to come back to his/her home country"; "whether the period with such circumstance was long enough to negate the intent of escaping punishment compared with the limitations period of the pertinent crime"; whether the intent to return was notified to the investigative authorities or consulate"; and "where the defendant resides for a living" (*i.e.*, primary residence). *Id.* ¶ 10 (citing Supreme Court Decision 2008Do4104; Supreme Court Decision 2011Do8462).  Additionally, Korean legal scholars have defined overseas fugitives, for purposes of Article 252, as "natives or foreigners who have *fled the country for the purpose of circumventing legal action immediately after committing a crime, or while under investigation or under the execution of a sentence*." *Id.* ¶ 15 (citing Sang Cheol Shin & Yung Ho Im, The Current State of Transnational Fugitive

Offenders and the Methods of Their Repatriation:  Issues and Policy Proposals, Journal of the National Police Association, 2016, vol. 18, no. 1, Vol. 56, p.144) (emphasis added).  Such fugitives generally "use fake IDs or passports to launder their identities, and they avoid being tracked by the police by changing their residences or names regularly, making it difficult to apprehend and repatriate."  *Id.* (quoting Shin & Im, supra , pp. 138-177).

Of course, nothing of the sort is alleged, let alone occurred, here.  To the contrary, objective circumstances, entirely inconsistent with the notion of flight, demonstrate that Mr. Lee, an American citizen, returned to the United States before he learned of any criminal investigation into his alleged embezzlement and that his purpose in returning home was to raise his family in the United States where he and his wife wished for their children to attend schools.  Prof. Lee Expert Report ¶ 23; Supreme Court Decision 2008Do4101; 2019Do5925.  The facts with regard to this analysis are set forth in detail above; application of the standard under Korean law to those facts is as follows:

*First*, Mr. Lee's background and the timeline of when he departed Korea are inconsistent with "stay[ing] abroad for the purpose of escaping criminal punishment."  *See* Prof. Lee Expert Report ¶¶ 23(a), 24.  Mr. Lee is an American citizen who, it is clear, never intended to relocate to Korea permanently, but always intended to return home to the United States.  *Id.* at ¶ 23(a).  Moreover, Mr. Lee's timeline for returning home to the United States demonstrates that it was contemplated, and indeed, it was in process, well before the SPO began investigating him.  He began taking steps to return home to the United States in 2003, and his children were attending school here in New Jersey by 2004.  *See* Collart Cert. Exs. 16-17.  Indeed, Mr. Lee's time in Korea during the end of 2004 and particularly in 2005 was extremely limited.  *See* ECF No. 1-1 at 65-66.  Further, Mr. Lee departed from Korea for the last time on May 14, 2005, but the Tax Office did

not file any written complaint against him with the SPO until October 2005 (and Mr. Lee was, in any event, unaware of that complaint even when it was filed).  ECF No. 1-1 at 39.  This timeline negates any alleged intent to flee Korea with the intent to avoid prosecution.  Prof. Lee Expert Report ¶ 23(c) (citing Seoul High Court Decision 2018no93 (holding that flight to avoid criminal prosecution was not established where the defendant left Korea before the criminal investigation into tax evasion began)).

*Second*, while the statute of limitations period in Korea is seven years, ECF No. 1-1 at 52, Mr. Lee has lived openly in the United States since 2005, i.e., for *18 years*.  Thus, Mr. Lee has remained in the United States—his home—for more than twice the length of the statute of limitations.  This suggests, as a matter of Korean law as explicated by Mr. Lee's Korean law expert, that Mr. Lee, who is neither an attorney nor versed in Korean criminal law (and therefore, unfamiliar with the nuances of what might suspend the statute of limitations) did not leave Korea for the purpose of fleeing criminal punishment.  Prof. Lee Expert Report ¶ 23(b).

*Third*, Mr. Lee cooperated with the SPO in 2006, after living at home in New Jersey for over one year.  As explained, Mr. Lee agreed to (and did) telephonically speak with Korean prosecutors and answer their questions; he also answered written questions provided to him through counsel.  Mr. Lee even offered to meet with prosecutors in person under certain conditions.  *See* Collart Cert. Ex. 3;[22] Prof. Lee Expert Report ¶ 23(e).  Since 2006, the SPO has made no effort to contact Mr. Lee or his counsel, who has consistently represented him since that time.

