**EXHIBIT 2**

*In the Matter of the Extradition of Steven Lee*,
Docket No. 2:23-mj-09089-CLW

Expert Opinion

Martin Uden

1. I have been asked to prepare advice regarding the Republic of Korea's request for extradition from the United States of America of Mr Steven Lee.  I have been retained by Mr Lee and Gibbons P.C. to provide background and expert opinion relating to that extradition request which is made at the request of the Republic of Korea pursuant to the bilateral extradition treaty in force between the two countries.

Introduction

2. The bulk of my working life has been spent as a member of the British Diplomatic Service.  I studied law at Queen Mary College, London University, and was called to the bar in 1977, before joining the Foreign & Commonwealth Office the same year.  I was sent in 1978 to Seoul to study the Korean language for two years full-time, prior to taking up an appointment as Second Secretary (Political) in the British Embassy in Seoul in 1980.  I subsequently returned to the Embassy in Seoul as Political Counsellor in 1994 and finally as British Ambassador in 2008. In total, I have lived some ten years in Seoul, am conversant with the Korean language, and have developed an understanding and expertise in Korean politics and culture.

3. My other diplomatic postings have included Bonn, Ottawa, San Francisco and Lagos and while on special unpaid leave from the FCO I was appointed in 2012 as the Coordinator of the UN Expert Panel on sanctions against North Korea, a post I held in New York until 2014.

4. On retirement from the FCO in 2015, I was employed by the Hong Kong and Shanghai Bank Corporation (HSBC) to undertake a quasi-ambassadorial role in the Far East, including in Korea.  Since leaving that job in 2017, I have become Executive Chairman of the British Korean Society and have also been appointed President of the British Korean War Veterans' Association.   I have been regularly invited by the Korean Embassy in London to speak at events regarding the Korean peninsula and similarly by the International Institute for International Affairs (commonly known as Chatham House) to take part in, and occasionally chair, public and private conferences and working groups on various aspects of the Korean peninsula.

5. In terms of published works, I wrote an historical introduction to *Korea: Caught in Time* (1997) by Terry Bennett and am the author of *Times Past in Korea* (2003). My brief curriculum vitae is appended to this report.

6. In this particular case, I come with some personal knowledge, having served as British Ambassador in Seoul from 2008 to 2011, at the beginning of which term, HSBC was pursuing the purchase of Korea Exchange Bank (KEB) from Lone Star.  I had met the Group Executive Chairman of HSBC in London before my posting and kept in close touch with the local CEO of HSBC in Seoul.  They were keen that I should use my position to understand and influence the Korean government's policy on the possible sale of KEB.  This was a major issue for me in the first year and more of my posting,

although our efforts proved fruitless because of the delay in the sale caused by the regulatory authorities; ultimately the Global Financial Crisis undermined the financial basis of the deal.

7. I can see from the business cards that I have retained from that era that I was in touch with the Governor of the Financial Supervisory Service, Kim Jong-chang[1] (who was in office from 2008-2011) and the Chairman of the Financial Services Commission, Chin Dong-soo (who was in office from 2009) and I also knew Jun Kwang-woo, who was Chin's predecessor, and Larry Klane, who served as Lone Star's nominee as Chairman and CEO of KEB from April 2009 to March 2012.  In all these cases my relationship was purely professional and I have not kept in touch with them since my term as ambassador ended. At the time, I would have seen it as part of my role to meet them as often as possible to ensure I was conversant with developments and to lobby them to facilitate the sale of KEB to HSBC.  I understand from counsel that Mr Steven Lee left Korea before my arrival in 2008, and I am not aware that I have ever met him.

8. I have been provided with the extradition complaint filed by the US Attorney's Office for the District of New Jersey dated 24 February 2023 in this case and its supporting documents, the letters dated 6 and 8 March 2023 regarding Mr Lee's release on bail, the judgement of the International Centre for the Settlement of Investment Disputes dated 30 August 2022 and its subsequent decision on rectification in the arbitration between various Lone Star-associated entities and the Republic of Korea. I have also been provided with news articles regarding the case by Gibbons P.C. and where I have relied on these I have verified the source and referenced them in this opinion. Counsel for Mr Lee have offered access to any and all information in their files for my review. I have also conducted my own research into media coverage of the case and give references to these sources where appropriate.

9. I have provided expert testimony in other cases regarding extradition to Korea.  The first was the case of *Republic of Korea v. Ong* (2022) before a Magistrates' Court in London where the Korean Prosecution Service sought extradition for an alleged offence in 2010.  The *Ong* case also involved the Korean financial regulatory authorities since the indictment alleged improper trading on the Korean Stock Exchange on the part of three Deutsche Bank traders, one of which was Mr Ong.

10. The case has not been publicly reported, but the District Judge delivered a long and detailed judgement in which he found against the request for extradition. District Judge Rimmer stated that the extradition request failed on three grounds:
    - It was attributable to extraneous considerations, including nationality and political motivation;
    - It suffered from undue delay; and

---

[1] I use the standard practice for Korean names of giving the family name first, followed by a two-syllable hyphenated given name. When the name is westernised, as with Steven Lee, I follow standard western practice.

- It entailed a real risk of police ill-treatment, a grossly disproportionate sentence and prison conditions that would disproportionately infringe the Requested Person's right against torture and/or inhumane and degrading treatment.

11. Following on from that case, I have been asked for an expert opinion in two other cases apart from Mr Lee's. Since these are not as yet fully resolved and subject to confidentiality agreements, I can say no more than that one was also before the US system, while another sought to overturn an Interpol red warrant.

The Korean Political Background

12. I would not wish to go into great detail regarding Korean history, but it is relevant to this case to note that Korea has viewed itself traditionally as unfortunately placed between the two major powers of China and Japan – a shrimp among whales as a Korean saying has it – and also subject to the more recent great power rivalry between the Soviet Union and the USA. It has been the object of numerous invasions over the years, from Japan and various Chinese dynasties, culminating in its absorption as a Japanese colony in 1910, an era which ended with its division at the end of the Second World War into two countries divided arbitrarily at the 38°N parallel. North Korea attempted to end that division by its invasion of the South in 1950, with a rough status quo ante along the Demilitarised Zone formalised by the ceasefire agreement of 1953.

