# EXHIBIT 4

**Expert Opinion of Mr. George Tugushi in the
proceedings in Respect of Mr. Steven Lee**


1.      This report has been prepared by George Tugushi in relation to the extradition request by the Republic of Korea in respect of Mr. Steven Lee.

2. I can confirm that I am an international expert on torture prevention and prison issues with specialized legal education and substantive practical experience in the field. A copy of my current Curriculum Vitae is attached, which sets out my qualifications and experience in detail.

3. Since 2005, I have been a member of the European Committee against Torture and Inhuman or Degrading Treatment or Punishment (CPT). I have served 3 consecutive mandates for a total of 12 years up to December 2017. Currently I continue to serve the Committee in the capacity of an expert. The Committee carries out monitoring visits to places of detention across Council of Europe member states. This includes visiting places of detention and evaluating the treatment of inmates, and conditions of detention, assessing healthcare services for detainees, against agreed international standards, with particular reference to the European Convention on Human Rights, and the European Convention for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment. Beginning in 2010, I chaired the CPT Jurisprudence Group, tasked with updating the standards of the Committee.  The CPT has a right of access to any and every place of detention and is able to talk with detainees and staff in private. It also has a right of access to any and all documentation, which it might wish to see.

4. After each visit, a report is made in relation to the state party, which is invited to respond to the report and is encouraged to publish both the report and the response. However, while publication is encouraged as an example of co-operation between the state party and the CPT, state parties cannot actually be compelled to publish the reports or the responses. As a member and expert of the CPT I have participated in the following visits both in the capacity of a member, Head of the sub-groups and on 3 visits as a Head of Delegation:

2007: Latvia, Greece
2008: Finland, Armenia, Greece
2009: Latvia, Ukraine
2010: Czech Republic, Armenia
2011: Ukraine, Latvia, Greece
2012: Lithuania
2013: Ukraine, Latvia, Greece
2014: Finland (Head of Delegation), Ukraine, Ukraine
2015: Armenia, Moldova, Sweden, Bulgaria
2016: Ukraine, Lithuania, Latvia (Head of Delegation)

2017: Ukraine (Head of Delegation), Azerbaijan, Poland
2018: Lithuania (Expert)
2018: Bulgaria (Expert)
2020: Ukraine (Expert)
2020: Finland (Expert)
2021: Bulgaria (Expert)
2023: Armenia (Expert)

5. From 2011-2015, I was also a member and Vice-Chairperson of the United Nations Committee against Torture (CAT) and Committee Rapporteur on reprisals. During 2009-2012, I occupied the position of the Public Defender (Parliamentary Ombudsman) who, amongst other responsibilities, is tasked with the monitoring of penitentiary institutions. Currently I work as an expert for the CPT, a consultant for European projects in numerous member states and in the Council of Europe and other countries in the area of prevention of torture and other forms of ill-treatment.

6. In my capacity as an international consultant, I have worked on torture prevention issues in Ukraine, Armenia, Latvia, Republic of Moldova, Serbia, Bosnia and Herzegovina, Montenegro, North Macedonia, Turkey, Greece, Kosovo, Kazakhstan, Turkmenistan, Uzbekistan, Viet Nam, and Hong Kong.

7. I have previously served as an expert in several extradition cases, including extradition requests from the Republic of Korea (2 cases), India (3 cases), France (7 cases), Spain, Latvia (4 cases), Moldova (11 cases), Poland (6 cases), Hungary (3 cases) Belgium (6 cases), Thailand, Israel, Czech Republic (2 cases), Azerbaijan, Romania (8 cases), Bulgaria (3 cases), Greece (3 cases), Cyprus, North Macedonia, USA, Japan, Russian Federation, Armenia. In 2019 I visited prisons in Moldova and in Azerbaijan each in respect of extradition cases in which I was instructed as an expert by the solicitors from UK. In 2022 I visited Latvia in respect of extradition case and inspected prison and prison hospital. In 2023 I visited Moldova to inspect 2 prisons in respect of the extradition case.

## Background to the case

8.    I understand from Mr. Lee's lawyers and the documents I have reviewed that a local arrest warrant in Korea was issued on 29 October 2019 by the Judge Yong-Shin Kim of the Seoul Central District Court. It is a judicial document and grants the right to arrest Mr. Lee. According to the information provided by the government of Korea, Mr. Lee is wanted for prosecution on three accounts of occupational embezzlement and breach of trust in violation of Article 356 of the Act on the Aggravated Punishment etc. of the specific economic crimes, related to the offences were committed in Korea.

9.    The authorities of the Republic of Korea submitted the extradition request to the Government of the USA pursuant to the agreement between the United States and Korea,

2

found in the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Korea, signed on June 9, 1998, which entered into force on December 20, 1999. The authorities of Korea requested that a warrant for the arrest of Mr. Lee be issued in accordance with the treaty.

10.     In my opinion, in case of extradition, the place of detention for Mr. Lee will be the Seoul Detention Centre or the holding cell in a nearby police station. If remanded in custody he will most probably stay in the Seoul Detention Centre. Alternatively, another detention Centre of the Seoul Directorate or Incheon Detention Centre can be used for this purpose.

11.     As for his personal characteristics, Mr. Lee is a US citizen, born on 31 January 1969 in Los Angeles. He received his education in United States and accomplished his graduate studies in 1995.  According to my information, he is currently residing in the USA, having lived there for more than 40 years. He lives with his wife, and his two sons are also living in the US and are citizens of the United States.

12.     Mr. Lee fears that if extradited, he will be subjected not only to interrogation in violation of his rights but also to inhuman and degrading treatment as treatment of detainees by the staff of the facilities as well as conditions of detention in Korean detention facilities fall short of international standards.  Moreover, I understand that Mr. Lee's extradition is being sought for conduct that occurred over twenty years ago, but at a time (now) when the Republic of Korea has received adverse rulings in connection with arbitration against Mr. Lee's former employer, Lone Star Fund.  Thus, Mr. Lee is concerned that his custody is actually being sought not to prosecute him for embezzlement, as set forth in the extradition complaint, but in order to use him or information improperly obtained from him, for the Republic of Korea's advantage in that significant civil arbitration proceeding, which remains ongoing.