---

[22]Though the SPO made reference to a warrant and extradition request, no such documents were ever served upon or otherwise provided to Mr. Lee or his counsel, with whom prosecutors were in frequent communication.  *See* Collart Cert. Exs. 20-23.  And, though on August 18, 2006, the SPO stated that "some suspected crime including bribery or illicit lobby case involved with [sic] Mr. Steven should be charged soon," there was no mention of the present embezzlement charges, nor was Mr. Lee ever advised that he had been so charged.  *See* Collart Cert. Ex. 23 (email

*Finally*, since returning home, Mr. Lee has lived an open and honest life, as explained *supra* at 11-13.  He has taken no efforts to conceal his identity, including living in only two homes, both owned in his own name, registering to vote, paying taxes, and enrolling in Columbia University, also all in his own name. *See* Collart Cert. Exs. 6-14, 18.  Moreover, he has been an active member in his church community, attending weekly worship services, serving as a youth group leader, advising high school students about prospective colleges, and assisting with integrating new church members. *See* Collart Cert. Ex. 28;Prof. Lee Expert Report ¶ 23(f)-(g).

For its part, there is really no question as to why Korea waited so long to pursue Mr. Lee's extradition: it was certainly not because Mr. Lee was a fugitive.  Rather, the timing of Korea's request holds the answer.  After failing to pursue extradition for nearly 20 years, during which Mr. Lee lived openly in the United States, Korea suddenly decided it should seek Mr. Lee's extradition in July 2020, just one month after the ICSID arbitration panel was reconstituted and new hearings were ordered pursuant to ICSID Arbitration Rule 12.  ICSID at ¶ 50; ECF No. 1-1 at 35 (request for extradition dated July 31, 2020).  As discussed above, Korea apparently believes that Mr. Lee might be helpful in the context of that long-running, high-stakes arbitration fight against Lone Star.  But, as discussed above, this is not a legitimate purpose for extradition and, in any event, as set forth in this section, extradition is no longer available because Korea's effort, in connection with the arbitration, comes far too many years after the expiration of the relevant statutes of limitations under U.S. law.

In sum, the objective circumstances—as they are considered as a matter of Korean law—demonstrate that Mr. Lee did not come to the United States in order to avoid criminal prosecution

---

communication).  And obviously, such other charges cannot be considered here, at least not legitimately, *i.e.*, in violation of the treaty's specialty provision. Art. 15(1)(a)-(c). *See supra* at 39.

or punishment (with regard to the alleged embezzlement in the extradition complaint or anything else). Prof. Lee Expert Report ¶¶ 21, 24. As a result, he would not be considered a "fugitive" under Korean law and the statute of limitations has not tolled at any time over the last nineteen (19) years after completion of the alleged embezzlement on October 15, 2004. Prof. Lee Expert Report ¶¶ 21, 24. Korea's request to extradite should, accordingly, be denied, as Judge Clarke anticipated, for any prosecution of the offenses here at issue is clearly time-barred.

### III.   The "Humanitarian Exception" and The Convention Against Torture Prohibit Mr. Lee's Extradition.

The judicially-created doctrine of non-inquiry[23] "generally" places "humanitarian considerations . . .  within the purview of the executive branch," but courts have their own independent authority to recognize and apply a humanitarian exception to non-inquiry in certain circumstances, which are present here. *See Hoxha v. Levi*, 465 F.3d 554, 563, 564 n. 14 (3d Cir. 2006) (declining to apply humanitarian exception) (citing *Gallina v. Fraser*, 278 F.2d 77 (2d Cir. 1960)); *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 994 (9th Cir. 2012) (en banc) (Berzon, J., concurring in part and dissenting in part) ("Several courts have suggested, though no case has yet been decided on this basis, that there may be a 'humanitarian exception' to the rule of non-inquiry.").

In particular, in "situations where the relator, upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency," the Court may consider evidence of abuse and torture in the Requesting State in determining whether to extradite an individual who may be subject to such mistreatment. *Gallina* 278 F.2d at 79; *United States v. Kin-Hong*, 110 F.3d 103, 112 (1st Cir. 1997) (noting that the rule of non-inquiry may not be

---

[23]*See Trinidad y Garcia v. Thomas*, 683 F.3d 952, (9th Cir. 2012) (en banc) (Berzon, J., concurring in part and dissenting in part) (noting that the rule of non-inquiry is "judicially developed").

"regarded as an absolute" and recognizing that circumstances may exist to bar extradition where the foreign country's procedures or punishment "shocks the conscience"); *Prushinowski v. Samples*, 734 F.2d 1016, 1019 (4th Cir.1984) (noting that the rule of non-inquiry cannot "be carried out to absolute extremes without developing fissures" and that extradition may be denied if a respondent will be subject to egregious punishment); *see also Kin-Hong*, 110 F.3d at 106 ("There is the ultimate safeguard that extradition proceedings before United States courts comport with the Due Process Clause of the Constitution . . . .   Some future case may, on facts amounting to a violation of constitutional guarantees, warrant judicial intervention."); *Matter of Burt*, 737 F.2d 1477, 1487 (7th Cir. 1984) (recognizing that principles of due process may bar extradition where the United States bases its extradition decision upon "constitutionally impermissible factors as race, color, sex, national origin, religion, or political beliefs" or where there exists "other exceptional constitutional limitations . . . because of particularly attrocious [*sic*] procedures or punishments employed by the foreign jurisdiction.").