13. This short account can explain why Korea has generally found little to be gained from foreign engagements. On the contrary, maintaining a strict isolationist approach was regarded as a wise course, leaving the image of foreigners based on ignorance and manifold bad experiences. That attitude has of course changed radically with years of exposure to global influences (when I arrived in Seoul in the 1970s, Koreans generally had no right to a passport) and Korea's own success on the global stage has had a significant effect on the Korean mindset. Nonetheless, at the time of Mr Lee's work in Korea, the country was still reeling from the IMF Crisis which was commonly seen as a plague visited on Korea, rather than something for which Korea was itself responsible. I shall return to this theme when reviewing the Arbitration Tribunal's findings regarding Lone Star's involvement in Korea.

14. Since I shall argue that the decisions of Korean prosecutors are being made for reasons other than criminal prosecution, I should briefly outline the relevant circumstances of Korean politics since Mr Lee's time in Korea.

15. The Korean political system is very reminiscent of that of France, with a directly elected President who wields considerable political power. The President appoints a Prime Minister and Cabinet, subject to the approval of the National Assembly. The executive, including the Prime Minister, tends to be made up of a mixture of politicians and technocrats who are rarely drawn from the ranks of the National Assembly. The efficient running of the legislative system relies, as in France and the USA, on cooperation between the President and the Assembly, with no guarantee that the majority of the members of the Assembly will be from the President's party. Indeed, since the rhythm of Presidential and Assembly elections is deliberately not synchronised, a President can have a majority and a minority in the Assembly in the course of a single five-year term.

16. According to the statements of the Korean Prosecutor attached to the complaint filed by the US Attorney's Office for the District of New Jersey dated 24 February 2023, Mr Lee first visited Korea in 1991 for one week. He made another visit for approximately one week over Christmas and New Year in 1996. In 1998, he began making a series of shorter trips with increasing frequency and left for the final time in 2005. In March 1999, according to Attachment 2 of the Statement of Confirmation, he was granted permission to reside in Korea as Representative of Lone Star Advisors Korea.

17. In 1999 the Korean Presidency was held by President Kim Dae-jung. He was succeeded by President Roh Moo-hyun in February 2003, then President Lee Myung-bak in February 2008, President Park Geun-hye in February 2013, President Moon Jae-in in May 2017 and finally by the incumbent President Yoon Suk-yeol in May 2022. Unhelpfully, Korean political parties regularly change their names and exact composition, so we cannot establish the President's political views from the names of their parties but, in short, Presidents Kim, Roh and Moon would be regarded as on the progressive or liberal wing of politics, with Presidents Lee, Park and Yoon from the more conservative side.

18. While I would not suggest it is the only factor in this case, it is certainly relevant to note from this short chronology that Mr Lee's time in Korea and his alleged offences there took place while progressive Presidents were in power. The fact that a conservative President is now in office will mean, at a minimum, that the current government would not be uncomfortable with the pursuit of Mr Lee for offences which allegedly occurred under a progressive administration, and which have their background in the financial liberalisation following the IMF crisis which also took place under a progressive President.

Judicial and Prosecutorial Independence

19. Korea can pride itself on its emergence from an authoritarian military-based regime to a constitutional democracy. Reforms in 1987 established a truly democratic form of representation for both the Presidential and National Assembly electoral systems. The respected US think-tank, Freedom House,[2] assesses the Republic of Korea's political rights and civil liberties as scoring 83/100,[3] on a par with the USA. More specifically, Freedom House rates Korea's performance on the independence of the judiciary and due process in criminal and civil cases as 3 out of 4.[4] By and large, I would consider this a fair assessment.

20. Freedom House, in the same assessment, also notes that there have been instances where, "senior judges were ensnared in corruption scandals in recent years," and refers to political controversy regarding the status and powers of Prosecution Service. Given that there is some indication of political involvement (to be referred to later) in this case, it is appropriate to sketch out some of the reasons why Freedom House did not give Korea full marks for judicial independence and due process.

---

[2] https://freedomhouse.org/
[3] https://freedomhouse.org/country/south-korea/freedom-world/2023
[4] Ibid.

21. My review of the Arbitration Tribunal's judgement (which recounts the legal disputes between Korea and Lone Star) and my general familiarity with politically sensitive judgements lead me to accept that Korean courts are well able to resist political pressure, even though some commentators take a more critical stance.[5] In the various cases of litigation surrounding Lone Star, the courts have by no means accepted unhesitatingly the arguments of the Korean government and both sides have had their victories and defeats in the Korean courts. But there have also been disquieting episodes. To quote from the 2021 Freedom House report,[6] "Yang Sung-tae, who served as chief justice from 2011 to 2017, was on trial during 2020 after being accused in 2019 of manipulating high-profile cases in 47 instances to serve the interests of the administration and major businesses. Trials for several other judges who had been indicted for misconduct in 2019 proceeded during 2020, and at least three were found not guilty." (At the time of writing, the proceedings at first instance against Chief Justice Yang have still not been completed, but a judgement is expected imminently.)

22. The underlying Confucian nature of Korean society and the fact that the Chief Justice and members of the Supreme Court are appointed by the President (with the consent of the National Assembly) heighten the possibility that even senior judges will have regard to the political exigencies of the day, as shown by the allegations against Chief Justice Yang Sung-tae. Against this, it should be pointed out that members of the Supreme Court by convention serve a single six-year term, so cannot expect further advancement within the judicial service unless they rise to become Chief Justice, and (in contrast to the Chief Prosecutor) this rhythm has been rigorously maintained in the case of the Chief Justice, with the last five holders of the office taking up appointment on 25 September, six years after their predecessor took office.