**Affirmation**

13.     I confirm that his report is addressed to the court, having received instructions from GIBBONS Law in connection with the on-going extradition proceedings against Mr. Steven Lee.

14.     I understand that I may be asked questions to clarify this report in due course.

**Areas upon which expert evidence is sought**

15.     I have been asked to address general human rights concerns with respect to detention conditions in the Republic of Korea, with a focus on (1) the prohibition of Torture and Inhuman or Degrading Treatment or Punishment, established under international standards, related to

the treatment of persons deprived of their liberty; and (2) the UN Convention for the prohibition of Torture and other Cruel, Inhuman or Degrading Treatment or Punishment (UN CAT).

## Methodology

16.    In addition to detailed research and analysis conducted into available international and local sources and materials providing information about the human rights situation and conditions of detention in the places of custody in Korea, I also examined all relevant documents provided by Gibbons P.C., the lawyers of the person concerned.  Gibbons did not withhold any documents from me which I requested.

## Country profile

17.    The Republic of Korea ratified the UN Convention against Torture or other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) in 1995 but has not ratified the Optional Protocol to the Convention against Torture (OPCAT) and the mandate of the UN Sub-Committee for the Prevention of Torture (SPT) does not cover Korea. This prevents the SPT from visiting places of detention in Korea and no other international human rights monitoring body has access to prisons either.  As the OPCAT is not ratified, the national mechanism for the prevention of torture (NPM) is not established either. The Republic of Korea ratified the International Covenant on Civil and Political Rights (ICCPR)[1] in April 1990.

18.    Since ratification, the Government of the Republic of Korea has submitted 6 periodic reports to the UN Committee against Torture (CAT) and 5 reports to the UN Human Rights Committee (HRC). The review in CAT of the 3-5[th] combined reports took place in May 2017, while the review of the 6th report was postponed due to the pandemic. The last review in the HRC of the 4th periodic report on ICCPR took place in November 2015.

19.    Unlike places of custody in States of the Council of Europe, which are subject to regular monitoring by the European Committee for the Prevention of Torture, no such mechanism exists within Korea to monitor detention conditions. There is no national prisons inspectorate and very few official reports are published in respect of Korean places of detention. National Human Rights Commission and some NGOs have access to prisons and conduct monitoring work in detention places.

---

[1] Article 7 of the Covenant provides absolute prohibition of Torture: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment".

## Main issues of concern

20.    The human rights situation in the Republic of Korea, related to criminal suspects, persons remanded in custody and sentenced persons has been a matter of concern for local and international human rights monitoring and judicial bodies for a number of years.

21.    **One of the most important issues which merits particular attention is the correctional system of the Republic of Korea.** In case of detention, Mr. Lee should supposedly be placed in the Seoul Detention Facility which is under the control of the Ministry of Justice. Alternatively, he might be placed in other detention center under the authority of the Seoul Regional Correctional Headquarters.

22.    The prison system of the Republic of Korea is under the authority of the Ministry of Justice and consists of 54 institutions. The official capacity of the prison system in June 2020 stood at 48130 places and the actual prison population for the same period amounted to 53920, therefore the occupancy rate was 112 %[2].

23.    In the course of the review of the **4th periodic report submitted by the Government of the Republic of Korea, the UN Human Rights Committee** expressed concerns about prison conditions. More specifically the Committee was concerned on:

(a) Overcrowding in prisons and limited access to medical aid outside prisons;
(b) The reported frequent use of protective devices in prisons for retributive purposes[3], and termination of their use being subject to a decision by the prison guard;
(c) The reported use of solitary confinement, which can be imposed for up to 30 days, as the most common form of disciplinary punishment of inmates;
(d) The fact that external members of the disciplinary committees, which decide on the type of disciplinary action to be taken, are appointed by the prison warden.

Therefore the Committee issued the following recommendations:

(a) Ensure that solitary confinement is used only in the most exceptional circumstances and for strictly limited periods, and that the members of the disciplinary committees are appointed by an independent authority;
(b) Ensure that the implementation of article 99 (2) of the Administration and Treatment of Correctional Institution Inmates Act is vigorously monitored, and that the use of protective devices is subject to legally determined limits;
(c) Take specific steps to bring the prison system into line with the Covenant and the United Nations Standard Minimum Rules for the Treatment of Prisoners[4].

---

[2] https://www.prisonstudies.org/country/republic-south-korea
[3] Protective equipment includes the so-called "three-piece-set" which is simultaneously applied on the ankle, wrist, and head.
[4] CCPR/C/KOR/CO/4, paragraph 34-35.

**24.    The UN Committee against Torture in the course of the review of the 3-5th combined reports submitted by the Government of the Republic of Korea expressed its concerns on the following:**

(a) Continued overcrowding in correctional facilities, the amount of living space available to each inmate, which does not meet international standards, and the insufficient number of prison staff;

(b) Insufficient access to medical care and to outside medical facilities by inmates;

(c) The frequent use of protective devices and restraints to punish inmates and about the fact that the duration of their use is decided by prison guards;

(d) The absence of age- and gender-disaggregated data on persons in places of deprivation of liberty, including prisons, during the reporting period[5].

The Committee recommended the State Party to the Convention to:

(a) Take specific measures to improve the material conditions in correctional facilities and reduce overcrowding with a view to bringing them in line with the international standards enshrined in the United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules);

(b) Take urgent measures to increase the number of prison guards, hire additional medical personnel, further expand the room available to inmates in accordance with international standards and enable the referral of inmates requiring specialized medical care to outside medical facilities;

(c) Ensure that restraints (handcuffs, ancle-cuffs, restraint belts, protective helmets) are used only as a measure of last resort, for the shortest time possible and only when less intrusive alternatives for control have failed, and ensure the strict monitoring of the implementation of article 99 (2) of the Administration and Treatment of Correctional Institution Inmates Act;

(d) Consider using non-custodial measures and alternatives to detention in keeping with the United Nations Standard Minimum Rules for Non-custodial Measures (the Tokyo Rules);

(e) Provide age- and gender-disaggregated data on detainees covering the reporting period[6].