In *Kin-Hong*, the United Kingdom, acting on behalf of its then-colony Hong Kong, requested the respondent's extradition to Hong Kong to face charges of bribery.  110 F.3d at 107. The respondent challenged the request, in part, because the territory of Hong Kong was to revert to the People's Republic of China in a matter of months and it would have been impossible for the Crown Colony to try and punish respondent before that date.  *Id.*  106.  The respondent argued that trial and detention under the Chinese government would raise humanitarian concerns, as China's "judicial and penal systems have never approached any norm of justice."  *United States v. Kin-Hong*, No. 96-1386, Brief of Appellee, Lui Kin-Hon, 1996 WL 33658850, at 11.  Indeed, the respondent noted China's documented "use of torture as  an interrogation [method] in criminal investigations."  *Id.* at 12 n.5.  The First Circuit, however, declined to find that the respondent's

extradition would "shock the conscience" because, *inter alia*, it was sought "by the *current* Hong Kong regime, a colony of Great Britain, which . . . is one of this country's most trusted treaty partners." *Kin-Hong*, 110 F.3d at 112.

In this case, and in addition to the bases discussed above, special circumstances necessitate application of the humanitarian exception to bar Mr. Lee's extradition because substantial evidence indicates that he will be subject to torture and inhumane conditions if detained in Korea—the country seeking his extradition.  *See* Collart Cert. Ex. 4 (Expert Opinion and Report of George Tugushi, hereinafter "Tugushi Expert Report").  Indeed, Korea's record of torture, inhumane and degrading treatment, and poor prison conditions has caused courts to deny extradition on humanitarian grounds.  For example, in a recent extradition matter that involved very similar circumstances, the Westminster Magistrate's Court of England and Wales denied Korea's extradition request, in part, because the respondent Derek Ong would likely be tortured if extradited to South Korea.  *Republic of South Korea v. Derek Ong*, Decision made on 4 October 2022, Westminster Magistrate's Court of England and Wales [hereinafter "*Ong*"] ¶ 659 (denying extradition where "the Request does entail a real risk of police ill-treatment, a grossly disproportionate sentence and, in gravest particular, prison conditions that would disproportionately infringe the Requested Person's right against torture and/or inhumane and degrading treatment.").

In *Ong*, the Republic of Korea alleged that the respondent, a British citizen and resident, manipulated Korean financial markets with respect to certain derivatives, and requested his extradition from the United Kingdom.  *Id.* ¶¶ 2, 6-13, 455(a) ("The Requested Person is sought by an extradition request . . . issued by the Government which seeks his extradition to stand trial for an offense of violating the Korean Financial Investment Services and Capital Markets Act, by

manipulating and conspiring with others to manipulate the market price of options via massive stock sales to obtain profits from derivatives."). Expert witness George Tugushi testified on behalf of the respondent and detailed concerns international human rights organizations have found with respect to Korean prisons, such as "overcrowding, limited access to medical aid, frequent use of protective devices for retributive purposes and solitary confinement for up to 30 days." *Id.* ¶ 331.

The magistrate court adopted Mr. Tugushi's findings, which included "specific, up-to-date, relevant material," and found "substantial grounds for believing in a real risk of inhuman [*sic*] or degrading treatment" in Korean detention facilities. *Id.* ¶ 654. In particular, the court found that "[t]he problems with Korean prisons include, but may not be limited to, gross overcrowding in space routinely less than 3m$^2$ per prisoner; inadequate material conditions; inhumane and degrading restraint; solitary confinement practices; and questionable medical treatment in terms of access and methodology." *Id.* ¶ 655 (citations omitted). The court found these conditions particularly concerning given the respondent's demonstrated risk of suicide. *Id.* Finally, the court found that any assurances from Korea that it would improve prison conditions were "inadequate in light of Mr Tugushi's stark and compelling evidence, all of which is based on source material available to the Requesting State, and relevant to the assurances that have already been sought from the Republic of Korea." *Id.* ¶ 656. Therefore, the court denied the extradition request and discharged the respondent. *Id.* ¶ 659 (discharging Derek Ong "principally" on human right concerns).