23. Of greater concern, especially since President Yoon (himself a former Chief Prosecutor) came to power in May 2022, has been the role of the Korean Prosecution Service in political prosecutions and in government generally. At its highest level, the concern has centred on the practice whereby former Presidents have been subject to criminal prosecution after their term of office even though (with the exception of the impeachment of President Park Geun-hye) no allegations were raised by prosecutors while the Presidents were in power. Thus, President Chun Doo-hwan (served 1980-88) was convicted of insurrection and bribery in 1996; President Roh Tae-woo (1988-1993) was convicted at the same time for similar offences; President Roh Moo-hyun (2003-08) committed suicide in 2009 while his family was under investigation for corruption; President Lee Myung-bak (2008-2013) was convicted of corruption in 2018; and President Park Geun-hye (2013-17) was impeached and removed from office for influence-peddling and was convicted in 2018 of bribery and abuse of power.

24. It should be noted that in Korea both the judiciary and prosecutorial services are (similarly to the practice in France) separate streams of the legal profession, which

---

[5] "Judicial independence in South Korea revisited," East Asia Review, 6 July 2021, https://www.eastasiaforum.org/2021/07/06/judicial-independence-in-south-korea-revisited/
[6] https://freedomhouse.org/country/south-korea/freedom-world/2021

traditionally lawyers will elect to serve in soon after qualification. Most markedly in the case of the Korean prosecutorial service, this separation has led over the years to a jealous insistence on independence,[7] although this has often been regarded by political opponents as partisanship. Thus, whilst prosecutors routinely insist on their own detachment and public duty, the fact is that the subjects of their investigations have too often been opponents of the government, which has raised understandable suspicions that political bias may have been involved. While I have mentioned the instances of Presidents being investigated only when their political opponents have come to power, there have been numerous instances of families, political aides and ministers also being prosecuted in the same way. With the exception of President Park and her staff, I can think of no instance where prosecutors have raised cases against the incumbent administration.

25. The status of the Prosecution Service has become a matter of lively political debate in Korea. A recent review[8] argues that the pressures within the Prosecution Service to conform to corporate culture, the use of special investigations for political ends and the appointment of prosecutors outside the Prosecution Service (notably as the Senior Secretary for Civil Affairs in the President's Office) all led to doubts about the political independence of the Service and calls for its reform.

26. This had reached the point where over the years a suspicious coincidence of a new President appointing a new Chief Prosecutor at the start of the term of office had become accepted, even though Article 37 of the Prosecutors' Office Act makes it clear that prosecutors should not be removed from office except in exceptional circumstances. The practice, built up in recent years of the President making a fresh appointment of the Prosecutor General, gives the President the opportunity on taking office to pick an individual who shares the President's stance in whatever way, while making clear to the appointee to whom he owes his position.

27. The previous President, President Moon, led a notable campaign to clip the wings of the Service. One of his final acts was to pass legislation removing the Service's investigative powers except in cases of corruption or economic crime. The new Administration under President Yoon objected to this and sought to overturn the legislation on constitutional grounds but failed in this attempt.[9]

28. The main controversy regarding the Prosecution Service in Korea, however, is the President's status as a former Chief Prosecutor and his appointment of former colleagues to governmental positions. These concerns were voiced soon after he took

---

[7] "The Characteristics of the Korean Prosecution System and the Prosecutor's Direct Investigation," by Lee, Jung-Soo at https://www.unafei.or.jp/publications/pdf/RS_No53/No53_13VE_Soo.pdf
[8] "How Prosecutorial Independence is Lost: An Empirical Look inside South Korea's Bureaucratically Organized Prosecution" Neil Chisholm, Sungkyunkwan University, Seoul, 2021 https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766683
[9] "Justice Ministry must take court's ruling on prosecutor reforms to heart" Hankyoreh Shinmun, 24 March 2023, https://english.hani.co.kr/arti/english_edition/english_editorials/1085072.html

office[10] but have increased since.[11] While it is understandable that a President will pick his advisers from among those already known to him, the integration of so many senior prosecutors into the mainstream of government has not only raised concerns about the diversity of opinion that the President may receive, but also about this politicisation being a two-way street. Not only will ex-prosecutors see issues in the same corporate manner, their links to their old profession and the awareness among prosecutors that their decisions will have a higher political profile can have a corrosive effect on the necessary independence from political influence of the prosecutorial process.

Background to the financial scene in Korea

29. While the judgement of the International Centre for the Settlement of Investment Disputes (ICSID) provides a thorough review of the background to Lone Star's involvement in the Korean financial sector, it may be helpful to the court if I set out a summary of the history, not least because I was an observer of a good part of it. In fact, when I left Korea at the end of my 1994-97 posting in the British Embassy in Seoul, the storm clouds were already gathering elsewhere in Asia and notably in Thailand large amounts of foreign debt were putting immense pressure on the Thai currency's link to the US dollar.

30. Prior to 1997, the Korean financial sector was seen as a means to an end of ensuring a supply of adequate capital for investment, rather than as a source of national wealth or income in itself. This had the consequence of diverting not only finance, but also human capital, away from the finance sector and into manufacturing, leaving the sector exposed if unexpected pressures arose. This represented a risk not only for the financial institutions themselves, but also for any debtors where the institutions had extended excessive credit.

31. Those risks duly played out during what in Korea is called the "IMF Crisis" of 1997, which was a turning point for Korea and its financial sector.[12] A series of causes led to this serious financial crisis:

   a. A foreign exchange crisis hit Asian countries, the currencies falling against the US dollar and governments being unable to halt the slide;
   b. Korea's solid foreign currency reserves proved insufficient to halt a similar fate for the Korean Won (falling from some 800 to the US dollar to 1,700/$) with catastrophic consequences for over-indebted conglomerates;
   c. Mighty Korean companies such as Kia, Daewoo and Samsung had to divest subsidiaries or seek bankruptcy protection, while the financial institutions that had

---

[10] "Beware the republic of prosecutors" Korea Joongang Daily, 5 June 2022, https://koreajoongangdaily.joins.com/2022/06/05/opinion/editorials/Yoon-Sukyeol-appointments-prosecutors/20220605200141887.html

[11] "Tracing year one of Yoon's rampant prosecutor cronyism" Hankyoreh Shinmun, 9 March 2023, https://english.hani.co.kr/arti/english_edition/e_national/1082897.html

[12] "The Korean Financial Crisis of 1997 – A Strategy of Financial Sector Reform," by Tomás J. T. Baliño and Angel Ubide at https://www.imf.org/en/Publications/WP/Issues/2016/12/30/The-Korean-Financial-Crisis-of-1997-A-Strategy-of-Financial-Sector-Reform-2903

    extended credit to them were themselves forced into bankruptcy or absorption by other companies;

    d.    The Korean government had to seek assistance from the IMF in the face of a stock market collapse, negative economic growth, rising unemployment and interest rates.