**25.    Another serious matter of concern raised by the CAT is related to the excessive use of the solitary confinement in the places of custody. More specifically the Committee remained concerned** that inmates are frequently placed in solitary confinement, as a disciplinary measure, for periods of up to 30 days, without strict medical monitoring and without the possibility of appeal.[7]

The committee issued following recommendation on this matter:

---

[5] CAT/C/KOR/CO/3-5, paragraph 21
[6] Ibid, paragraph 22.
[7] Ibid, paragraph 23.

(a) Amend current legislation in order to ensure that solitary confinement remains an exceptional measure of last resort, applied for a duration that does not exceed 15 days, and that it is imposed in line with international standards;

(b) Ensure that the detainees' due process rights, such as the right to an independent hearing and to appeal, are respected when subjecting them to solitary confinement and that the disciplinary committee acts with impartiality;

(c) Establish clear and specific criteria for decisions on isolation and ensure that renewing and prolonging disciplinary sanctions of solitary confinement is strictly prohibited

(d) Ensure that detainees' physical and mental condition is monitored daily by qualified medical personnel throughout the period of solitary confinement.[8]

26.     The UN Committee against Torture also raised several other issues related to the human rights matters in the Republic of Korea. More specifically, the Committee, expressed its concerns on:  (1) the lack of a proper legal definition of torture in the Korean legislation that complies with the requirements of Article 1 of the Convention, (2)  existence of the statute of limitations, which can be used to avoid taking actions against those who commit acts of torture, (3) problems with the access to the fundamental legal safeguards against torture and ill-treatment by the persons deprived of their liberty, such as being informed about own rights, timely access to a lawyer, access to a doctor, and right to notify next of kin, (4) excessive use of force by the police, (5) weakness of independent complaints mechanisms, (6) deaths in custody, and (7) other matters such as violence against migrant workers, redress to the victims of torture, domestic violence,  rights of the conscientious objectors, independence, resources and mandate of the NHRC, etc.[9]

27.     On 5 November 2018, the National Human Rights commission of Korea conducted an *ex officio* investigation of human rights violations incurred by overcrowding at detention facilities and recommended that the Minister of Justice implements measures of the highest priority such as the expansion of living space for female inmates, develop measures to build and expand detention facilities, and seek ways to increase the number of those released on parole such as easing the criteria for the selection of those qualified for parole. The NHRCK recommended that the Prosecutor-General of the Supreme Prosecutors' Office reduce pre-trial detention by observing the presumption of innocence and conducting investigations without physical restraint.[10]

28.     In the above-mentioned investigation the National Human Rights Commission of Korea also investigated the matters on the disciplinary punishments, related treatment, and legal procedures. During the investigation 10 correctional facilities, including Incheon Detention Centre were visited[11].

The Committee investigated the following matters:

---

[8] Ibid, paragraph 24.
[9] CAT/C/KOR/CO/3-5, paragraphs 7, 8, 9, 10, 11, 12, 13, 14, 19, 20, 25, 26, 27, 28, 39, 43, 44, 47.
[10] National Human Rights Commission of Korea Annual Report 2018, page 95.
[11] Report on the results of the 2018 Correctional Facility Visits, Correction Division, Committee on Freedom 2nd Division

- Whether investigation and isolation is being abused as a means of controlling inmates, and whether the period of continuous punishment and restrictions on treatment are excessive.

- Related to protective equipment (means of restraint), whether the reason and grounds for determining that the use of protective equipment is necessary are appropriate, whether the period of use of protective equipment is excessive, and whether the inmate health checks are performed appropriately.

- Investigation of various problems such as the CCTV retention period of correctional facilities, separation of the room for investigation and punishment, non-wearing of nameplates by the Correctional Mobile Patrol Team (CRPT), and the formal operation of the disciplinary committee.

29.    As a result of the investigation, visits to the places of custody, including detailed interviews with persons recently subjected to disciplinary measures, as well as analysis of the related documentation and evaluation of the premises, the Committee identified systemic issues which result in violation of the rights of inmates.

30.    Inmates were frequently punished. In many cases, slander against the prison officer (in most cases, the prison officer spoke first and then inmate) or abusive language were the reasons for punishment. It appeared that punishments were excessive. Also, among the reasons for intra-prisoner violence, there was found intentional bullying of the other prisoners and incidents caused by lack of adequate mental health provision.

31.    The report details problems regarding the operation of the Correctional Rapid Patrol Team (CRPT). Inmates interviewed made consistent allegations that members of CRPT are verbally abusive and the way they apply force amounts to torture when using protective equipment.

32.    In the opinion of the Commission, it is noteworthy that most of the prisoners have the perception that the CRPT unconditionally uses excessive coercive force, which they consider to be disproportionate, inflicting severe pain on the persons concerned. In addition, CRPT members do not wear name tags, which makes it impossible to identify them and in case of violations to investigate complaints.

33.    Another major problem resulting in violation of the rights of the inmates concerned, relates to the use of protective equipment, the so-called "three-piece-set" which is simultaneously applied on the ankle, wrist, and head. When applied, prisoners wear it for excessive periods of time. Prisoners at Daejeon Prison and Busan Detention Centre complained of the humiliation imposed when defecating while wearing protective equipment. Inmates are compelled to defecate in the suit at night, and then must wait all night to wash up because the prisoners cannot take it off immediately to change their clothes.

34.     In my opinion, the practice of forcing inmates to defecate while being restrained and waiting for hours for the restraints to be removed and wash themselves, should be considered as inhuman and degrading, breaching provisions of the UN Convention against Torture and standards established by the UN SMR- Nelson Mandela Rules.

35.     Following disciplinary incidents, including incidents of inter-prisoner violence, inmates are usually taken to isolation rooms for the period of investigation. They remain there until the decision on the disciplinary measure is taken.   While in investigation isolation, inmates are prohibited to watch TV, read newspapers, and use self-purchased items. They are also prohibited from any contact with outside world; including being unable to complain to outside bodies about the treatment. In most cases, inmates subjected to disciplinary investigation have to stay in isolation much longer than required for investigation.

36.     During the punishment, the restrictions on treatment in the Administration and Treatment of Correctional Institution Inmates Act should not include prohibition of reading or suspension of outdoor exercise. However, in practice in all correctional facilities reviewed, prisoners were restricted from purchasing goods, receiving visits, writing letters, watching TV, etc., the only occupation permitted is reading books and even that is restricted; prisoners at the Seoul Detention Centre or Changwon Prison could only read one religious book, and Mokpo Prison and Chuncheon Prisons prohibited the importation of books.