Here, the risk of torture, inhumane and degrading treatment, and other misconduct by Korea is particularly acute because Korea has made clear its desire to interrogate Mr. Lee in an effort to overturn the Lone Star arbitration award, a matter that, as described above, is one of great national importance. These specific circumstances, coupled with "stark and compelling evidence"

of Korea's generalized propensity to torture and mistreat its prisoners, demonstrate a substantial risk that Mr. Lee will be subject to torture, inhumane and degrading treatment, and other abuse upon his extradition.  As detailed in a new report provided by Mr. Tugushi to this Court, the UN Committee against Torture (CAT), UN Human Rights Committee (HRC), the reports of the National Human Rights Commission of Korea (NHRCK), and the recent judgment from the Westminster Magistrate's Court all confirm that confinement in a Korean facility poses the very real risk of the imposition of various forms of torture or inhumane treatment, including physical harm from the application of various types of restraints or confinement in painful positions; isolation and excessive solitary confinement; lack of access to timely medical care; and substandard living conditions, including systemic overcrowding; and the denial of access to legal counsel.  Tugushi Expert Report ¶ 91.

The specter of torture is considerably heighted here given the political climate in Korea and the vilification of Lone Star and foreign investors, and Mr. Lee in particular, in the Korean press, as well as Korea's expressed intent to interrogate Mr. Lee, thereby using his detention to coerce his testimony in a way that it has not been able to do in the past.  *See*, *e.g.*, Collart Cert. Ex. 31 (bounty article 30423) ("WANTED DEAD or ALIVE, STEVEN LEE . . . For illegal KEB purchase" ); Se Young Lee, *In $8 billion Samsung bid, some Koreans break ranks to side with foreign activist*, http://finance.yahoo.com/news/8-billion-samsung-bid-koreans-211153152.html?1=1 (June 14, 2015) ("The stereotype of the money-hungry foreign opportunist is a staple of local media coverage.  U.S.-based private equity firm Lone Star remains the archetypical villain, often portrayed as a greedy investor that took advantage of the country in the aftermath of the 1997-98 Asian financial crisis, profiting massively from its investment in Korea Exchange Bank.").  Certainly, the pressure on the Korean Government to deal harshly with Lone

Star, and Mr. Lee, will make such inhumane treatment far more likely. *See James P. B. v. Edwards*, No. CV 21-4810 (JMV), 2021 WL 2981044, at *1 (D.N.J. July 15, 2021) (Board of Immigration Appeals relied on pressure from the media in finding that the likelihood of torture if respondent was removed to Liberia was elevated, in part, because of the president of Liberia's receipt of negative media, where the record demonstrated that criminal deportees are reported by the media; the president had "been given very negative news coverage for his relationship with the respondent"; and newspapers in Liberia reported that respondent had cooperated against the president).

The treatment amounting to torture and inhumane conditions that Mr. Lee will likely face in Korea will have particularly devastating consequences given Mr. Lee's fragile health. Indeed, shortly before this submission was due to be filed, on October 7, 2023, Mr. Lee suffered a heart attack and required emergency medical attention. Upon examination, doctors determined that he had critical coronary disease and required urgent quadruple bypass surgery and artery grafting, which was performed on October 10, 2023. *See* Collart Cert. Ex. 26. Mr. Lee now remains under the intense care of medical professionals and will require ongoing cardiac rehabilitation for several months and monitoring. Given the documented inadequacies with the provision of medical treatment in Korean prisons, the conditions Mr. Lee will face will seriously threaten his life and should be regarded by this Court as a basis to deny his extradition. *See* Tugushi Expert Report ¶ 98 ("It goes without saying that placement of Mr. Lee in the overcrowded detention facility, in the overheated cell, might negatively affect his health. Considering his condition and systemic problem of timely access to specialized care in the prisons of Korea, the risk of his health deteriorating is very high."); *Ong*, ¶ 655 (noting that "inadequate material conditions" and "questionable medical treatment in terms of access and methodology," among other things, were

of acute concern given Mr. Ong's "medical profile" and risk of suicide).  Considering Mr. Lee's recent and potential ongoing medical issues, his extradition to Korea and subsequent "incarceration combined with lack of access to timely medical care might be life-threatening."  Tugushi Expert Report ¶ 100.

Given the substantial likelihood that Mr. Lee will be subject to torture, inhumane and degrading treatment, and abusive conditions in Korean prisons—and that his medical condition is such that the documented lack of care in a Korean facility could prove life-threatening upon detention in Korea, the humanitarian exception to the non-inquiry principle should be applied to bar Mr. Lee's extradition.  Korea's request should be denied lest it be permitted to interrogate, coerce, torture, abuse, and perhaps even kill Steven Lee, an American citizen.

## CONCLUSION

For the foregoing reasons, the Court should deny the Government's Motion for Extradition and decline to certify the matter to the Secretary of State.


Dated:  October 16, 2022

Respectfully submitted,

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Anne M. Collart
Christina M. LaBruno
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com

*Attorneys for Respondent,*
*Steven Lee*