32. The conditionality imposed by the IMF in return for its assistance to Korea in 1997 included greater exchange rate flexibility, tighter monetary policy, structural economic reform (notably to improve governance at the large conglomerates) and reform of the financial sector, to include greater foreign participation, not least to take over failing Korean financial institutions.[13] This led to significantly greater foreign involvement in the Korean financial sector.

33. The IMF Crisis came as a massive shock to Korean society. Korea had not suffered negative economic growth since 1979 in the aftermath of the assassination of President Park Chung-hee, and it had put enormous societal trust in the interventionist policies of the government and the ability of the conglomerates to provide continued employment and solid profits. Nor was there any well-developed social safety net to help those disadvantaged by these shocks. The effects went far beyond redundancies at large companies. Due to the extent of the stock market fall and loss of confidence in the financial system, overall consumption fell and many small businesses failed. While external commentators saw the events as an opportunity to bring the conglomerates to heel and to increase foreign investment generally, Koreans saw the crisis as a humiliation, caused by factors outside Korea's control and not one brought about by any significant fault on Korea's part.

34. In short, foreign investment in the Korean financial sector was seen as highly unwelcome and forced on the country by the IMF. The government found that the burden of non-performing loans was such that some banks had to be nationalised and/or merged with other Korean banks or be taken over by foreign interests.[14] The government itself had to take on the non-performing loans of failed banks and provide guarantees to the (often foreign) acquiring banks. As a consequence, the Korea Exchange Bank received fresh capital from Commerzbank, its foreign partner; Korea First Bank (which, with Seoul Bank, had been recapitalised by the government) was taken over by Newbridge Capital and subsequently sold to Standard Chartered Bank; and other banks were merged with or taken over by domestic banks.

35. The foreign interests that purchased Korean financial firms went on to cash out with significant profits. Newbridge's sale of Korea First to Standard Chartered in 2005 is said[15] to have created a profit of $1.25 billion, with nil tax liability in Korea thanks to the transaction being channelled through Malaysia.[16] Similarly, in 2004 the private

---

[13] "Crisis and Recovery: What We Have Learned from the South Korean Experience?" by Jong-Wha Lee and Changyong Rhee at https://core.ac.uk/download/pdf/231897267.pdf

[14] "The banking reform in Korea: issues and challenges," by Yung Chul Park at https://www.bis.org/publ/plcy07r.pdf

[15] "S. Korea wants to rewrite its tax treaties," Hankyoreh Shinmun, 10 July 2007, https://www.hani.co.kr/arti/english_edition/e_business/221456.html

[16] See also the ICSID Tribunal's judgement of 22 August 2022, paragraph 111

equity firm, Carlyle, is said to have made $761 million through its sale of KorAm Bank, again with no tax liability in Korea.

36. The (likely justified) perception that Korean financial companies had received substantial government support and then been sold at massive profits by foreign buyers with clever accounting to avoid Korean tax did not help the next instance of a foreign company attempting to cash out its investment in a Korean bank. The US private equity firm, Lone Star, had bought a controlling stake in Korea Exchange Bank (KEB) in 2003 for $1.2 billion, through a Belgian subsidiary for the same tax reasons. KEB returned to profit and Lone Star attempted to sell its stake, including to Hong Kong and Shanghai Bank Corporation, concluding a preliminary sale agreement in late 2007. However, as the Financial Times[17] later put it, "South Korea's politicians, unions and newspapers have lambasted Lone Star as a foreign vulture feasting on a nation felled by the 1997 Asian financial crisis."

37. As a complicated series of alleged corruption and accounting scandals emerged, the Korean regulators blocked the sale to HSBC, and HSBC withdrew its offer after the collapse of Lehman Brothers in 2008. Lone Star was eventually forced to divest itself of its controlling interest, and a protracted legal battle continues to this day between Lone Star and the Korean government at the International Centre for the Settlement of Investment Disputes (ICSID).

38. The ICSID Tribunal found in 2022 that Lone Star was entitled to the protection of the 2006 Investment Protection Treaty[18] between Belgium and the Republic of Korea and should therefore have received "fair and equitable treatment" from the Korean authorities. It found that by prioritising political considerations in blocking the sale of KEB and pressing for a reduction in the price to be paid for the company, the Financial Services Commission (FSC) wrongfully caused Lone Star to take a US$433 million loss, as against the profit it would have made if the FSC had discharged its duties appropriately. The Tribunal also found that Lone Star was partially to blame for the loss and accordingly reduced the sum awarded by 50%. Both Lone Star[19] and Korea[20] have appealed against the ruling.

Lone Star's involvement in Korea

39. The ICSID Tribunal's ruling covers Lone Star's investments in Korea comprehensively, but it would be relevant to highlight the popular view of the transactions and the criticism of the Korean authorities' handling of these investments to demonstrate the political profile that Lone Star has attained in Korea.

40. I have chosen to illustrate the attitude towards Lone Star by tracking comments and reporting in the Korea Times since 2012. This date marks the sale of KEB, so in some

---

[17] "Lone Star struggles with Seoul to shed KEB," Financial Times, 1 August 2011
[18] https://www.fdfa.be/en/agreement-between-the-belgium-luxembourg-economic-union-and-the-government-of-the-republic-of-korea
[19] "Lone Star seeks to cancel int'l tribunal order against Korea," Korea Times, 1 August 2023 https://www.koreatimes.co.kr/www/biz/2023/08/602_356096.html
[20] "Korea appeals World Bank ruling on Lone Star dispute," Joongang Daily News, 1 September 2023 https://koreajoongangdaily.joins.com/news/2023-09-01/business/finance/Korean-government-files-complaint-against-Lone-Stars-ruling/1860360

senses Lone Star had withdrawn from Korea at that point.  The Korea Times itself is one of two English-language print dailies in Korea. It has a middle-ground and slightly conservative editorial line and hosts foreign and Korean commentators regularly on its pages.  But I use it particularly since its archives are easily searchable and these references can be easily examined given that they are in English.  I have seen other Korean-language reporting which on the whole is similar or even more hostile towards Lone Star.