37.     Article 43 (1) of the 'Mandela Rules' prohibits 'long-term (more than 15 consecutive days) solitary confinement'; whereas Article 108, Subparagraph 14 of the Korean Administration and Treatment of Correctional Institution Inmates Act stipulates  'confinement for less than thirty (30) days' as one of the types of punishment, and Article 109 (2) of the same Act stipulates that up to half of the long-term period can be increased, and a maximum of forty-five (45) days of confinement is possible. In the case of the Busan Detention Centre, the NHRCK found prisoners subjected to additional consecutive confinement periods for violating new rules during the execution of punishment, resulting in a total of eighty-eight (88) consecutive days of confinement period. A prisoner at the Jeju Prison was detained in the punishment room for a total of ninety-five (95) days (=45 days + 35 days + 15 days) because of the imposition of additional punishment continuously in the punishment room.

38.     The NHRCK recommended to set an upper limit of the confinement period at thirty (30) days in view of the Constitutional Court's decision (2003Hun-Ma289 decided on 24 February 2005) which affirmed that 'prisoners are in a situation where there is a high possibility of infringing on various basic rights due to the nature of forced detention in a closed facility that is isolated from the outside world, especially there is a considerable risk of arbitrary exercise of or abuse of the right to punish because the punishment for violating rules is determined and executed within the prison', and the risks of confinement for the physical and mental health of the prisoners.

39.     According to data submitted by the correctional facilities under investigation, the number of prisoners punished for more than fifteen (15) days in solitary confinement, which as stated

above is 'long-term solitary confinement' prohibited by the 'Mandela Rules', has increased from about 41% to about 60% of the total number of prisoners in the year under review (August 2017 to July 2018).

40.     Moreover, despite the Korean Administration and Treatment of Correctional Institution Inmates Act providing for 14 different types of punishment, from warning to confinement, to suit the individual treatment of punishment, it was found that punishment other than confinement (at one extreme end) and warning (at the other extreme end) were hardly enforced.

41.     As to material conditions, the Committee also observed that in the prisons visited punishment cells were in poor states of repair, and the cells were unbearably hot, as well as filthy. Some inmates alleged that repairs were carried out immediately prior to the visit of the Committee.

42.     In addition, the NHRCK recommended that the Prime Minister form a council of relevant ministries, such as the Ministry of Justice, Ministry of the Interior and Safety, and Ministry of Economy and Finance, and promptly resolve the issue of overcrowding at detention facilities. The NHRCK recommended that the Chief Justice of the Supreme Court reduce pre-trial detention by realizing the principle of trials without physical restraint.[12]

43.     The NHRCK made recommendations to improve the overcrowding at detention facilities and consequent human rights violations more than ten times since the inception of the Commission. However, the accommodation rate (ratio of the actual number of inmates accommodated to the total capacity of facilities) has been on the rise since 2013 and reached 115.4% as of the end of 2017. In particular, the accommodation rate of detention facilities near large cities stood at 124.3%, which is 8.9% higher than the national average.

44.     Overcrowding poses an even more serious problem during the hot summer months and cold winter months. Inmates are often caught up in quarrels, refuse to stay in cells with others, and thereby suffer punishment. The NHRCK concluded that the overcrowding at detention facilities represents a failure to meet the minimum standards for facilities accommodating people and a violation of human rights beyond the nation's right to punish, which damages the human dignity of over 60,000 inmates[13].

45.     This *ex officio* investigation highlighted the need for the effort of the courts and prosecution to realize the principle of trials and investigations without physical restraint to advance the resolution of the overcrowding issue. The number of detainees over the past five years rose by 26%, and detained suspects on trial accounted for 35.4% of the total detainees in 2017. Meanwhile, the total capacity increased by a mere 4%[14].

---

[12] Ibid.
[13] Ibid.
[14] Ibid, page 96.

46.    The NHRCK concluded that the substantive resolution of the overcrowding at detention facilities required the concerted effort of all government agencies, the realization of trials and investigations without physical restraint by the courts and prosecution, and the change of civil society's perception towards correctional facilities[15].

47.    **National Human Rights Commission of Korea (NHRCK) in its opinion report for the consideration of the Sixth Periodic Report submitted by Republic of Korea to the UN Committee against Torture** provided the Committee with the information related to the implementation of the CAT's previous recommendations to the Korean authorities.

48.    The commission in its report states that in case of overcrowding in correctional facilities, the minimum living space for single occupancy cell and multi occupancy cell (for one person) under the standards established by the International Committee of the Red Cross (ICRC) is $5.40m^2$ and $3.40m^2$, $4.65\text{-}5m^2$ and $7.20m^2$ in Japan, respectively, and $5.57m^2$ for single occupancy in the U.S. On the other hand, it is a mere $4.62m^2$ and $2.58m^2$ in Korea[16] which leads to severe overcrowding in correctional institutions. The Constitutional Court of Korea has ruled that overcrowding is unconstitutional by violating the human dignity and value of the inmates (Constitutional Court Decision 2013Heonma142 Decided 29 December 2016).

49.    As noted above, the NHRCK conducted an ex officio investigation on detention facilities in 2018 and confirmed the issues of overcrowding and lack of manpower and facilities, and made recommendations including: implementation of preferential measures (the use of idle spaces, the expansion of living rooms for female inmates); construction and extension of correctional facilities by coming up with measures to persuade residents; active expansion of parole; reduction of pre-trial detention to implement the principle of investigation and trial without detention; establishment of a consultation committee to resolve the overcrowding of correctional facilities; regular notification of implementation status.[17]

50.    With regards to fairness of punishment for inmates, the article 111 of "Administration and Treatment of Correctional Institution Inmates Act" stipulates establishment of disciplinary committee, being comprised at least five but not more than seven members with at least three outside members. However, the outside members are selected among the directors of the competent agencies, which hampers the independence of the members and highly likely leads to arbitrary disciplinary decisions.[18]

51.    In addition, the U.N.  "Standard Minimum Rules for the Treatment of Prisoners (Nelson Mandela Rules)" prohibits long-term solitary confinement for more than 15 consecutive days (art. 43-1 and 44) whereas the "Administration and Treatment of Correctional Institution Inmates Act" allows forfeiture of rights for up to 30 days and not more than 45 days (art. 108

---

[15] Ibid.