41. I believe the following extracts give a representative flavour of media comments regarding Lone Star.

- "It is safe to say that South Koreans have a bittersweet feeling about the financial regulator's approval of Hana Bank's deal to take over Korea Exchange Bank (KEB) from the Dallas-based Lone Star Funds. They can heave a sigh of relief as the local bank is to take back KEB after nine years of control by foreign capital. But they are unhappy with the U.S. private equity fund for its predatory nature. […] It is true that Lone Star's too profit-oriented policy has touched off a xenophobic attitude among Koreans toward foreign capital. […] But, it seems hard for Koreans to remember the fund as a good investor, rather than a predator."[21]

- "[E]ven after Korean regulators allowed Lone Star to execute its sale of the Korea Exchange Bank (KEB) to Hana Financial Group, providing a cheerful ending to its lengthy effort to sell the bank it had acquired in 2003, the U.S. buyout firm's departure leaves a bitter aftertaste. […] Lone Star Funds Chairman John Grayken has yet to act on its promise to donate 100 billion won to help Korean society. […] While he was desperately trying to improve Lone Star's local image so it isn't perceived as 'meoktwi' (eating and fleeing) foreign capital exploiting distressed Korean assets, 100 billion won is apparently too much money for him to put where his mouth is. As a result, the Korean public's distrust for foreign buyout firms, fair or not, grows further."[22]

- "Lone Star had come here to earn profits for its investors. Unless it had violated the rules, it should have had the freedom to quit Korea at its own discretion, but this was not the case. After years of public humiliation, Lone Star quit Korea this year dishonorably. Lone Star had been made a political football for those seeking to realize economic justice and democratization."[23]

- "After nine years of enduring accusations of 'meoktwi' (eating and fleeing), Lone Star managed to sell KEB to Hana earlier this year and for a gain of more than 4 trillion won ($3.42 billion) in what was the biggest merger and acquisition (M&A) deal ever in Korean banking. With that kind of money involved, NTS authorities will want to assure that no taxes are left unpaid, sources say. And since tax authorities and Lone Star remain engaged in a number of court battles, there is

---

[21] "Farewell to Lone Star," Korea Times, 29 January 2012, http://www.koreatimes.co.kr/www/opinion/2012/01/137_103665.html
[22] "Grayken failing to put money where mouth is," Korea Times, 1 March 2012, http://www.koreatimes.co.kr/www/tech/2012/03/129_106010.html
[23] "Abuse of economic democratization," Korea Times, 2 March 2012, http://www.koreatimes.co.kr/www/nation/2012/03/113_107453.html

- speculation that the NTS would want to use any new information gathered from the probe to arm its lawyers."[24]
- "In the nine years before selling the bank to Hana, Lone Star endured accusations of 'meoktwi' (eating and fleeing) after making a killing off once-distressed Korean assets. The legal onslaught it appears to be preparing against the Korean government suggests that the buyout firm retains a bitter feeling of unfinished business here."[25]
- "Most Koreans might not have wanted to hear the name Lone Star Fund again. […] The U.S. speculative fund has just returned — wanting even more. […] At stake is the possible outflow of an enormous sum of additional national wealth — with 5 trillion won, for instance, South Gyeongsang Province, which recently stopped providing free school meals for lack of money, could feed students for 150 years. Or all the students in national and public universities could study for three years without paying tuition. Also at risk is the government's administrative authority and the country's image among foreign investors. If things go awry, other foreign investors could follow Lone Star's example, regarding Seoul as easy prey."[26]
- "The ICA [International Court of Arbitration] finding for Hana Financial is significant in that the ruling has recognized and exposed the U.S. buyout fund's greed to the world. […] We hope the government will mobilize all means and resources available to win the case against Lone Star, which has long been notorious here for its ruthless and predatory pursuit of windfalls."[27]
- "Domestic private equity firms (PEFs) are still suffering from the prejudice that they are 'greedy vultures,' although it has been 15 years since Korea allowed their operation and they have become key players in the local M&A market. Their investment strategies are still considered negative by the public, who remember when Lone Star Funds raked in huge profits from its investment in the Korea Exchange Bank (KEB) just after the 1998 Asian financial crisis."[28]
- "Korea faces five more investor-state dispute settlement cases. […] Most famous — or rather infamous — among them was the Lone Star case, in which the Korean government was ordered to pay an 'additional' 280 billion won to the Texas-based hedge fund, which had already raked no less than 5 trillion won here by acquiring a failed bank and reselling it based on dubious qualifications. […] Korea must no longer remain an easy target of Wall Street gadflies and their short-term opportunism. […] Seoul must also join forces with Asian and European countries to abolish the ISDS [Investor-State Dispute Settlement] from the FTA [Free Trade Agreement] deals it signed with key partners, including the U.S. It has long been a toxic clause in this post-neo-liberalistic world prioritizing environment, social, and

---

[24] "KEB comes under tax probe," Korea Times, 2 May 2012, http://www.koreatimes.co.kr/www/tech/2012/05/129_111457.html
[25] It's not over yet!" Korea Times, 29 May 2012, http://www.koreatimes.co.kr/www/tech/2012/05/129_111932.html
[26] "Lone Star's return," Korea Times, 17 May 2015, http://www.koreatimes.co.kr/www/opinion/2015/05/137_179089.html
[27] "Lone Star's greed," Korea Times, 17 May 2019, http://www.koreatimes.co.kr/www/opinion/2019/05/137_269027.html
[28] "PEFs still stigmatized as greedy vultures," Korea Times, 6 May 2020, http://www.koreatimes.co.kr/www/biz/2020/05/602_288950.html

    corporate governance (ESG) values. Korea must stop outdated practices to cease being a global ATM."[29]

42. These extracts may seem over-lengthy, but they give a clear image of how Lone Star is regarded in the Korean press, even years after the company had exited the country, although the length of the arbitration process kept the saga alive for much of the time.