[16] Recommendations on ex officio investigation of human rights violation of inmates by overcrowding in detention facilities (5 November 2018).

[17] NHRCK opinion report for the consideration of the Sixth Periodic Report submitted by Republic of Korea to the UN Committee against Torture, paragraph 30.

[18] Ibid, paragraph 31

and 109), which leaves a room for excessive forfeiture of rights exceeding international standards[19].

52.    The NHRCK accordingly issued 15 recommendations including eight recommendations related to investigation acceptance and seven related to punishment, based on the results of the visit to the correctional institution on 16 January 2019. However, the Korean government did not accept six recommendations including: (1) Use a name badge for the Correctional Rapid Patrol Team (CPRT)[20] and take human rights training course when being selected as a team member; (2) Wear minimal protective equipment; (3) Separate the investigation room and the punishment room; (4) Provide the information of disciplinary members in advance to guarantee the right of inmates to avoid members, comprise disciplinary committee with over the majority of outside members, and exclude former correctional officials from outside members; (5) Establish disciplinary retrial system, and (6) Limit forfeiture of rights for up to 15 days to comply with international human rights standards, and revise relevant regulations so that continuous execution of forfeiture of rights shall have a certain period in between[21].

53.    **In its joint submission to the UN Committee against Torture (CAT), a group of 76 Korean NGOs in February 2020** provided the Committee with information related to the application of the solitary confinement in the prisons of Korea. According to Articles 108 and 109(2) of the Administration and Treatment of Correctional Institution Inmates Act, inmates in correctional institutions may be subject to up to 30 days of solitary confinement, and when there are two or more grounds for disciplinary action, the disciplinary action may be increased by up to one-half of the original duration, which allows inmates to be isolated for a maximum of 45 days. This constitutes prolonged solitary confinement for a time period in excess of 15 consecutive days prohibited by Rules 43(1) and 44 of the United Nations Standard Minimum Rules for the Treatment of Prisoners. According to a 2018 survey conducted in 10 correctional facilities by the NHRCK, between August 2017 and July 2018, the number of inmates who had been subject to solitary confinement exceeding 15 days accounted for about 41 to 60 percent of the total inmates who had been in solitary confinement, which shows that long-term solitary confinement is prevalent.

54.    The NGOs in their submission also raised an issue of the absence of the standard for the standard adequate temperature in the correctional facilities.

55.    According to their statement, recently, the extreme heatwave and tropical nights in the summer have continued and the strong cold waves in the winter have arisen. In August 2016, when the heatwave and tropical nights had continued, 2 inmates in the Pusan correctional facility, which offer only 1.74 square meters per one inmate, died at intervals of one day because of heat stroke in the investigative detention rooms. Current laws related to the administration of correctional institutions do not stipulate the standard for adequate indoor-

---

[19] Ibid, paragraph 32

[20]  The CPRT is responsible for maintaining the order of correctional facilities and for supporting safe custody, as well as initial suppression of the emergency in the event that impairs safety and order.

[21] Ibid.

temperature of correctional facilities. The managers of correctional facilities arbitrarily decide air-conditioning and heating according to its internal regulations. Thus, the inmates' right to life is violated in the correctional facilities[22].

56.     **The National Human Rights Commission of Korea (NHRCK), in its submission to the UN Human Rights Committee** for the adoption of the List of Issues Prior to Reporting in relation to the consideration of the Fifth Periodic Report by the Government of Republic of Korea provided an overview on the issues identified in the detention facilities.

57.     According to the NHRCK the government states that it guarantees the right of inmates to meeting and communication but under Article 41 of the Administration and Treatment of Correctional Institution Inmates Act[23], the grounds for prohibition of meeting with people outside a correctional institution are vague, which enables arbitrary prohibition of meeting by correctional institutions.

58.     The government of Korea says that it is enhancing medical treatment by providing annual health examination, telemedicine system, and medically specialized prison. However, with excessive time required to receive outside treatment, lack of medical personnel and systematic medical approach to inmates with mental illness and limitation of emergency medical system during night and holidays, the right to health and medicine of inmates in correctional facilities are not adequately guaranteed.

59.     The overcrowding in detention facilities (124% compared to standard, as of April 2017) is partly attributable to lack of secured facilities and difficulty in expanding facilities due to collectivism, but there also exists a systematic problem that the criminal justice system in Korea, while declaring the principle of investigation without detention, does not take into account the severity of the crime and carries out arrest and detention.

60.     Overcrowding in detention facilities is inhumane and unfair treatment against the inmates, which requires fundamental and systematic measures to be resolved. In this regard, the Constitutional Court of the Republic of Korea also confirmed that overcrowding is in violation of Constitution, infringing upon human dignity and value.

61.     The government states that the disciplinary action against inmates is carried out through a fair process, but the actual operation of the disciplinary committee is not based on independent and clear standard, leaving possibility of arbitrary decision on disciplinary action.

---

[22] Joint submission to the UN Committee against Torture (CAT), group of 76 Korean NGOs, February 2020
[23] Administration and Treatment of Correctional Institution Inmates Act』 Article 41 (1)Prisoners may meet with persons outside a correctional institution: Provided, That this shall not apply in any of the following cases:
    1. Where prisoners are likely to engage in any behavior in violation of criminal law;
    2. Where a ruling prohibiting meetings is rendered under the Criminal Procedure Act or any other Act;
    3. Where it is likely to do harm to edification of convicted prisoners or their sound rehabilitation into society;
    4. Where it is likely to do harm to the security or order of the institution.

Joint NGO Submission to the Human Rights Committee for Lists of Issues Prior to Reporting Republic of Korea 126th Session May 2019 South Korean Human Rights Organizations Network (97 NGOs) raise the issue of the excessive solitary confinement as provided in paragraphs 34, 36, 47 and 49 of this report[24].