Recent media interest in Lone Star

43. Lone Star achieved greater prominence in the Korean media with the election of President Yoon in the 9 March 2022 elections. He took office on 10 May 2022. Media focused on his and his nominee for Justice Minister's role in the Lone Star case,[30] while questions were also asked regarding the role of the nominee for Prime Minister in the legal firm which represented Lone Star at the time of the acquisition of KEB.[31]

44. The ruling of the ICSID tribunal in August 2022 naturally attracted enormous media interest. The Justice Minister testified[32] to a National Assembly Committee that he believed the government could win on appeal. As mentioned above,[33] the Korean government has now appealed against the ruling, citing various procedural errors in the ruling, with the Ministry of Justice also reported as saying,[34] "we have filed the cancellation as the public's taxes should not be wasted due to a ruling that has legal errors." News of the appeal was widely reported in the Korean media[35] and given the President's own involvement in the case as a prosecutor, there is no question that the government is staking a great deal on its efforts to overturn the ruling, including Mr Lee's extradition and subsequent interrogation and prosecution, which is meant to achieve that goal.

Mr Steven Lee's arrests

45. Before his recent arrest in New Jersey, Mr Lee was apprehended in Italy in 2017.[36] He was released from custody and allowed to return to the USA, reportedly since the applicable statute of limitations had expired.[37] It is worth noting that although both

---

[29] "Irksome hedge funds," Korea Times, 27 June 2023, https://www.koreatimes.co.kr/www/opinion/2023/06/137_353759.html

[30] "Han, a confidant of Yoon, known for special probe expertise," Yonhap news agency, 13 April 2022, https://en.yna.co.kr/view/AEN20220413008400315?section=search

[31] "PM says no involvement with Lone Star while working at law firm," Yonhap news agency, 31 August 2022, https://en.yna.co.kr/view/AEN20220831006200315?section=search

[32] "Seoul sees high odds of reversing Lone Star-favoring ruling," Korea Economic Daily, 3 September 2022, https://www.kedglobal.com/private-equity/newsView/ked202209020011

[33] Paragraph 37, *infra*

[34] "Gov't seeks cancellation of tribunal's Lone Star Funds ruling," Korea Joongang Daily, 1 September 2023, https://koreajoongangdaily.joins.com/news/2023-09-01/business/finance/Govt-seeks-cancellation-of-tribunals-Lone-Star-Funds-ruling/1860478

[35] Apart from the report already cited at footnotes 20 and 34, easily accessible and similar reports are also at https://www.koreaherald.com/view.php?ud=20230901000588, https://en.yna.co.kr/view/AEN20230901004600315, https://www.youtube.com/watch?v=3rmiynOOwbA, and https://www.koreatimes.co.kr/www/nation/2023/09/113_358292.html

[36] "Former Head of Lone Star Korea Apprehended in Italy," Korea Bizwire, 22 August 2017, http://koreabizwire.com/former-head-of-lone-star-korea-apprehended-in-italy/92284

[37] "Ex-Seoul chief of U.S. equity fund released: ministry," Korea Herald, 1 September 2017, https://www.koreaherald.com/view.php?ud=20170901000849

Korea Bizwire and the Korea Herald quote Ministry sources for their stories, these are the only two English-language reports I have found on what would seem to be a noteworthy arrest. Neither of these two media outlets reported both the arrest <u>and</u> the release.  It may be that the then administration – a progressive one under President Moon inaugurated in May 2017 – had no wish to highlight the case. Korean-language media reported different versions of the episode: one[38] explicitly quoting the Ministry of Justice as saying that "the statute of limitations for the crime in question had expired, so he was released." Another[39] reported that in testimony to a National Assembly inspection it emerged that Mr Lee had been arrested on 6 August and released on the 18th while the Ministry of Justice submitted its extradition request only on the 22nd.

46. Mr Lee was again arrested in New Jersey in March 2023. This time (using similar online search terms) I can find the arrest was covered (quoting sources from the Ministry of Justice) by the Korea Herald,[40] Korea Times[41] and Joongang Daily,[42] including follow-up reports when he was released on bail. There was also extensive coverage in the Korean-language media.  Of note to this case is a commentary in the Munhwa Ilbo,[43] which I have reviewed in Korean and using online translation tools. In this, the newspaper quotes a Ministry of Justice official as saying, **"Steven Lee's arrest on the 2nd has generated momentum to consider the cancellation of the International Centre for Investment Dispute Resolution (ICSID) adjudication."** The article goes on to say, **"Currently, the Ministry of Justice expects that the resumption of related investigations into former CEO Lee will also reinforce positive content in the application to cancel the Lone Star ruling."** Although any information that Mr Lee is able to provide might not be technically relevant to the arguments[44] put forward in the Korean government's appeal against the ruling, the suggestion would appear to be that Mr. Lee would be able to provide information that the government would use to seek to re-open the issue of the price paid for KEB in 2003, thereby undermining the calculation of Lone Star's foregone profit. But, of course, these are not the reasons stated for Mr Lee's extradition in the Korean government's submission.

---

[38] "Steven Lee released from Italy… 'The statute of limitations for prosecution has been completed.'" Money Today, 1 September 2017, https://news.mt.co.kr/mtview.php?no=2017090118008277449
[39] "Key Lone Star suspect Steven Lee missed in Italy," Hankyoreh Shinmun, 12 October 2017, https://www.hani.co.kr/arti/politics/politics_general/814268.html
[40] "Former Lone Star official arrested in US," Korea Herald, quoting Yonhap news agency, 5 March 2023, https://www.koreaherald.com/view.php?ud=20230305000171
[41] "Former Lone Star official arrested in US," Korea Times, quoting Yonhap news agency, 6 March 2023, https://www.koreatimes.co.kr/www/biz/2023/09/602_346544.html
[42] "Former Lone Star Funds official arrested in New Jersey," Korea Joongang Daily, 6 March 2023, https://koreajoongangdaily.joins.com/2023/03/06/business/finance/lone-star-funds-korea-exchange-bank/20230306124902704.html
[43] "Justice Department 'secures momentum to apply for cancellation of Lone Star compensation award' with Steven Lee's arrest," Munhwa Ilbo, 6 March 2023, https://www.munhwa.com/news/view.html?no=20230306010399210 68001
[44] Listed in "S. Korea files for cancellation of int'l tribunal's compensation order in Lone Star case," Yonhap news agency, 1 September 2023, https://en.yna.co.kr/view/AEN20230901004600315

47. In the same vein, an article in the Seoul Shinmun[45] also relies on quotes from Ministry of Justice officials. It states, "An official from the Ministry of Justice said, 'Doesn't everyone agree that we shouldn't waste a penny of blood tax?' and added, 'As it is a case that caused public outrage, (the process) can gain momentum in the future.'"