62.     Timely access to a lawyer by the persons deprived of their liberty is another matter of concern raised by the human rights bodies in Korea. Local human rights groups have raised the issue of access to a lawyer by the persons deprived of liberty on several occasions. The report prepared by 63 civil society organizations of Korea, submitted to the 60th session of the UN Committee against Torture (CAT),[25] provides information on outstanding legal issues, related to the right to defense in the criminal proceedings. More specifically, the report refers to the Article 243-2 of the Criminal Procedural Act of Korea, which provides:

Upon receiving an application from a criminal suspect, his/her defense counsel, legal representative, spouse, lineal relative, or sibling, a prosecutor or a senior judicial police officer shall allow the defense counsel to have an interview with the suspect or shall allow the defense counsel to participate in the interrogation of the suspect, unless there is good cause.

63.     According to the Enforcement Decree of the Act on the Performance of Duties by Special Judicial Police Officers (Defense Counsel's Participation), special judicial police officers shall allow defense counsel to participate in the process of interrogation of suspect specified under the Criminal Procedural Act Article 243 section 2-1 unless there are good causes to deny such participation. Good causes may include obstruction of interrogation, revealing of investigative secret, etc. caused by defense counsel which could lead to adversely affect the investigation.

64.     When there is a request from a suspect under the section 1 of the Law, special judicial police should guide the applicant to submit written statement regarding the appointment of counsel prior to the counsel's participation. Even if the suspect applies under the section 1, special judicial police officer can interrogate the suspect without defense counsel's participation if the counsel fails to attend the interrogation after substantial period had passed or he/she is unable to attend. Special judicial police can restrict the defense counsel's participation when the police considers that counsel's participation can lead to the obstruction of interrogation or revealing of investigative secret, etc.

65.     It is evident that the criminal suspects can be denied access to their right to defense because of the arbitrary decision of judicial police. Police can claim that the counsel either obstructs interrogation or puts investigative secrets at risk. Current law provides room for a broad interpretation of the term "good cause".

66.     This issue was also raised by the UN Committee against Torture during the review of the Korea's 3-5th combined reports in 2017.

---

[24] NHRCK, "Recommendation for the promotion of inmates' human rights issued as a result of the 2018 survey in correctional facilities," 18Visit0001500, Jan.16, 2019
[25] Report of the 63 NGOs to the CAT, 60th session, 20/03/2017.

67.    The Committee remained concerned that persons deprived of their liberty do not enjoy the right to fundamental legal safeguards from the very outset of their detention, in particular in cases of urgent arrest conducted without a warrant. It was also concerned that detained persons may not: be informed of their right to remain silent, obtain a medical screening within 24 hours of arrest, be able to request and receive a medical examination by a qualified medical doctor within 24 hours of their arrival in a place of detention, have access to an independent doctor upon their request, be allowed to inform a family member or a person of their choice, be brought before a judge 48 hours after their arrest, and have access to legal counsel from the very outset of detention and during all stages of the proceedings against them, including for reasons of "good cause" established by the prosecution or police. It was further concerned that legal counsels' requests for participating in suspect interrogations are "mostly granted" and that a meeting between a detainee and a lawyer was recorded using closed circuit television[26].

**Overcrowding of detention facilities and living space provided to the inmates**

68.    As noted above, overcrowding and lack of adequate living space both for remand and sentenced prisoners in Korea has been a matter of serious concern for years. It is evident that the Korean prison system is experiencing systemic overcrowding and living space provided to prisoners falls far short of European standards, and in turn is the core reason for the wider systemic violation of the rights of prisoners. It goes without saying that prisons where prisoners are detained in such cramped conditions will always have associated chronic problems with material conditions, sanitary conditions, access to exercise, food quality, gang hierarchies, violence, among others.

69.    While the Korean authorities do not publish information on the established living space per inmate, rulings from the domestic courts, including the Constitutional Court provide important information. One of the landmark decisions delivered by the Constitutional Court of Korea directly relates to the problem of overcrowding in detention centers[27].

70.    In this case, the Constitutional Court held that the act of confining convicted prisoners in detention centre rooms that do not provide the minimum space required by a person (which in Korea is deemed to be 2.58 ㎡) infringes upon human dignity and worth, and thus violates the Constitution. In that case, which concerned detention at Seoul Detention Centre in late 2012 the space that was available for use per person during the time the male adult complainant was confined in the cell at Issue (measuring 8.96 ㎡, accommodating up to 6 prisoners) was 1.06 ㎡ for two days and 16 hours and 1.27 ㎡ for six days and five hours. Such space is insufficient for a Korean male adult of average height to comfortably stretch his limbs, and so small that one must lie on one's side to sleep. Thus, even considering the overall circumstances, such as the period the complainant was confined in the cell at Issue, and the time he spent outside of the

---

[26] CAT/C/KOR/CO/3-5
[27] Case on Overcrowded Detention Centres [2013Hun-Ma142, December 29, 2016]

cell at issue due to visits and exercise, the complainant could not maintain his minimum dignity as a human being, which was held to infringe upon the human dignity and worth of the complainant.

71.     The Concurring Opinion of the Four other Justices in this case provides that, in light of Article 10 of the Constitution which prescribes the inviolable dignity and worth of humans, the state   should secure a confinement space of at least 2.58 $\text{m}^2$ per each convicted prisoner within the correctional facilities to protect the convicted prisoner's human dignity and worth during confinement. Nevertheless, considering the practical difficulties with regard to expanding correctional facilities to meet this norm, they call for improvements to be made in line with the aforementioned criteria within a certain period (within five to seven years at the latest).

72.     This systemic overcrowding, and an increased number of complaints from prisoners placed in various detention centres, was the core reason for the NHRCK to conduct and ex officio investigation of the detention centres in October 2017. The Commission merged 25 complaints submitted by different prisoners and launched an investigation with a focus on prison overcrowding.

73.     The investigation report provides a detailed assessment of the detention centres investigated, as well as recommendations to tackle the overcrowding found there. According to the report, in December 2017, more than 80 percent of the institutions operated above its official capacity and the level of overcrowding in 12 facilities was above 130%. Occupancy rates of correctional facilities located near metropolitan area and large cities was reaching 124.3%.

74.     The report records that, by the end of December 2017, the actual number of prisoners in Korean prisons amounted to 55,198, exceeding the official capacity of 47,820 by 7,400. Out of those 55,198 inmates, 36,359 (66%) were provided less than 2.58 $\text{m}^2$ of living space.