48. It may be relevant to highlight another recent extradition case involving the USA and Korea, in which the stated crime for which extradition was sought appears inconsistent with Korea's true prosecution intent. Mr Keith Yoo was recently extradited from New York. As was clear in press reports prior to his extradition, his father had founded the company that owned the *Sewol*, which tragically sank in 2014 killing over 300 people, the vast majority school students. Mr Yoo had lived in New York as a green card holder for many years, but President Park Geun-hye had announced to her Cabinet that the swift prosecution of the entire Yoo family was required. One report states,[46]

> "President Park Geun-hye ordered a quick arrest of the fugitive owner of the sunken ferry Sewol on Tuesday, saying he is the "root cause" of the tragic sinking and must be brought to justice. […]
> 'The Yoo Byung-eun family, the root cause of this tragedy, is ridiculing the law and causing indignation among the people even though they must repent before the people and reveal the truth. This is a challenge to our society and a crime that cannot be protected or defended by anything,' Park said.
> 'I hope law enforcement authorities will do their best to make a quick arrest so as to help reveal the truth and bring him to justice,' she said."

49. Rather than seek his extradition on charges related to that tragedy, the Korean Prosecution Service charged Mr Yoo with embezzlement and succeeded (after what appears to be a characteristically long delay) in securing his extradition in August this year relating to those charges.[47] The charges of embezzlement have only a flimsy connection to the *Sewol* disaster in that it could be argued that if Mr Yoo had depleted the financial resources of the family firm there would have been less money to spend on maintaining the vessel.

50. The Korean Ministry of Justice issued a press release[48] on his extradition, describing him as, "the last remaining fugitive in the sinking of the Sewol ferry incident." The US/Korea Extradition Treaty of 1998 has, in Article 15, a standard rule on speciality stating, "subject to specific exceptions, that a person extradited under the Treaty may not be detained, tried or punished in the Requesting State for an offense other than

---

[45] "Will Steven Lee's arrest affect Lone Star's application to cancel compensation award?" Seoul Shinmun 12 March 2023, https://www.seoul.co.kr/news/newsView.php?id=20230312500091. I can find no English-language version of this account and have had to amend some of the online translations that I have used.
[46] "Park orders quick arrest of fugitive ferry owner," Yonhap news agency, 27 May 2014, https://en.yna.co.kr/view/AEN20140527003651315
[47] "Scion of Family Tied to 2014 Ferry Disaster Is Extradited to South Korea," New York Times, 4 August 2023, https://www.nytimes.com/2023/08/02/world/asia/yoo-hyuk-kee-south-korea-ferry.html
[48] "YOO Hyuk Kee, the Last Remaining Fugitive in the Sinking of the Sewol Ferry Incident Extradited to Korea," Ministry of Justice, 4 August 2023,
https://viewer.moj.go.kr/skin/doc.html?rs=/result/bbs/49&fn=temp_1691105994856100

that for which extradition has been granted."[49] Consistent with the press reporting from prior to, and at the time of, his extradition, Mr Yoo is now[50] to be charged with further offences related to the Sewol disaster, despite those charges not appearing in the extradition complaint.

51. There are of course differences between these two cases in that Mr Yoo's alleged offences occurred more recently than in Mr Lee's case, and the connection to a heart-rending tragedy that has left numerous bereaved families is not present in the Lone Star case. But the preparedness of the prosecution to ignore the rule on speciality is of concern in Mr Lee's case as well as in Mr Yoo's

Conclusions

52. I am aware that the many strands of this opinion have made for a complicated narrative. The burden of the argument that I have sought to explain can be summarised as follows:

- Korean history has left the nation with a legacy of antipathy, suspicion and occasional hostility towards foreigners, with these attitudes particularly strong in relation to foreign involvement in the financial sector.
- The swings of the political pendulum in Korea, especially in Presidential elections, have resulted in alternations between progressive and conservative Presidents. It is relevant to this case that financial liberalisation in Korea, Mr Lee's alleged offences and his arrest in Italy all took place during progressive administrations, while there is currently a conservative administration in power in Seoul.
- Korea enjoys a vibrant and functioning democracy, but there are questions about judicial and even larger questions about prosecutorial political impartiality. There is particular concern that with the current President having previously served as Chief Prosecutor and having appointed numerous of his former colleagues to

---

[49] "Extradition Treaty with the Republic of Korea; submission by the President to the Senate," 2 March 1999, page ix, https://www.congress.gov/106/cdoc/tdoc2/CDOC-106tdoc2.pdf

[50] "Yoo Byung-eon's second son is indicted on charges of embezzlement of 25.5 billion won… 9 years after the Sewol Ferry disaster," Hankyoreh Shinmun, 22 August 2023, https://www.hani.co.kr/arti/area/capital/1105344.html?_ga=2.231636121.743405116.1694427282-1385223098.1694267664 I regret that I have not been able to find any English-language reporting of this development. An online translation of the relevant extract reads:

"Incheon District Prosecutors' Office plans to indict Yoo for additional crimes with additional consent from the United States in accordance with the extradition treaty. The extradition treaty stipulates that additional consent from the United States is required to detain, try, and punish a person for a crime other than the crime for which extradition is based. Crimes that require additional consent include charges of embezzlement under the Special Police Act for taking out affiliated funds worth 30.64752 billion won to overseas corporations, tax evasion worth 12.55583 billion won, and submission of false tax invoice totals worth 10.95005 billion won.