75.     The NHRCK observed, inevitably, that when prisoners are accommodated in overcrowded cells, lacking sufficient living space, the majority are unable to exercise their other rights in practice. For example, due to overcrowding, the right of prisoners to receive and meet visitors from outside was cut from 30 minutes to 10 minutes per meeting. Consultation time with a doctor in the prison was also reduced to 1 minute and 20 seconds per treatment.

76.     According to the domestic regulations, inmates should be provided with access to outdoor exercise for at least for 1 hour per day. Due to overcrowding, exercise time was reduced to 30 minutes, and time allocated for showering was reduced to 20 minutes *per week*. On shower day, the exercise time was reduced further to 15 minutes.

77.     All of this has, as the NHRCK also observed, knock-on effects for prisoner discipline (and for consequent exposure to excessive and inhuman solitary confinement conditions and disciplinary punishments). Faced with grossly overcrowded cells, prisoner refuse to enter them. Prisoners are, according to the NHRCK, willing to risk punishment to avoid harsh living conditions. For example, in case of Daejeon prison, 272 cases of refusal to enter the cell and

assault cases related to the overcrowding and accounted for 39% of the total number of disciplinary punishments, while in Daegu detention facility the proportion of disciplinary sanctions for the same grounds reached 76%. In summer period the situation is further exacerbated due to heat in the cells.

78.    In 2021 the NHRC conducted another investigation and visited 10 prisons on 30 November 2021.[28] Main aim of the visits and investigation was to investigate the access of prisoners to medical care. The visits concerned prisons with most of the complaints on access to healthcare.

79.    The report produced by the NHRC provides that shortage of medical personnel in the prisons remains a big problem and general shortage amounts to 25 % with 89 Doctors out of 117 available posts. While out of 53 institutions, 25 have 1 doctor - 5 operate without any doctor. As of September 2021, 38 out of 52 correctional facilities did not have any specialists as regular employees and remaining 15 facilities had a total of 21 specialists as regular staff[29].

80.    Difficulty to recruit medical staff is largely related to low wages, which are not competitive. Considering increasing medical needs of prisoners in the future, the problems related to the lack of access to the medical care in prisons will become more severe.

81.    The report also provides that in recent years, due to the climate changes, Korean prisons in summer operated during extreme heat waves and in winter during cold waves. The report refers to Busan prison, where the inmates are provided living space of 1.74m2 per person and number of prisoners died during heat wave due to heart related problems. While in summer in prisons it was extremely hot, in winter it was very cold.[30]

82.    The authoritative study published in 2021[31] reveals serious shortcoming in the provision of healthcare in Korean prisons. More specifically the study confirms that compared to the general population, prisoners in Korea have higher prevalence of almost all physical and mental diseases, including hyperlipidemia (SPR, 20.18; 95% confidence interval [CI], 19.43 to 20.94), pulmonary tuberculosis (SPR, 9.58; 95% CI, 7.91 to 11.50), diabetes (SPR, 6.13; 95% CI, 5.96 to 6.31), cancer (SPR, 2.36; 95% CI, 2.07 to 2.68), and depression (SPR, 46.73; 95% CI, 44.14 to 49.43). When compared with the low-income population segment, higher prevalence was still found among prisoners for most diseases, including pulmonary tuberculosis (SPR, 6.39; 95% CI, 5.27 to 7.67) and depression (SPR, 34.71; 95% CI, 32.79 to 36.72).

83.    The study finds that prisoners are more likely to be unhealthy than the general population, even in comparison with a low-income segment of the general population in Korea.

---

[28] Busan Prison, Suwon Detention Center, Ulsan Detention Center, Chuncheon Prison, Jeonju Prison, Prison of Hope, Cheongju Women's Prison, Daejeon Prison, Gyeongbuk North 2nd Prison, Seoul Detention Center.
[29] NHRC Decision of the second Committee on infringement remedies, Recommendations to improve prisoners' rights based on the 2021 visit to the correctional facilities.
[30] Ibid.
[31] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8289480/

84.    Another finding that merits consideration is that the higher prevalence of disease among prisoners may be related to the medical environment of prisons. Although most of prisons in Korea provide 1 or more attending doctors inside the prison, there is a limited number of doctor-hours available per day to fill the demand; it is not easy for prisoners to get timely and appropriate medical care in prison. Prisoners usually have to wait for long times in queue before they can see a doctor, and sometimes their requests for healthcare services are rejected by prison officers if the symptoms do not seem to be severe. Further, when prisoners need to see a hospital doctor outside the prison for getting necessary medical treatment, waiting times may become even longer. This might negatively influence on prisoners' health by increasing stress, exacerbating the disease onset and ultimately increasing the severity of illness. This can be a crucial issue, particularly for prisoners with mental diseases requiring specialized services that cannot be attended to by general practitioner doctors in prison. This should be considered in the context of our findings that the prevalence of both major depression and schizophrenia was more than 40 times higher among prisoners than among the general population.

85.    In a recent extradition case, **Republic of South Korea v. Derek ONG, considered in the Westminster Magistrate's Court of England and Wales,** District Judge Rimmer ruled against the extradition of Mr. ONG to the Republic of Korea. The Judge considered that the Request for Derek Ong's surrender was, in his judgment, politically motivated, subject to oppressive delay due to passage of time, and incompatible with his ECHR Article 3 of the European Convention rights[32].

86.    More specifically, in respect of ECHR Article 3, the Judge accepted the written and oral arguments of the defence, which he found highly persuasive. In the opinion of the District Judge, the prison problems constituted by far the gravest Article 3 concern, although he did also find that Mr Ong may be deprived of legal advice during police interviews should Korea wish to question him afresh. He further found that there is potentially a life sentence available, which he considered grossly disproportionate to the type of financial crime alleged[33].

87.    The Judge noted that the problems with Korean prisons include, but may not be limited to, gross overcrowding in space routinely less than 3m2 per; inadequate material conditions; inhumane and degrading restraint; solitary confinement practices; and questionable medical treatment in terms of access and methodology. The Judge did not find the assurances presented before the court suffice to alleviate this court's concerns as to the real risk identified. The Requesting State has not discharged its burden, to the criminal standard, to dispel the doubts the Requested Person has amply raised. Nor did Korea's aspirations for the improvement of the prison estate bring comfort. The assurances are bland, generalised and largely comprise recitations of Korean law the Judge stated. Nor did consider that monitoring would assist. The Judge found that, on the evidence, there is no practical mechanism in place adequately to facilitate proper monitoring of the correctional facilities.[34]

---

[32] Republic of South Korea v. Derek ONG, Decision made on 4 October 2022, Westminster Magistrate's Court of England and Wales.
[33] Ibid, Paragraph 654.
[34] Ibid, Paragraph 655.