The Incheon District Prosecutors' Office identified circumstances in which overloading and overcapacity, which are believed to be the primary causes of the Sewol Ferry disaster that occurred in 2014, resulted from the management corruption of the family that owns Cheonghaejin Shipping Co., Ltd. and conducted an investigation into the matter. As a result, 20 people, including 6 members of former Chairman Yu's family, 9 presidents of affiliates, and 5 close associates, were arrested and indicted on charges of management corruption, and all were found guilty. Prosecutors determined that Mr. Yoo was the 'management successor' to his father, former Chairman Yoo, and requested extradition from the United States, and forcibly repatriated him to Korea on August 4."

- mainstream government positions, the Prosecution Service is liable to be swayed by political considerations in its decisions.
- The IMF Crisis of 1998 led to reforms which permitted greater involvement by foreign corporations in the Korean financial sector. The IMF Crisis itself is seen by many Koreans as caused by external factors rather than by Korean misadventure and the entry of foreign interests into the financial sector as a dangerous and unwelcome expedient.
- The practice of some foreign firms to make large profits from their investments in Korean banks exacerbated this perception and led to considerable opposition to Lone Star's efforts, in particular, to achieve a similar outcome. These efforts became particularly controversial and long-lived because of suspicions around the purchase of KEB, the reluctance of the financial regulators to sanction any sale until legal issues were clarified and finally a long-drawn-out international arbitration dispute which resulted in a judgement awarding damages to Lone Star. Both sides have appealed against aspects of this finding.
- President Moon's entry into office in May 2022 and the Tribunal's award against the Korean government in August 2022 led to renewed media interest in Lone Star, although that interest had never completely disappeared.
- The Ministry of Justice has been quoted as believing that the Tribunal's finding could be overturned and that the arrest and extradition of Mr Steven Lee would add positive reinforcement to those efforts, allowing the government to avoid paying any taxpayer's money.
- There has been a notable difference in how incumbent administrations have handled Mr Lee's case. When he was arrested in 2017 in Italy, the response from the then progressive government was unmistakably *piano* with no pending valid arrest warrant in place, an extradition request apparently being filed only after Mr Lee had been released by the Italian courts and minimal press coverage; in contrast, the current conservative administration has, at least since the arbitration with Lone Star has escalated, taken a *forte* approach, culminating in his arrest in New Jersey in March 2023 with considerable press coverage and fanfare.
- This *piano/forte* response from different Korean governments; the clear wish of the current government to overturn the Tribunal's ruling; press briefing from the Ministry of Justice that Mr Lee's testimony could be material to an appeal; the years elapsed during which the Korean authorities could have pressed for his extradition; and recent history regarding the case of Mr Keith Yoo showing a preparedness on the part of the Korean prosecutors to use the extradition process for reasons beyond prosecution of the alleged offence, all force me to conclude that there is a strong possibility that the Korean government in this case is now seeking to extradite Mr Lee, not in order to answer to allegations dating from 2003-5, but instead to interrogate him in order to strengthen their grounds for appeal against the Tribunal's findings against Korea or otherwise invalidate the Tribunal's award.

Declaration

53. I am writing this report as a result of instructions from Mr Lee and his lawyers, but I see my duty as assisting the United States District Court in the District of New Jersey

      to reach proper conclusions in this case based on its merits and the applicable law and practice.

54. All the matters on which I have expressed an opinion lie within my field of expertise. Wherever I have no personal knowledge I have indicated the source of that information. I have included all facts of which I am aware which might adversely affect my opinion. I have done my best in preparing this statement to be accurate and complete. While having regard to the urgency of submitting this report to the Court, I have mentioned all matters that I regard as relevant to the opinions I have expressed.

55. I have not included in this statement anything which has been suggested to me by anyone, including lawyers instructing me, without forming my own independent view of the matters. At the time of finalising this statement, I consider it to be complete and accurate. I will notify those instructing me if, for any reason, I subsequently consider that the report requires my correction or qualification.

56. I understand that this report may be required to be presented in court and that it would then be evidence that I would be prepared to give under oath, subject to any correction or qualification that I may make before swearing to veracity. I confirm that I have made clear which facts and matters referred to in this report are within my own knowledge and which are not. Those that are in my knowledge I confirm to be true. The opinions I have expressed represent my true and complete professional opinions as to the matters to which they refer.

57. I stand ready to assist Mr Lee and his legal team or the District Court further in this matter should that be necessary, by further explanation of the matters covered or of any others which fall within my expertise.

Martin Uden

1 October 2023

**Curriculum vitae, Martin David Uden**

1976    Graduated in Laws, Queen Mary College, London

1977    Called to the Bar, Inner Temple

1977    Joined Foreign & Commonwealth Office

1978    Language student, British Embassy, Seoul

1980    Second Secretary, Political, British Embassy, Seoul

1982    Head of Japan Section, FCO

1984    Nuclear Energy Department, FCO

1986    First Secretary, British Embassy, Bonn

1990    Yugoslavia and Albania Section, FCO

1992    Deputy Head, Conference on Security and Cooperation in Europe Unit, FCO

1994    Political Counsellor, British Embassy, Seoul

1997    Counsellor, Economic and Trade, British High Commission, Ottawa

2001    Director International, Invest UK, London

2003    Consul-General, San Francisco

2008    British Ambassador, Seoul

2012    Managing Director, British Business Embassy, UK Trade & Investment

2012    Coordinator, UN Panel on Experts on North Korea, New York

2015    Deputy High Commissioner, Lagos

2015    Senior Government Liaison, Hong Kong & Shanghai Bank, Hong Kong

2017    International Partnerships Adviser, Queen Mary University of London (part-time and continuing)

2018    Executive Chairman, British Korean Society (part-time and continuing)

2018    Trustee, latterly vice-Chair, United Society Partners in the Gospel (part-time and continuing)

2019    Member, Advisory Council on National Records and Archives (part-time and continuing)

2019    President, British Korean War Veterans' Association (part-time and continuing)


Author of "Times Past in Korea," 2003, an anthology of foreign writings on Korea, based on my own collection of antiquarian books, and of a historical introduction to "Korea: Caught in time," 1997.