88.    The judge accepted the submissions of the defence to the extent that it is a matter of judicial discretion as to whether to make a detailed Aranyosi request to seek further assurances. He was persuaded, for the reasons he has argued, that I should not do so. The Requesting State has had adequate opportunity already, over the protracted history of this case, to supply meaningful assurances. The Judge found the assurances inadequate in light of Mr Tugushi's stark and compelling evidence, all of which is based on source material available to the Requesting State, and relevant to the assurances that have already been sought from the Republic of Korea.[35]

**Main Risks and Concerns**

89.    The concluding observations of the UN Committee against Torture (CAT), UN Human Rights Committee (HRC), the reports of the National Human Rights Commission of Korea (NHRCK), Recent Judgement from the Westminster Magistrate's Court as well as other credible sources, all confirm that access to a lawyer for detained persons is an issue,  living conditions in prisons of the Republic of Korea remain substandard, with overcrowding and lack of sufficient living space being a systemic issue, application of excessive solitary confinement being a serious problem, excessive application by prison guards of means of restraints to punish inmates as well as lack of access to timely medical care raising serious concerns as well.

90.    Considering the investigation reports of the NHRCK the risk of being subjected to the inhuman and degrading treatment in the Korean prison system is rather high. Minor omission or violation of the rules can become the reason for the ill-treatment of the person concerned. Correctional Rapid Patrol Teams operating in Korean penitentiaries (CRPT) frequently use excessive force and apply coercive means in the form of the so-called "three-piece-set" which is simultaneously applied on the ankle, wrist, and head. In addition, there are documented cases when restrained prisoners wear this equipment for excessive periods of time. Prisoners from several detention facilities have complained of the humiliation imposed when defecating while wearing protective equipment. Inmates are compelled to defecate in the suit at night, and then must wait all night to wash up because the prisoners cannot take it off immediately to change their clothes.

91.    Lengthy solitary confinement is practiced in Korean prisons, which can last a few years, in gross violation of all established international norms and standards related to the imprisonment and rights of the prisoners.

---

[35] Ibid, paragraph 656.

92.     In addition, the NHRC, as a result of its investigations has documented serious problems with air temperature inside prison cells (cold in winter, overheat in summer).

93.     As a result of this overcrowding a significant number of prisoners experience inhuman and degrading conditions, and risk being subjected to lengthy solitary confinement on disciplinary grounds. As multiple reports indicate, disciplinary proceedings also fall short of international standards and frequently are considered as unfair and excessive. The NHRCK notes that prisoners frequently violate the rules, refusing the enter overheated overcrowded cells and subject themselves to disciplinary sanctions.  Within the cells, in the likely event of minor incident or a conflict with another inmate, Mr. Lee risks being restrained and put into lengthy isolation in inhuman and degrading conditions.

94.     As mentioned above, Mr. Lee in case of detention, will most probably stay in Seoul Detention Centre. He might be also detained in the Incheon Detention Center. If convicted and sentenced to imprisonment he will most probably stay in the same place until the judgement becomes final. According to the data from 30 September 2020, Seoul Detention Centre has numerous problems identified above. It operates significantly above its official capacity. The Seoul Detention Centre on 30 September 2020 held 2564 inmates when its official operational capacity stood at 2210 places and Incheon Detention Center for the same date held 2062 inmates with an official capacity of 1580 places (density 130.5%).

95.     Thus, Seoul and Incheon Detention Centers as a possible place for the imprisonment of Mr. Lee, both are seriously overcrowded. Recalling that the capacity figures are measured against a Korean norm of 2.58m2 living space per inmate in a multi occupancy cell, both prisons are not even providing that (substandard space) in practice. The NHRCK overcrowding investigation report from December 2017 confirms that the majority of prisoners in Korea are accommodated in these overcrowded facilities and living space provided falls systematically below 2.58m$^2$.  This runs against minimum international standards, and detention of a person in the living space below 3 m2 is considered inhuman and degrading.

96.     As described above, as a direct consequence of overcrowding, and even if he is able to avoid confrontation and disciplinary sanction in the crowded cells, Mr. Lee also faces being deprived of, among other things, adequate visiting rights (10 minutes per day), outdoor daily exercise (30 minutes per day, 15 on shower day) and hygiene (shower 20 minutes per week).

97.     Mr. Lee and his counsel reasonably fear that because of the on-going legal disputes related to the Lone Star as well as other issues related to his case, the risk of subjecting him to inhuman and degrading treatment by the investigation bodies in the form of undue pressure and harsh interrogation techniques is, particularly high.

98.     Finally, as I am informed Mr. Lee in October 2023 suffered from the myocardial infraction (heart attack) as a result of which he was hospitalized.  He underwent quadruple bypass surgery and had to remain under the supervision of the doctors. It goes without saying that placement of Mr. Lee in the overcrowded detention facility, in the overheated cell, might negatively affect

his health. Considering his condition and systemic problem of timely access to specialized care in the prisons of Korea, the risk of his health deteriorating is very high.

99.    I have noted above that various reports indicate that the right to healthcare and medicine in correctional facilities in Korea is not adequately guaranteed, excessive time is required to receive outside treatment, there is a lack of medical personnel, and healthcare for inmates with mental illness and emergency medical needs during night and holidays is limited.

100.   Should Mr. Lee require medical care, there is a significant risk that he will not be provided such care timely. Considering his recent health problems, his incarceration combined with lack of access to timely medical care might be life-threatening.

101.   Based on the issues raised Above, in case of detention on remand as well as in case of conviction, Mr. Lee risks being subjected to treatment in violation of international standards enshrined in the UN Standard Minimum Rules on the Treatment of Prisoners (Mandela Rules) and rights protected under UN Convention against Torture (CAT) and International Covenant on Civil and Political Rights (ICCPR).

George Tugushi

October 14, 2023